## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In re: **ENGINEERED PROPULSION SYSTEMS, INC.,**

Debtor.

Case No. 20-11957-gmh

Chapter 11

## MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO SELL ALL OF ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) APPROVING BID PROCEDURES; (III) APPROVING DATES AND DEADLINES RELATING TO THE DEBTOR'S SALE PROCESS; AND (IV) GRANTING RELATED RELIEF

Engineered Propulsion Systems, Inc. (the "Debtor" or "EPS"), as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), by its counsel, James D. Sweet and Virginia E. George of Steinhilber Swanson LLP, hereby moves the Court for an order: 1) authorizing the Debtor to sell substantially all of its assets in the manner more fully set forth below; 2) approving the proposed Bid Procedures that will govern the sale process; 3) establishing dates and deadlines related to the sale process; and, 4) granting related relief (the "Motion"). In support of this Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Fed. R. Bankr. R. 5005.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue of the Chapter 11 Case and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

4.      The Debtor consents, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

5.      The relief sought in this Motion is based upon sections 105(a), 363, 363(b), 363(f), 363(m), 541, and 554(a) of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 2002(a)(2), 4001, 6004 and 6004(h).

## BACKGROUND

### General Background

6.      The petition commencing the Chapter 11 Case was filed on July 29, 2020 (the "Petition Date").

7.      The Debtor is authorized to continue to operate its business and manage its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No trustee, examiner or statutory committee of creditors has been appointed in the Chapter 11 Case.

9.      The Debtor proposes to sell all of its assets (the "Property"), pursuant to the terms of an asset purchase agreement (as amended from time to time, the "APA"), the form of which is attached hereto as **Exhibit A**, with EPS Engineered Propulsion Systems, Inc. (the "Buyer"), for a price comprised of payment or assumption of secured debt, a credit bid, and the assumption of obligations under executory contracts to be assumed by the Buyer in the estimated sum of $1,400,520.

10.     Despite the similarity of the Buyer's name to EPS, the Buyer is not an affiliate, subsidiary or otherwise related to EPS; however, the Buyer is a creditor of EPS.  The Buyer is the lender under the Working Capital Loan (as defined below) and the Buyer holds Convertible Notes (as defined below) in the outstanding principal amount of $12,329,820, and with a value as of the Petition Date of $13,871,305.22.  In addition, pursuant to that certain *Debtor-in-Possession Credit Agreement* dated as of July 31, 2020 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof the "DIP Credit Agreement," together with the schedules and exhibits attached thereto, and all agreements, documents, instruments and amendments executed and delivered in connection therewith, the "DIP Documents"), and various orders entered by the Court, the Buyer is lender under EPS's senior secured post-petition facility pursuant to which it obtained post-petition financing from the Buyer in the amount of not less than $2,500,000 (the "DIP Loan"), which amount may be subject to adjustment, depending upon the timing of the approval of the sale.

**Company and Product Background**

11.     EPS was formed in 2006 by Michael Fuchs ("Mr. Fuchs") and Steven Weinzierl ("Mr. Weinzierl").

12.     EPS has a current workforce of approximately nineteen (19) full-time and five (5) part-time employees, including Mr. Fuchs and Mr. Weinzierl.

13.     Both Mr. Fuchs and Mr. Weinzierl were engine designers who were working in the automotive industry.

14.    They felt strongly that airplane engines needed to be rethought from the ground up and built on state-of-the-art clean diesel technology.

15.    They were confident that they could radically redesign the airplane engine and revolutionize the general aviation market.

16.    As a result, EPS was formed to pursue these goals.

17.    Over the intervening years, EPS worked with a small, hand-picked team of engineers that were top-notch in the business and created an entirely new aircraft engine design.

18.    In the process, EPS also patented a number of unique technological advancements.

19.    The new engine EPS designed was reconfigured specifically for airplane installation, was designed to optimize propeller rotation, and was more efficient that its predecessors while greatly increasing ease of pilot operation.

20.    EPS did its best not to rely on outside consulting over which it had no control to produce the parts to specifications.

21.    To ensure production quality and maintain competitive costs, EPS decided it would manufacture its new engine in-house.

22.    In 2011, with the proof-of-concept design completed, EPS began to line up suppliers and production partners, including Bosch General Aviation Technology, a subsidiary of Robert Bosch GmbH ("Bosch").

23.    Additionally, to ensure that manufacturing remained strong in America, the majority of the new engines were built at EPS's headquarters in New Richmond, Wisconsin, keeping jobs and growing business for workers in the area.

24.     In addition to developing a new diesel engine, EPS has also developed an innovative heavy fuel-based (Diesel or Jet fuel) piston engine propulsion system for the general aviation and drone market in the 385hp and 8-cylinder class as a drop-in replacement for existing propulsion systems.

25.     EPS's system burns fifty percent less fuel in climb/take off configuration and thirty percent less during cruising altitude, utilizing a worldwide available fuel.

26.     EPS is approximately nine months away from reaching FAA Type-certification/Production-certification according to its electronic engine control unit ("EECU") hardware and software supplier, Bosch, and the FAA.

### Pre-Petition Operational Developments Leading to the Filing

27.     Recently, EPS fulfilled government contracts with the United States Air Force relating to the development and demonstration of a smaller, 200hp, 4-cylinder version of its new engine as a potential alternative propulsion system for drones, such as the GA Reaper.

28.     As an Aerospace Manufacturer and Department of Defense ("DoD") Contractor, EPS is deemed to be "essential" by the DoD and the State of Wisconsin and is currently operating while taking all precautions related to the COVID-19 pandemic.

29.     EPS has office, manufacturing, assembly, and testing facilities in New Richmond, WI.

30.     EPS Engineered Propulsion Systems GmbH is a wholly owned subsidiary of EPS, that is located in Germany, and that operates out of its office facility in Burscheid near Cologne.

31.     Bosch, as the EPS's EECU and engine control software primary supplier and development partner, experienced delays early summer of 2019, resulting in multiple schedule misses and cost increases.

32.     EPS is the first company in half a century to introduce a new, ground-up developed (clean sheet design) Diesel engine with an Electronic Control System submitted to the Federal Aviation Administration ("FAA") for Type-Certification.

33.     Although the FAA has well established rules for existing technologies and processes, the organization is challenged in regard to innovations, especially by industry newcomers.

34.     This institutional challenge has resulted in prolonged discussions and decision-making processes at the FAA.

35.     Normal iterations in design improvements which appeared sound in principle were revealed in application testing to be detrimental to engine life.

36.     These test results required additional interactions with the FAA, along with subsequent design revisions, to address these issues.

37.     Additionally, COVID-19 has disrupted normal chains of communication and workforce participation, both for EPS and the FAA; especially in how the two entities worked together, and how the European personnel worked with the personnel in the United States.

38.     COVID-19 has drastically altered the investment strategies of potential investors relating to research and development projects, as other projects involving actual products already created became available for investments.

39.    Projects, such as those being pursued by EPS in the development stage, became much less attractive investments, leading to an increase in the time required of EPS to secure adequate funds to complete the project.

40.    The recent string of Boeing 737 Max incidents also led to a complete change of interactions between EPS and the FAA.

41.    Specifically, the FAA pulled many approval processes in-house and took them away from embedded Designated Engineering Representatives ("DER's"), and added layers of new oversight to various projects, resulting in schedule slippage and cost increases, although in the end, no substantive changes were implemented as a result of this enhanced oversight.

42.    Changes in oversight procedures at the FAA resulted in an attempt by the FAA to apply higher levels of Design Assurance to the EECU and software than are required by existing guidance or regulation.

43.    This additional oversight activity required nine months to resolve.

44.    As a result of the events discussed above, the larger note holders and shareholders of EPS could not find common ground in addressing the need for additional investments, which resulted in gridlock among these entities concerning subordination to larger or newer investments.

### Prepetition Loans and Security Interests

45.    As of the Petition Date, the Debtor owed approximately $23,540,430.56 in outstanding debt, comprised of: (a) secured loans (collectively, the "FNCB Loans") from First National Community Bank ("FNCB"), (b) a secured loan (the "WI Loan") from the Wisconsin Economic Development Corporation, administered by the

Wisconsin Department of Administration (the "WI Lender"), (c) a loan secured by a purchase money security interest in certain equipment (the "USBEC Loan") from U.S. Bank Equipment Finance ("USBEC"), (d) several tranches of secured funding from the parties-in-interest listed on **Exhibit B** hereto (collectively, the "Convertible Note Holders"), whose financings were made in the form of convertible secured promissory notes (collectively, the "Convertible Notes"), and, (e) a $250,000.00 secured loan (the "Working Capital Loan") from the Buyer (in such capacity, the "Working Capital Lender") for pre-petition working capital purposes.

46.    The FNCB Loans are evidenced by various notes and security agreements (collectively, the "FNCB Loan Documents") that generally describe purchase money loans made to EPS for the purchase of essential development and production equipment.

47.    As of the Petition Date, the aggregate outstanding principal balance of the FNCB Loans is $1,415,462.64.

48.    The FNCB Loans were used to finance the Debtor's purchase of machinery, equipment and facilities for its business, and the FNCB Loans are secured by first priority: (a) purchase money security interests on and liens in certain machinery, equipment and supplies, and, (b) security interests on and liens in all of the Debtor's other assets, including without limitation, Cash Collateral (collectively, the "Prepetition Collateral").

49.    The WI Loan is evidenced by an Amended Promissory Note and

corresponding security agreement, dated November 16, 2016 (the "WI Loan Documents").

50.    As of the Petition Date, the aggregate outstanding principal balance of the WI Loan is $253,691.51.

51.    The WI Loan was used to finance the Debtor's purchase of machinery, equipment, and supplies for its business, and is secured by a second priority security interest in and liens on the Prepetition Collateral.

52.    The USBEC Loan was used to finance the Debtor's purchase of specific equipment and is secured by a purchase money security interest in such equipment.

53.    As of the Petition Date, the aggregate outstanding principal balance of the USBEC Loan is $71,000.

54.    The Convertible Notes are evidenced by various notes, purchase agreements, and other documents, including security agreements.

55.    The Convertible Notes, enjoy differing lien priorities on the Intellectual property of the Debtor (the "IP"), as described more particularly on **Exhibit B**.

56.    As of the Petition Date, however, the aggregate outstanding principal balance of the Convertible Notes is $21,511,666.60.  The Buyer, as ultimate assignee of Windecker PA Power, LLC and Alite GmbH, holds Convertible Notes in the aggregate principal and interest amount of approximately $13,871,305 (as of the Petition Date).

57.    Based on the amount being offered by the Buyer, it does not appear the

Convertible Note Holders, regardless of priority, will participate in any dividend as a result of the proposed sale.

58.    On July 27, 2020, the Debtor obtained the Working Capital Loan from the Working Capital Lender in contemplation of the chapter 11 filing.

59.    The Working Capital Loan is evidenced by a Fixed Rate Note dated July 27, 2020 and a security agreement.

60.     As of the Petition Date, the outstanding principal balance of the Working Capital Loan was $250,000.00.

61.    The Working Capital Loan is secured by a security interests in and liens on the Prepetition Collateral and has since been rolled into the DIP Loan.

## Marketing and Sale Process

62.    Prior to the Petition Date and continuing to the present, the Debtor, with the assistance of its professionals, engaged in the process of exploring a sale of some or all of its equity interests or its physical assets, but until recently, this has focused primarily the sale of its equity interests.

63.    In 2011, EPS began to sell common stock to finance its operations.

64.    Initially, it received investments in relatively small amounts from so-called "angel investors".

65.    This stock capitalization plan sustained the company through three rounds of stock sales, again to relatively small investors.

66.     EPS's management and board had always hoped, and had attempted to find, that "one" larger investor that could carry it through to FAA certification process and completion, but that investor never appeared.

67.     Over the ensuing years, EPS even engaged a handful of licensed investment firms in order to attempt to find larger investors.

68.     EPS's management and board also spent a great deal of their own time working to find investors.

69.     In pursuit of such investment, they attended heavily attended trade shows, such as the world-famous EAA in Oshkosh, Wisconsin.  But their success in locating investors was hit and miss at best.

70.     As time passed, investors also began to demand alternative forms of investment, such as "secured, convertible promissory notes" (discussed below).

71.     This requirement significantly complicated the capital structure and caused the balance sheet to become quite unattractive to potential investors.

72.     As noted above, EPS has issued millions of dollars of Convertible Notes, which created working capital for EPS.

73.     The sale of the Convertible Notes began in February 2014 and continued over a period of 6 years until the last batch were sold in February 2020.

74.     In early 2020, it became obvious to the EPS board that there were no additional buyers for its Convertible Notes, and that either a major equity or debt infusion would be needed, or the company would be need to be sold.

75.     In 2018 and 2019, EPS did have some significant interest from one large private equity fund; but after months of due diligence and negotiations, the potential investor decided not to invest.

76.    That process left EPS in a very difficult financial situation.

77.    Multiple suitors were sought by the board members, but none appeared until one of the major Convertible Note holders and a board member proposed to purchase the assets of EPS through a bankruptcy sale that involved a major cash infusion to bridge EPS's financial needs until FAA Type-Certification could be achieved.

78.    After almost a month of negotiations and discussions with the potential buyer's counsel, the potential buyer withdrew his interest in EPS.

79.    But the financial pressure on EPS only intensified with this failed sale behind it.

80.    Beginning mid-June 2020, EPS and the Buyer commenced (and have continued to undertake) good faith discussions regarding the potential purchase of EPS.

81.    The EPS board is not aware of other potential buyers ready to make a stalking horse bid but is aware of other potential bidders should this Motion be approved authorizing the sale process.

82.    Various members of the board continue the process of searching for interested buyers even as this sale process gets underway.

83.    And, the board has agreed to hire TrueNorth Capital Partners, LLC as its investment banker to assist EPS to run its sale process, subject to this Court's approval.

## The Proposed Sale

84.    EPS's management and board have approved the APA.  The Buyer has agreed to serve as the stalking horse bidder for the Property, subject to an auction and

sale process pursuant to which the Debtor can select the highest or otherwise best offer as determined in its business judgment.

85.    The terms of the sale under the APA are sophisticated and complicated, but may be summarized as follows:

a)    <u>Assets</u>:    The Property consists substantially all of EPS's assets, whether tangible or intangible; whether choate or inchoate; and whether present or future, except as noted in the APA.  There are no material assets exempted from the foregoing list.

b)    <u>Liabilities</u>:    But for notable exceptions, set out below, none of EPS's debts or obligations will be assumed or undertaken as part of the Buyer's offer in the APA.

c)    <u>Purchase Price</u>:    The purchase price has several specific components that add, in the aggregate, to the total price being offered for the Property:

i.    A credit bid of up to the full amount of all obligations under the DIP Loan and the Convertible Notes owed to the Buyer (as of the closing of the proposed sale) pursuant to section 363(k) of the Bankruptcy Code, which, as of the date of this Motion is equal to the aggregate principal amount of approximately $14,829,820 (as of the Petition Date), <u>plus</u> accrued interest, fees and expenses, based on the following: (y) obligations under the DIP Loan, comprised of principal in the amount of not less than $2,500,000 (as of the date of the projected closing date) (which amount may be subject to revision upward depending upon the date of closing), <u>plus</u> accrued interest, fees and

expenses, and (z) obligations owed to the Buyer (as ultimate assignee of Windecker PA Power, LLC and Alite GmbH) under the Convertible Notes in the aggregate principal amount of approximately $12,329,820, plus accrued interest, fees and expenses;

ii.    Assumption or payment in full of all amounts owed by the Debtor to FNCB under the FCNB Loans;

iii.    Assumption or payment in full of all amounts owed by the Debtor to WI Lender under the WI Loan;

iv.    Assumption or payment in full of all amounts owed to USBEC; and,

v.    Assignment of all executory contracts assumed by the Buyer, along with payment of all amounts necessary to cure defaults under such assumed executory contracts, subject to the cure amount CAP (as defined in the APA).

86.    Section 363(k) of the Bankruptcy Code grants the holder of a secured claim the right to bid at the sale of property subject to its lien and "offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  "It is well settled among district and bankruptcy courts that creditors can bid the full-face value of their secured claims under § 363(k)."  In re SubMicron Sys. Corp., 432 F.3d 448, 460 (3d Cir. 2006).  Credit bidding serves the purposes of providing a "safeguard for secured creditors, by insuring against the undervaluation of their collateral at an asset sale." In re Aeropostale, Inc., 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016).

## The Bid Procedures

87.    The Debtor proposes to conduct the sale process pursuant to the procedures and timelines set forth on Exhibit C (the "Bid Procedures"), which will govern the sale process relating to the final approval of a sale and a buyer.

88.    The Bid Procedures have been agreed upon by the Buyer and EPS.

89.    The Debtor reserves the right to modify the Bid Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtor, in consultation with their advisors, counsel to the Buyer and any official committee appointed in the Chapter 11 Case (collectively the "Consultation Parties"), as it deems appropriate to maximize value for EPS's estate and creditors.

90.    The Debtor believes that conducting a sale process for the Property according to the proposed timeline will produce a fair and robust auction and will provide its estate with the best opportunity to maximize the value of the Property.

**WHEREFORE,** the Debtor respectfully requests that the Court enter orders:

A.    Approving the Bid Procedures;

B.    Authorizing, subject to the holding of a final hearing in the event of an objection by any party in interest, the Debtor to sell all of its assets as more specifically described in the APA, free and clear of all liens, claims, interests and encumbrances; and,

C.    Granting such other and further relief as the Court may deem just and equitable.

Dated this 15th day of October, 2020.        **STEINHILBER SWANSON LLP**

By:    */s/ James D. Sweet*
          James D. Sweet
          Virginia E. George
          Eliza M. Reyes
          Attorneys for the Debtor
          122 W. Washington Ave., Suite 850
          Madison, WI 53703-2718
          Tel: (608) 630-8990; Fax: (608) 630-8991
          jsweet@steinhilberswanson.com
          vgeorge@steinhilberswanson.com
          ereyes@steinhilberswanson.com

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**dated as of October 15, 2020,**

**by and between**

**EPS Engineered Propulsion Systems, Inc.,**

**as the Buyer**

**and**

**Engineered Propulsion Systems, Inc.,**

**as the Seller**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of October 15, 2020, by and between EPS Engineered Propulsion Systems, Inc. (together with its successors, designees and assigns, the "Buyer") and Engineered Propulsion Systems, Inc., a Delaware corporation (hereinafter referred to as the "Seller" or "EPS," and together with the Buyer, the "Parties," and each, a "Party").

## RECITALS

**WHEREAS**, the Seller is engaged in the business of research and development, as well as the design and engineering of aviation propulsion systems (the "Business") and is operating the Business as "debtor-in-possession" under chapter 11 bankruptcy proceedings (the "Chapter 11 Case") filed on July 29, 2020 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Wisconsin (the "Court"), in Case No. 20-11957;

**WHEREAS**, the Buyer is a Delaware corporation;

**WHEREAS**, the Buyer desires to purchase the assets of the Business for the purpose of engaging in the same business as was operated by the Seller prior to this sale, and the Seller desires to sell and transfer to the Buyer the assets of the Business, all as described herein, pursuant to Section 363(f) of the Code (as defined below);

**WHEREAS**, the Buyer is not offering to purchase any assets not identified in this Agreement, all of which shall remain with the Seller;

**WHEREAS**, the Buyer holds secured promissory notes and other related documents issued by the Debtor prior to the Petition in the aggregate principal amount of approximately $12,329,820 plus accrued interest, fees and expenses (the "Note Holder Obligations");

**WHEREAS**, prior to the Petition Date, the Buyer (in such capacity, the "Working Capital Lender") provided a working capital loan (the "Working Capital Loan") to the Seller in the original principal amount of $250,000, which was rolled into the DIP Loan (both as defined below); in accordance with the DIP Order;

**WHEREAS**, on July 31, 2020, the Parties entered into a debtor-in-possession credit facility, pursuant to which the Buyer (in such capacity, the "DIP Lender") agreed to provide a secured super-priority debtor-in-possession loan facility to the Seller pursuant to the DIP Order and the DIP Loan Documents (as defined below);

US_145152957v13

**WHEREAS**, the Seller intends to seek entry of the Sale Procedures Order (as defined below) by the Court upon the terms and subject to the conditions set forth herein and in the Sale Procedures Order;

**WHEREAS**, the Seller intends to seek entry of the Sale Order by the Court approving this Agreement and authorizing the Seller to consummate the Contemplated Transactions (as defined below) upon the terms and subject to the conditions set forth herein and in the Sale Order;

**WHEREAS**, the board of directors or other applicable governing body of the Seller has determined that it is advisable and in the best interests of the Seller's estate and the beneficiaries of such estate to consummate the Contemplated Transactions provided for herein pursuant to the Sale Procedures Order and the Sale Order and has approved this Agreement, subject to higher and better offers as contemplated by the Sale Procedures Order; and,

**WHEREAS**, the Contemplated Transactions are subject to the approval of the Court, subject to higher and better offers as contemplated by the Sale Procedures Order and will be consummated only pursuant to the Sale Order to be entered by the Court.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual agreements and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and subject to the approval of the Court under such procedures and according to such timing as the Court may direct, the Buyer and the Seller hereby agree as follows:

<u>**ARTICLE I**</u>

<u>**PURCHASE AND SALE OF ASSETS**</u>

1.1    <u>Defined Terms</u>.  Capitalized terms used herein have the meanings set forth in <u>Section 6.1</u>, hereof.

1.2    <u>Purchased Assets</u>.  Pursuant to Sections 105, 363 and 365 of the Code, subject to the terms and conditions of this Agreement, and in reliance upon the limited representations, warranties, covenants and agreements made in this Agreement by the Seller and the Buyer, the Buyer hereby agrees that it shall purchase, accept and acquire from the Seller, at the Closing, and the Seller shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing, the following assets, properties, both real and

personal, of the Businesses, whether tangible or intangible, and located as described below (the "Purchased Assets"):

(a)     all raw material inventories of whatever kind, including, without limitation, supplies and accessories used in the Business and that are located in, or awaiting to be moved from Mojave, California to, New Richmond, Wisconsin, that are owned by the Seller as of the date of the Closing, including all rights of the Seller to receive such raw material inventories (the "Inventories");

(b)     the equipment, furniture, appliances, industrial artwork, computers, computer terminals and printers, telephone systems, telecopiers and photocopiers, office supplies and office equipment, factory machinery and equipment, tools, all materials handling and plant vehicles, fixtures, leasehold improvements and all other tangible personal property of every kind and description which is owned or leased by the Seller (hereinafter, the "Equipment"), more specifically listed on Schedule 1.2(b) hereto;

(c)     those contracts, leases, subleases, arrangements, commitments and other agreements of the Seller, including, without limitation, customer agreements, vendor agreements, purchase orders, sales orders, installation and maintenance agreements, hardware lease or rental agreements, and other arrangements and understandings related to the Business as are designated by the Buyer within five days after the approval by the Court of this Agreement, and that are subject to the provisions of Sections 1.3, 2.3, and 5.3, below;

(d)     all work in progress of the Business, in whatever stage of completion and wherever located (the "Work-in-Progress") as of the date of the Closing, as further described in Schedule 1.2 (d);

(e)     all Intellectual Property, domain names, and all goodwill associated with the Business, as more specifically described on Schedule 1.2(e), along with all associated licenses and sublicenses granted and obtained with respect thereto and rights thereunder, remedies against infringements thereof and rights to protection of interests therein under the laws of all jurisdictions and all rights under any confidentiality agreements executed by any third party for the benefit of the Seller to the extent relating to the Purchased Assets and/or Assumed Liabilities;

-3-

(f)  to the extent legally transferrable, all qualifications, registrations, filings, privileges, immunities, certifications, accreditations, consents, licenses, permits, authorizations and approvals of Governmental Entities and non-Governmental Entities, which are used or required authorizing the Seller to own and operate the Business, including, without limitation, all certificates of occupancy and certificates, licenses and permits relating to zoning, building, housing, safety, Environmental Laws, fire and health (the "Permits");

(g)  all Records of the Business, except for Records that are expressly deemed Excluded Assets, subject to the access provisions of Section 5.9, below;

(h)  all sales, marketing and development and expansion plans, strategic plans, projections, studies, reports and other documents and data (including, without limitation, creative materials, advertising and promotional matters, websites, and current and past lists of customers, suppliers, vendors and sources), and all training materials and marketing brochures related to the Business;

(i)  all of the Seller's rights and remedies on and after the Closing Date, under warranty or otherwise, against a manufacturer, vendor, supplier, contractor, or other Person for any defects in any Purchased Asset and/or Assumed Liabilities;

(j)  all causes of action, choses in action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of the Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) and rights of recovery with respect to any of the foregoing, including all estate augmentation rights granted to the Seller under chapter 5 of the Code;

(k)  all stock ownership in all subsidiary corporations, both foreign and domestic, and all rights and responsibilities that appertain thereto;

(l)  all cash, cash equivalents, bank deposits and similar cash items of the Seller;

(m)  all Accounts Receivable of the Seller as of the Closing;

-4-

(n)    without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of the Seller;

(o)    all rights of the Seller under any non-disclosure or confidentiality, noncompete, or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of the Seller to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(p)    the amount of, and all rights to any, insurance proceeds received by the Seller after the date hereof in respect of (i) the loss, destruction or condemnation of any of the Purchased Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(q)    all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by the Seller; and,

(r)    all other assets that are related to or used in connection with the Purchased Assets or the Business.

All assets owned by the Seller that are not included within the list of Purchased Assets shall remain the assets of the Seller after the sale contemplated hereby is closed (the "Excluded Assets"). For the avoidance of doubt, "Excluded Assets" shall include, without limitation, (i) all testing and analytical data and files generated out of or in connection with the Seller's three prime contracts with the United States Air Force and (ii) the V8 and 4-cylinder engines developed by the Seller and delivered to the United States Air Force in connection therewith.

1.3    Assumption of Assumed Liabilities. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts that are assumed by the Buyer after the Closing, such later date of assumption), the Buyer shall assume from the Seller, and the Seller shall irrevocably convey, transfer, and assign to the Buyer, the Liabilities under contracts, notes, and for employee obligations assumed by the Buyer that are specifically listed on Schedule 2.2 (the "Assumed Liabilities"), and as further provided in Sections 5.3 and 5.4, hereof; provided, however, that the Buyer shall not be obligated to assume or pay any Cure Amounts with respect to the Assumed Contracts in excess of the Cure Amount Cap.

US_145152957v13

1.4    <u>Excluded Liabilities</u>. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that the Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of the Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").  For the avoidance of doubt, "Excluded Liabilities" shall include, without limitations, any Liabilities, debts or obligations of the Seller of any kind whatsoever, that is in existence at the time of the Closing, whether actual, contingent, accrued, known or unknown, including, without limitation, any relating to interest-bearing debt, interest and termination penalties on indebtedness, taxes, employee compensation, severance, pension, profit-sharing, health insurance, disability insurance or other employee benefit plans and programs, worker's compensation, breach or negligent performance of any contract, or breach of warranty relating thereto, Liabilities resulting from breach of contract, torts (including, without limitation, product liability claims), illegal activity, unlawful employment or business practice, infringement of intellectual property rights, claim for environmental liability or remediation or any other Liability or obligation whatsoever.  All such non-assumed Liabilities, debts and obligations shall remain the responsibility of the Seller which shall pay and discharge the same when and as due and shall be restricted as liability against the Seller under Section 363(f) of the Code.

## ARTICLE II

## PURCHASE PRICE

2.1    <u>Closing</u>.  The closing (the "<u>Closing</u>") of the purchase and sale of the Purchased Assets shall take place on or before five days following the entry of a Final Order of the Court approving the sale by Seller to Buyer (the "<u>Closing Date</u>"), at the offices of Steinhilber Swanson LLP, or at such other time and place and manner, including remotely by electronic exchange of counterpart signature pages, as may be mutually agreed to by the Buyer and the Seller.

2.2    <u>Payment of the Purchase Price</u>.  The aggregate purchase price (the "<u>Purchase Price</u>") for the Purchased Assets shall be composed of the following:  (a) the Credit Bid, (b) assumption by the Buyer of the Assumed Liabilities, (c) assumption or payment in full of the Seller's obligations (the "<u>FNCB Obligations</u>") owed to First National Community Bank ("<u>FNCB</u>") as of the Closing Date, (d) assumption or payment in full of the Seller's obligations (the "<u>WEDC Obligations</u>") owed to the Wisconsin Economic Development Corporation ("<u>WEDC</u>") as of the Closing Date, and, (e) assumption or payment in full of the Seller's obligations (the "<u>USBEF</u>

-6-

Obligations") owed to US Bank Equipment Finance ("USBEF") as of the Closing Date. The Purchase Price shall be satisfied at the Closing as to (i) the Credit Bid, by causing (x) the DIP Lender to acknowledge satisfaction of the DIP Obligations and (y) the Buyer to acknowledge satisfaction of such portion of the Note Holder Obligations covered by the Credit Bid, and to release all guarantees of the security interests and liens on the Purchased Assets securing the DIP Obligations (collectively, the "Credit Bid and Release"), (ii) the Assumed Liabilities described in Schedule 2.2, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements, (iii) the FNCB Obligations, by assuming such obligation through one or more Assignment and Assumption Agreements or by causing FNCB to acknowledge satisfaction of the FNCB Obligations, (iv) the WEDC Obligations, by assuming such obligation through one or more Assignment and Assumption Agreements or by causing WEDC to acknowledge satisfaction of the WEDC Obligations, and (v) the USBEF Obligations, by assuming such obligation through one or more Assignment and Assumption Agreements or by causing USBEF to acknowledge satisfaction of the USBEF Obligations.  As additional consideration for the Purchased Assets, the Buyer will take all steps necessary to undertake responsibility for the Assumed Liabilities.

2.3     Pre-Closing Deliveries by Buyer; Assumed Contracts and Leases.

(a)     Schedule 2.3(a) sets forth a list of all executory contracts and unexpired leases to which the Seller is a party.  Prior to the Sale Hearing, the Buyer shall deliver to the Seller, in writing, a complete list of the executory contracts and unexpired leases to which the Seller is a party, which the Buyer wishes for the Seller to assume and assign to the Buyer under Section 365 of the Code (the "Assumed Contract List").

(b)     The Seller may assume or reject any executory contracts and unexpired leases not so identified in the Seller's discretion.

(c)     Within a reasonable time following the receipt of such list, the Seller shall take all reasonable and necessary steps to file and pursue the assumption and assignment of the contracts and leases set forth on the Assumed Contract List to the Buyer, and to undertake such negotiations with the relevant contract counterparties, including any landlords, to effectuate the assumption and assignment of such contracts to the Buyer.

(d)     The Closing shall not be contingent upon the assumption and assignment of such contracts and leases; it being the duty of the Seller to use its best efforts to assume and assign such contracts and leases.  Notwithstanding the foregoing, in the event the Seller is unable to assign such contracts and

leases to the Buyer pursuant to an order of the Court, then the parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from third parties necessary to assume and assign such contracts and leases to the Buyer.

(e)     Subject to the Cure Amount Cap, all Cure Amounts, if any, necessary to cure all defaults, if any, associated with the Seller's assumption of the specified contracts and leases shall be paid to the Seller by the Buyer as and when each contract and lease is assigned to the Buyer.

2.4     <u>Closing Deliveries by the Seller</u>.  At the Closing, the Seller shall deliver the following documents or other items, duly executed by the Seller, as necessary, to the Buyer:

(a)     the Assignment, Assumption and Bill of Sale in substantially the form of <u>Exhibit A</u> (the "<u>Assignment, Assumption and Bill of Sale</u>"), conveying the Purchased Assets to the Buyer free and clear of any lien, claim or encumbrance consistent with the Sale Order;

(b)     a certificate of the President of the Seller certifying as to the incumbency of the Seller's officer who is authorized to execute the Assignment, Assumption and Bill of Sale;

(c)     a certified copy of the Sale Order from the Court approving the terms of the sale;

(d)     instruments of assignment in form and substance to be agreed to by the parties in their reasonable discretion for each registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor, and general assignments of all other Intellectual Property of the Seller;

(e)     such other bills of sale, special warranty deeds, completed transfer tax returns, title affidavits, assignments of leases, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Buyer (in each case signed and acknowledged as appropriate), as the Buyer may reasonably request to vest in the Buyer all the right, title and interest of the Seller in, to or under any or all the Purchased Assets; provided that all of the reasonable and documented out-of-pocket post-Closing costs incurred by the Seller in preparing and delivering the foregoing shall be borne by

-8-

the Buyer and paid promptly after demand therefor and receipt of supporting invoices;

(f)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to the Buyer;

(g)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(h)     certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets;

(i)     all other previously undelivered certificates, agreements and other documents, instruments and writings reasonably requested by the Buyer to be delivered by the Seller at or prior to the Closing pursuant to this Agreement; and,

(j)     such other documentation as the parties may reasonably agree is necessary to convey good and merchantable title to the Buyer.

2.5     <u>Closing Deliveries by the Buyer</u>.  At the Closing, the Buyer shall deliver the following documents or other items, duly executed by the Buyer, as necessary, to the Seller:

(a)     the Credit Bid and Release, in form and substance satisfactory to the Seller (including documentation reasonably acceptable to the Seller evidencing satisfaction of the DIP Obligations);

(b)     an executed copy of the Assignment, Assumption and Bill of Sale;

(c)     a certificate of an officer of the Buyer certifying as to the incumbency of the Buyer's officer who is authorized to execute the Assignment, Assumption and Bill of Sale; and,

(d)     all other documents reasonably requested by counsel for the Seller to consummate the transactions herein contemplated.

2.6     <u>Sales, Transfer and Property Taxes</u>.  The Seller shall pay from sale proceeds, at Closing, any and all transfer, sales, purchase, use, value added, excise or

-9-

similar tax imposed under the laws of the United States, or any state or political subdivision thereof, which arises out of the transfer by the Seller to the Buyer of any of the Purchased Assets, subject to any exemption therefrom contained in the Code. The Seller shall also pay from sale proceeds, at Closing, all delinquent personal property taxes for the year, if any.  Personal property taxes for 2020 shall be prorated on a daily basis to the Closing Date using the actual real and personal property taxes levied for 2019.

2.7    <u>Purchase Price Allocation</u>.  The Purchase Price shall be allocated as set forth on <u>Schedule 2.7</u>.

## <u>ARTICLE III</u>

## <u>LIMITED REPRESENTATIONS AND WARRANTIES<br>OF THE SELLER</u>

To induce the Buyer to enter this Agreement, the Seller makes the following limited representations and warranties to the Buyer (which representations and warranties shall survive the Closing), each of which shall be deemed to be independently material and relied upon by the Buyer, regardless of any investigation made by, or information known to, the Buyer.

3.1    <u>Organization; Authorization</u>.  The Seller is a Delaware corporation and, as such, has the necessary power and authority to enter into and perform the transactions contemplated hereby in accordance with the terms and conditions hereof, subject to approval by the Court.  The execution and delivery of this Agreement, and the performance by the Seller of its obligations contained herein, when approved by the Court, have been duly authorized by all corporation actions.

3.2    <u>Enforceability</u>.  This Agreement and all other agreements of the Seller contemplated hereby are or, upon the approval of the Court and upon the execution and delivery of this Agreement, will be the valid and binding obligations of the Seller, enforceable against it in accordance with their terms.

3.3    <u>Title to Assets</u>.  To the Seller's knowledge, as of immediately prior to the Closing, the Seller has good and marketable fee simple title to all of the Purchased Assets, and once the Court's order approving the sale of the assets described herein, such title may be conveyed to Buyer free and clear of any lien, encumbrance or restrictions on transfer, other than liens or restrictions on title created by the Buyer pursuant to the Sale Order.

-10-

3.4    <u>Third-Party Consents</u>.  Except for the approval of the Court, the Seller has no knowledge of any third-party consents, approvals or authorizations necessary for the execution and consummation of the transactions contemplated hereby, or of any such consents, approvals or authorizations that are required in order for any of the Purchased Assets to be conveyed to the Buyer.

3.5    <u>Litigation</u>.  Except as disclosed in the papers filed by the Seller with the Court as part of its bankruptcy filing, there is no litigation, claim, proceeding or investigation pending, or, to the Seller's knowledge, threatened against or relating to the Seller, its properties or Business, or the Seller's ability to perform its obligations under this Agreement.  The parties understand that the automatic stay will become or became effective against any such action brought or threatened against the Seller when the Chapter 11 Case was filed and that it prohibits any further litigation against the Seller outside of the context of the Chapter 11 Case.

3.6    <u>Authorization</u>.  The Court has jurisdiction to authorize the Seller to convey the assets to the Buyer pursuant to applicable bankruptcy law.

3.7    <u>Purchased Assets</u>.  The Seller makes no representation or warranty to the Buyer concerning the condition or merchantability of the Purchased Assets to be sold to the Buyer herein.  The Buyer has satisfied itself that the Purchased Assets include all of the assets it believes are necessary to carry on the operations of the Business as the Buyer, in its sole discretion, intends to carry it out.  The Buyer is purchasing all of the Purchased Assets in their current condition, "as is, where is", on the Closing Date, and without any representation or warranty from the Seller that such Assets are usable in the ordinary course of business, are good and merchantable, or free from material defects.

3.8    <u>Reserved</u>.

3.9    <u>Compliance with Laws</u>.  To the Seller's Knowledge, the Seller is in material compliance with all Laws applicable to the Business or the Purchased Assets in all material respects.  As of the date hereof, the Seller has not received any written notice of violation of any Law with respect to the Seller, the Business or the Purchased Assets and there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.  The Seller has been contacted by the United States Department of Treasury on behalf of CFIUS regarding its historical financing matters.  There has been correspondence related to the same, but no allegation or other indication that the Seller is in violation of any law, rule, or regulation.

3.10    Contracts.  Schedule 3.10(a) sets forth an accurate list, as of the date
hereof, of all material executory contracts and unexpired leases, including any and all
amendments, modifications, supplements, exhibits and restatements thereto and
thereof, to which the Seller is a party with respect to the Business as of the date hereof
(and the Seller has made available, or within fifteen (15) days of the date hereof shall
make available, to the Buyer true and complete copies of all such executory ccontracts
and unexpired leases).  Except as set forth in Schedule 3.10(b), the Seller has not
assigned, delegated or otherwise transferred to any third party any of its rights or
obligations with respect to any executory contract or unexpired lease.  The Seller has
not, and, to the Seller's Knowledge, no other party to any executory contract or
unexpired lease has, commenced any action against the Seller and the Seller has not
given or received any written notice of any material default or violation under any
executory contract or unexpired lease that has not been withdrawn or dismissed
except to the extent such default or violation will be cured as a result of the payment
of the applicable cure amounts, assuming entry of the Sale Order.  To the Seller's
Knowledge, each executory contract or unexpired lease to be assumed and assigned
to the Buyer is, or will be upon the Closing and payment of any cure amounts, valid,
binding and in full force and effect in accordance with its terms.

3.11.    Intellectual Property.  Schedule 3.11(a) sets forth a true and complete list
of (i) all Intellectual Property that is owned by the Seller, (ii) all executory contracts
pursuant to which any Seller obtains the right to use any Intellectual Property, and
(iii) all material contracts pursuant to which any Seller grants to any other Person the
right to use any Intellectual Property.  The Seller owns all Intellectual Property free
and clear of all Liens (except for Permitted Liens), and all such Intellectual Property
is valid, subsisting and, enforceable, and is not subject to any outstanding Decree
adversely affecting the Seller's use thereof or rights thereto.    To the Seller's
Knowledge and except as set forth on Schedule 3.11(b), none of the use of the
Intellectual Property included in the Purchased Assets, the conduct of the Business as
currently conducted, nor any of the products sold or services provided by the Seller
or any of its Affiliates in connection therewith, infringes upon or otherwise violates
the Intellectual Property of any other Person.  To the Seller's Knowledge, no third
party is infringing any Intellectual Property owned by the Seller and included in the
Purchased Assets, except as would not reasonably be expected to have a Material
Adverse Effect.

3.12.    Real Property.  The Seller does not own any real property.

3.13.    Purchased Inventory.  No Inventory that is Purchased Inventory is
damaged in any way or subject to a current or past product recall, except for any such

US_145152957v13

damage or any such recall which would not be material to the Purchased Inventory taken as a whole.  To the Seller's Knowledge, the Purchased Inventory is (a) in material compliance with United States federal and applicable state guidelines for such products as of the date hereof; and (b) in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be.

3.14.  <u>Environmental Matters</u>.  Except as set forth in <u>Schedule 3.14</u>, (a) the Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws; (b) the Seller has not received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws; (c) to the Seller's Knowledge, no Hazardous Substance has been released at any current or former real property owned or leased by the Seller, by the Seller in violation of any Environmental Law; and (d) the Seller has made available to the Buyer copies of all material environmental audits, assessments and reports in its possession relating any actual or potential Liabilities under Environmental Laws with respect to any current or former real property leased or owned by the Seller.

3.15.  <u>Financial Statements</u>.  The Seller has made available to the Buyer true and correct copies of (a) the audited balance sheets of the Seller as of the fiscal year ended on or about December 31, 2018 and December 31, 2017 and the related audited statements of income and of cash flows of the Seller for the years then ended, and (b) the unaudited balance sheet of the Seller for the fiscal year ended on or about December 31, 2019, and the related statement of income and cash flows of the Seller for the twelve (12) months then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "<u>Financial Statements</u>").  Each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of the Seller as of the dates and for the periods indicated therein, subject to normal yearend adjustments and the absence of complete notes in the case of the unaudited statements.  Other than with respect to Excluded Liabilities as to which the Seller does not provide any representations and warranties, the Seller has no material Liabilities that would be required by GAAP to be reflected on a balance sheet (or the notes thereto) of the Seller, except for liabilities and obligations (i) reflected, accrued or reserved against in the Seller's balance sheet for the fiscal year ended on or about December 31, 2019 (or the notes thereto) included in the Financial Statements, (ii) incurred in the Ordinary Course of Business since December 31, 2019, (iii) incurred

-13-

pursuant to the Contemplated Transactions, or (iv) obligations under executory contracts or unexpired leases that are assumed and assigned to the Buyer (other than liabilities or obligations related to or arising out of breaches of such executory contracts and unexpired leases to the extent arising prior to the Closing Date). Since December 31, 2019, to the Seller's Knowledge, as of the date hereof, Seller has not received any written complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Seller or its internal accounting controls with respect to the Business.

3.16.   <u>No other Agreements to Purchase</u>.  The Seller has not entered into any agreement with any other Person (written or oral) which grants such third party the right or option to purchase or acquire from the Seller any Purchased Asset, other than purchase orders for Inventory accepted by the Seller in the Ordinary Course of Business, the DIP Loan Documents, or as may be required under the Auction process.

3.17.   <u>Taxes</u>.

(a)    The Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct, and complete in all material respects.  All material Taxes owed by the Seller and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid.  In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Seller do not file Tax Returns that the Seller or the Business is or may be subject to taxation by that jurisdiction.

(b)    There is no audit, dispute, claim, or controversy concerning any Tax Liability or Tax Return of the Seller or with respect to the Business in progress or pending by any taxing authority.  The Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on the Buyer, its direct or indirect equity holders, or their Affiliates.

(c)    There are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(d)    The Seller is not a party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for customary gross-up or indemnification provisions in commercial agreements entered into in the ordinary course of business, the primary

subject matter of which is not related to Taxes, in each case that would be binding on Buyer.

(e)    The Seller has not participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b).

(f)    The Seller has collected or withheld all material Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been or will be duly paid to the proper Governmental Entity, and the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements.

(g)    The Seller has collected all material amounts of sales and use Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations.

## ARTICLE IV

## REPRESENTATIONS OF THE BUYER

To induce the Seller to enter this Agreement, the Buyer makes the following representations and warranties to the Seller (which representations and warranties shall survive the Closing), each of which shall be deemed to be independently material and relied upon by the Seller and the Court, regardless of any investigation made by, or information known to, the Seller.

4.1    <u>Organization; Authorization</u>.  The Buyer has all necessary power and authority to enter into and perform the transactions contemplated herein in accordance with the terms and conditions hereof, subject to entry of the Sale Order, in form and substance acceptable to the Buyer.  The execution and delivery of this Agreement, and the performance by the Buyer of its obligations contained herein, have been or will be duly authorized by all required company actions.

4.2    <u>Enforceability</u>.  This Agreement and all other agreements of the Buyer contemplated hereby are or, upon the execution thereof, will be the valid and binding

-15-

obligations of the Buyer enforceable against him or it in accordance with their terms, subject to entry of the Sale Order, in form and substance acceptable to the Buyer. Even if the Buyer assigns this Agreement to another party, as is its right to do, the Buyer remains liable to the Seller for all obligations that are required of the Buyer at Closing in the event that the Buyer's assignee fails to complete the transaction.

4.3    <u>Conflicting Obligations</u>.  The execution and delivery of this Agreement do not, and the consummation of the sale and purchase of the Purchased Assets and the Business contemplated hereby will not:

(a)    conflict with or violate any provisions of the organization of any entity formed by the Buyer; or,

(b)    conflict with or violate any provisions of, or result in the maturation or acceleration of, any obligations under any contract, agreement, instrument, document, lease, license, permit, indenture, or obligation, or any law, statute, ordinance, rule, regulation, code, guideline, order, arbitration award, judgment or decree, to which the Buyer is subject or to which the Buyer is a party.

4.4    <u>Litigation</u>.  There is no litigation, claim, proceeding, or investigation pending, or to the Buyer's knowledge, threatened against the Buyer relating to the Buyer's ability to perform his or his obligations under this Agreement.

## ARTICLE V

## OTHER COVENANTS, CONTINGENCIES, RISK OF LOSS AND EMPLOYMENT

5.1    <u>Contingencies</u>.    The Buyer's obligations under this Agreement are contingent upon (a) entry of the Sale Procedures Order, in form and substance acceptable to the Buyer and (b) entry of the Sale Order, in form and substance acceptable to the Buyer.

5.2    <u>Risk of Loss</u>.  The risk of loss or damage to the Purchased Assets to be sold hereunder due to fire, theft, or other casualty shall be upon the Seller at all times prior to the Closing Date.  In the event of loss or damage to any of the Purchased Assets due to fire, theft, or other casualty while the risk of such loss or damage is on the Seller, the Buyer shall be entitled to terminate this Agreement upon written notice to the Seller, and the obligations of the parties shall thereupon be discharged.  The rights conferred

-16-

upon the Buyer in this <u>Section 5.2</u> shall constitute the Buyer's sole remedy in the event that such loss or damage occurs while the risk thereof is on the Seller.

    5.3    <u>Employment of Seller's Employees; Termination of Employees</u>.

    (a)    Effective as of midnight of the Closing Date, the Seller shall terminate the employment of all of its employees, including those of its employees who shall be employed by the Buyer post-Closing.

    (b)    The actual number and identity of the employees to be rehired by the Buyer shall be identified by the Buyer no later than five (5) days following the entry of the Sale Order.

    (c)    The accrued vacation obligations owed to workers by the Seller who are rehired by the Buyer shall be assumed by the Buyer as a portion of the Assumed Liabilities under <u>Sections 1.2(c)</u> and <u>1.3</u>, hereof.

    5.4    <u>Assumed Liabilities Specified.</u>  Not earlier than five days prior to the Closing, nor less than two days prior to the Closing, the Buyer shall deliver to the Seller the Exhibits to <u>Schedule 2.2</u>, hereof, setting forth the specific contracts and obligations being assumed.  The Buyer's obligation hereunder is to assume all obligations categorized in <u>Schedule 2.2</u>, and the Exhibits to that Schedule that shall provide the detail of the liabilities being assumed.

    5.5    <u>Timing/Expiration of this Agreement</u>.  Once executed, and provided that the Seller's operation continues in the ordinary course of business until the Closing Date, this Agreement shall remain binding and enforceable in accordance with its terms against Buyer through the process of seeking and procuring approval of the Court for Seller to convey the assets to be conveyed hereunder, unless otherwise terminated as set forth herein.  As such, except as otherwise terminated as set forth herein, this Agreement shall not be deemed to have expired, nor shall the Buyer have the right to withdraw its agreement hereto, unless the Court shall determine that a different buyer is to purchase the assets, the Court determines that the Seller may not close on this Agreement, or a period of 18-months from the date hereof has passed, whichever shall first occur. Notwithstanding the foregoing, the Buyer may terminate this Agreement at any time after Seller materially ceases operations as they existed at the time of the execution of this Agreement.

    5.6    <u>Bankruptcy Actions</u>.

    (a)    The Seller has commenced the Chapter 11 Case as of the Petition Date.

-17-

(b)     The Seller shall have filed the Sale Motion, which motion shall seek the Court's: (i) entry of the Sale Procedures Order by November 9, 2020, and (ii) entry of the Sale Order by no later than the Sale Order Deadline that provides the parties, *inter alia*, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than three (3) days following the entry of the Sale Order, subject to the satisfaction of all conditions to the obligations of the Seller and the Buyer as set forth in herein (other than conditions with respect to actions the Seller and/or the Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(c)     The Seller will provide the Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the Contemplated Transactions prepared by the Seller prior to the filing thereof in the Chapter 11 Case.  All motions, applications, and supporting papers prepared by the Seller and relating to the Contemplated Transactions to be filed on behalf of the Seller after the date hereof must be approved in form and substance by the Buyer, such approval not unreasonably withheld or delayed.

(d)     Each of the Buyer and the Seller shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(e)     Each of the Buyer and the Seller will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order and the Sale Procedures Order, including furnishing affidavits or other documents or information for filing with the Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and demonstrating that the Buyer is a good faith buyer under Section 363(m) of the Code.

(f)     Pursuant to the terms of the proposed Sale Procedures Order, the Seller will, among other things, solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to the Seller) and in accordance with the procedures set forth in the proposed Sale Procedures Order, and the Seller shall adhere to those procedures.  The Seller and the Buyer agree, and the Sale Procedures Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best offer for the Purchased Assets.

(g)     The Seller shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice,

-18-

including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the executory contracts and unexpired leases and all Taxing authorities in jurisdictions applicable to the Seller and as otherwise required by the Code.

(h)     The Seller shall serve a cure notice by first class mail on all non-debtor counterparties to all executory contracts and unexpired leases as required by the Sale Procedures Order and provide a copy of the same to the Buyer.

5.7     Conduct of Business.  Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Loan Documents and the DIP Budget, and except as expressly contemplated by this Agreement or as set forth on Schedule 5.7, or required under the Code or other applicable Law and except with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

(a)     the Seller shall not permit or suffer to exist any event of default under the DIP Loan Documents and shall comply with the DIP Order in all material respects;

(b)     the Seller shall use commercially reasonable efforts to conduct the Business and operate and maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business and shall maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and the Seller on the Petition Date;

(c)     the Seller shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of the Seller or the Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(d)     except as permitted by this Agreement, the Seller shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business or except to the extent permitted by the DIP Loan Documents;

-19-

(e)    the Seller shall not, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens or except to the extent permitted by the DIP Loan Documents;

(f)    the Seller shall not assume, reject, or assign any executory contract or unexpired lease that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to the Buyer;

(g)    the Seller shall not enter into new executory contracts or leases or amend or modify any executory contracts or unexpired leases, or amend, modify, extend, renew or terminate any lease, nor enter into any new lease, in each case other than in the Ordinary Course of Business;

(h)    the Seller shall not remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business);

(i)    the Seller shall make all post-petition payments related to any executory contracts and unexpired leases to be assumed and assigned to the Buyer (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof to the extent provided in the DIP Budget;

(j)    the Seller shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(k)    the Seller shall not, directly or indirectly, cancel, forgive, or compromise any material debt or claim or waive or release any material right of the Seller, in each case that constitutes a Purchased Asset;

(l)    the Seller shall (w) conduct the Business in the Ordinary Course of Business, (x) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (y) use commercially reasonable efforts to keep available the services of the Current Employees, to the extent reasonably feasible, and (z) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, to the extent reasonably feasible; and,

(m)    other than as required by applicable Law, the Seller shall not (i) grant any loan to or pay any bonus to any employee, (ii) hire or promote or terminate the

-20-

employment (other than for cause) of any employee with an annual base salary in excess of $100,000.00, (iii) grant or increase any other severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Current Employee, (iv) recognize any union or other collective employee representative, (v) increase the compensation, bonus or other benefits payable to any employee, (vi) pay to any employee any benefit or amount not required under any Employee Benefit Plan as in effect on the date of this Agreement, (vii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any Assumed Plan, or (viii) take any action to accelerate the vesting of, or payment of, any compensation or benefit under any Assumed Plan.

Nothing contained in this Agreement is intended to give the Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of the Seller prior to the Closing.

5.8.    Notice of Developments.  From the date hereof until the Closing Date, each of the Seller (with respect to itself), as the case may be, shall promptly disclose to the Buyer, on the one hand, and the Buyer shall promptly disclose to the Seller, on the other hand, in writing (in the form of an update to the Schedules, if applicable) after attaining knowledge (as applicable to each of the Seller and Buyer) of any real or alleged failure of any of the Seller or the Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.8 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

5.9    Access.  Upon reasonable advance written request by the Buyer, both during and after the Due Diligence Period, the Seller shall permit the Buyer and its Representatives to have reasonable access to, and make reasonable investigation of, during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the Seller, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Seller related to the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.  The Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with the Buyer and its Representatives in connection with such investigation and examination, and the Buyer and its

-21-

Representatives shall cooperate with the Seller and its Representatives and shall use their reasonable efforts to minimize any disruption to the Business.

5.10. <u>Bulk Transfer Laws</u>.  The Buyer acknowledges that the Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Contemplated Transactions, and hereby waives all claims related to the noncompliance therewith.  The Parties intend that pursuant to Section 363(f) of the Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

5.11 <u>Release of Claims</u>.  Notwithstanding anything contained herein to the contrary, effective as of the Closing, (i) the Seller shall deliver to the Buyer and the DIP Lender full, irrevocable and unconditional releases of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against the Buyer, the DIP Lender and their respective current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns, and affiliates, each of the foregoing in their capacity as such (individually and collectively, the "<u>Buyer Released Parties</u>"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Seller ever had, now have, or may have against Buyer Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing; and (ii) the Buyer shall, deliver, and shall cause the DIP Lender to deliver, full, irrevocable and unconditional releases of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against the Seller and its current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns, and affiliates, each of the foregoing in their capacity as such (individually and collectively, the "<u>Seller Released Parties</u>"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Buyer and the DIP Lender ever had, now have, or may have against Seller Released

-22-

Parties in connection with any event, conduct or circumstance occurring prior to the Closing, other than any deficiency claim against the Seller in any remaining Note Holder Obligations after giving effect to the Credit Bid and Release; in each of cases (i) and (ii), other than claims against a Party under this Agreement and the other agreements or instruments being executed and delivered pursuant to the terms hereof to give effect to the Contemplated Transactions.

## ARTICLE VI

## DEFINITIONS

6.1   <u>Certain Defined Terms</u>.  In addition to terms defined throughout this Agreement, as used in this Agreement, the following terms shall have the meanings specified in this <u>Section 6.1</u>, unless the context otherwise requires:

(a)   "<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of the Seller in connection with the Business as conducted by the Seller and (b) any security interest, claim, remedy or other right related to any of the foregoing.

(b)   "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(c)   "<u>Agreement</u>" means this Asset Purchase Agreement, together with all Exhibits and Schedules hereto, as amended, restated, supplemented, or otherwise modified from time to time (including changes made pursuant to court order) in accordance with the terms hereof.

(d)   "<u>Alternate Transaction</u>" means a transaction or series of related transactions pursuant to which the Seller, pursuant to the Sale Procedures Order, (a) accept a Qualified Bid, other than that of the Buyer, as the highest and best offer, or, (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset

-23-

sale, stock sale, merger, reorganization or other similar transaction (by the Seller or otherwise), including pursuant to a Plan or refinancing, all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than the Buyer, but does not mean the sale of assets to customers conducted in the Ordinary Course of Business.

(e) "Assignment, Assumption and Bill of Sale" has the meaning set forth in Section 2.4(a).

(f) "Assumed Contract List" has the meaning set forth in Section 2.3(a).

(g) "Assumed Contracts" means those executory contracts and unexpired leases that have been assumed by the Seller and assigned to the Buyer pursuant to this Agreement and Section 365 of the Code.

(h) "Assumed Liabilities" has the meaning set forth in Section 1.3.

(i) "Assumed Plan" means all rights of the Seller under any Employee Benefit Plans assumed and assigned to the Buyer, including all assets held with respect thereto and any insurance contracts, administrative services agreements, or funding arrangements.

(j) "Auction" means the auction for the sale and assignment of the Purchased Assets as specified in the Sale Procedures Order.

(k) "Break-Up Fee" has the meaning set forth in Section 8.4.

(l) "Business" has the meaning set forth in the recitals to this Agreement.

(m) "Buyer" means EPS Engineered Propulsion Systems, Inc. or its permitted successors, designees, and assigns, as set forth in the first paragraph to this Agreement.

(n) "Buyer Released Party" has the meaning set forth in Section 5.11.

(o) "CFIUS" means the Committee on Foreign Investment in the United States.

(p) "CFIUS Clearance" means (i) a written determination from CFIUS that the Contemplated Transactions are not subject to the DPA, (ii) a written notice issued by CFIUS that it has (1) determined that there are no unresolved national security concerns with respect to the Contemplated

Transactions and (2) concluded all action under the DPA, or (iii) either (1) the President of the United States shall have determined not to use his powers pursuant to DPA to unwind, suspend, condition or prohibit the consummation of the Contemplated Transactions or (2) the period allotted for presidential action under the DPA shall have passed without any determination by the President.

(q)  "Chapter 11 Case" has the meaning set forth in the recitals.

(r)  "Claim" means a "claim" as defined in Section 101(5) of the Code, whether arising before or after the Petition Date.

(s)  "Closing" has the meaning set forth in Section 2.1.

(t)  "Closing Date" has the meaning set forth in Section 2.1.

(u)  "Code" means the United States Bankruptcy Code and its constituent parts, located at 11 U.S.C. Sections 101, *et seq.,* and the Federal Rules of Bankruptcy Procedure, as may be applicable.

(v)  "Contemplated Transactions" means the sale by the Seller to the Buyer, and the purchase by the Buyer from the Seller, of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities.

(w)  "Court" means the United State Bankruptcy Court for the Western District of Wisconsin.

(x)  "Credit Bid" means a bid by the Buyer pursuant to Section 363(k) of the Code equal to up to (i) the full amount of the DIP Obligations as of the Closing Date plus (ii) the full amount of the Noteholder Obligations as of the Closing.

(y)  "Credit Bid and Release" has the meaning set forth in Section 2.2.

(z)  "Cure Amount" means the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under any executory contract or unexpired lease to be assumed and assigned to the Buyer, in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Code and any Decree of the Court.

(aa)  "Cure Amount Cap" means $1,400,520.

-25-

(bb)    "Current Employees" means all individuals employed by the Seller as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

(cc)    "Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order, or any other order of any Governmental Entity.

(dd)    "DIP Budget" shall have the same meaning as the term "Budget" as defined in the DIP Order.

(ee)    "DIP Facility" has the meaning set forth in the recitals.

(ff)    "DIP Lender" has the meaning set forth in the recitals.

(gg)    "DIP Loan Agreement" shall have the same meaning as the term "DIP Credit Agreement" as defined in the DIP Order.

(hh)    "DIP Loan Documents" shall have the meaning given such term in the DIP Order, and for the avoidance of doubt shall include all guarantees, all other security agreements, pledge agreements, notes, guarantees, mortgages, certificates, Uniform Commercial Code financing statements and all other related agreements, instruments and other documents, in each case relating to the DIP Obligations, and executed and/or delivered in connection therewith by the Seller.

(ii)    "DIP Obligations" means the "DIP Obligations" as defined under the DIP Order.

(jj)    "DIP Order" means as of any date of determination (i) the Order Granting Interim Relief on Certain of Debtor's First Day Motions and Notice of Continued Hearing on First Day Motions; (ii) the Interim Order Authorizing Debtor to Obtain Post-Petition financing and Authorizing Debtor's Use of Cash Collateral; or, (iii) the Final Order (as defined in the Interim Order), whichever such Order is then in effect.

(kk)    "DPA" means the Defense Production Action.

(ll)    "Due Diligence Period" begins on the date of this Agreement and ends on the later of (a) the date that is forty-five (45) days after the date of this

-26-

Agreement and (b) the date that is fifteen (15) days after the date the Seller certifies to the Buyer in writing that the Seller has complied in all material respects with the Buyer's request for documents.

(mm) "<u>Employee Benefit Plan</u>" means:  (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement and, (c) any other benefit or compensation plan, program, agreement or arrangement of any kind, providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case, maintained or contributed to by the Seller or in which the Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

(nn) "<u>Environmental Laws</u>" means all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

(oo) "<u>Equipment</u>" has the meaning set forth in <u>Section 1.2(b)</u>.

(pp) "<u>Excluded Assets</u>" has the meaning set forth in <u>Section 1.2</u>.

(qq) "<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 1.4</u>.

(rr) "<u>Expense Reimbursement</u>" has the meaning set forth in <u>Section 3.8</u>.

(ss) "<u>FNCB</u>" has the meaning set forth in <u>Section 2.2</u>.

(tt)  "<u>FNCB Obligations</u>" has the meaning set forth in <u>Section 2.2</u>.

(uu) "<u>Financial Statement</u>" has the meaning set forth in <u>Section 3.15</u>.

(vv) "<u>Former Employee</u>" means all individuals who have been employed by the Seller who are not Current Employees.

(ww) "<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time.

-27-

(xx)    "<u>Governmental Entity</u>" means any United States federal, state, or local or non-United States governmental or regulatory authority, agency, commission, court, body, or other governmental entity.

(yy)    "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance, or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

(zz)    "<u>Intellectual Property</u>" means, all intellectual property, including, without limitation:

   i.    inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof;

   ii.    trademarks, service marks, trade dress, logos, trade names, brand names, corporate names, domain names and other electronic communication identifications, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith;

   iii.    copyrightable works, copyrights, and applications, registrations, and renewals in connection therewith;

   iv.    trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals);

   v.    all computer software (including data and related documentation);

   vi.    all domain names;

   vii.    all other intellectual proprietary rights; and,

-28-

viii.     all copies and tangible embodiments thereof (in whatever form or medium).

(aaa)  "<u>Inventories</u>" has the meaning set forth in <u>Section 1.2 (a)</u>.

(bbb)  "<u>IRC</u>" means the United States Internal Revenue Code of 1986, as amended.

(ccc)  "<u>Knowledge</u>" means, with respect to any party, the actual knowledge of such party after reasonable inquiry and, if such party fails to make such inquiry, shall include the constructive knowledge of such facts as would have been learned had such reasonable inquiry been made.

(ddd)  "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

(eee)  "<u>Liability</u>" or "<u>Liabilities</u>" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including, without limitation, any liability for Taxes in existence as of the Closing.

(fff)  "<u>Lien</u>" means any mortgage, pledge, lien, encumbrance, charge, or other security interest of any kind.

(ggg)  "<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following

-29-

shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) any effect resulting from the filing, announcement, or pendency of the Chapter 11 Case, including (1) the Seller's inability to pay certain prepetition obligations as a result of the commencement of the Chapter 11 Case, (2) any Decree of the Court, (3) any action or omission of the Seller taken or not taken in order to avoid violation of any Decree or objections of the Court, or (4) any other effect, directly or indirectly, related thereto; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underwayas of the date of this Agreement, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters); (v) changes in Law or in GAAP or interpretations thereof; (vi) any actions taken by the Buyer or any of its Affiliates (other than those expressly permitted to be taken hereunder); (vii) inaction by the Seller due to the Buyer's refusal to consent to a request for consent by the Seller under Section 5.3; or, (viii) the negotiation, announcement or pendency of this Agreement or the consummation of the sale and assumption contemplated hereby or pursuant to the Auction, or the identity, nature or ownership of Buyer or any Person submitting a Qualified Bid; (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of the Seller to consummate the Contemplated Transactions on the terms set forth herein and therein.

(hhh) "Ordinary Course of Business" means the ordinary and usual course of business of the Seller taken as a whole consistent with past custom and practice and considering the commencement of the Chapter 11 Case and the Seller's current distressed financial condition.

(iii) "Note Holder Obligations" has the meaning set forth in the recitals.

(jjj) "Outside Date" means December 4, 2020.

(kkk)  "<u>Permits</u>" has the meaning set forth in <u>Section 1.2(f)</u>.

(lll)  "<u>Permitted Liens</u>" means (a) Liens for Taxes which are (i) being contested in good faith by appropriate proceedings or (ii) not due and payable as of the Closing Date and which shall be prorated or otherwise released at Closing, and, in each case of clauses (i) and (ii), for which adequate reserves have been made on the Financial Statements in accordance with GAAP and which shall be prorated or otherwise released at Closing; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings for which adequate reserves have been made on the Financial Statements in accordance with GAAP and which shall be prorated or otherwise released at Closing; (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (e) with respect to leasehold improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable lease; (f) any Liens associated with or arising in connection with any Assumed Liabilities; and, (g) Liens that will be released or removed by operation of the Sale Order (including, without limitation, Liens under DIP Loan Documents).

(mmm)    "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

(nnn)  "<u>Petition Date</u>" means the date of the filing of the Chapter 11 Case.

-31-

(ooo) "<u>Plan</u>" means a plan of reorganization or liquidation proposed by the Seller.

(ppp) "<u>Purchased Assets</u>" has the meaning set forth in <u>Section 1.2</u>.

(qqq) "<u>Purchased Inventory</u>" means Inventory that is part of the Purchased Assets.

(rrr) "<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.2</u>.

(sss) "<u>Qualified Bid</u>" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

(ttt) "<u>Records</u>" means books of account, ledgers, forms, records, documents, files, invoices, vendor or supplier lists, plans and other data which are necessary to or desirable for the ownership, use, maintenance or operation of the Business and which are owned or used by any Seller, including, without limitation, all blueprints and specifications, all manuals, all personnel, payroll, payroll tax and labor relations records, all environmental control records, environmental impact reports, statements, studies and related documents, handbooks, technical manuals and data, engineering specifications and work papers, all pricing and cost information, all sales records, all accounting and financial records, all sales and use tax returns, reports, files and records, asset history records and files, all data entry and accounting systems used to conduct the day-to-day operations of the Business, all maintenance and repair records, all correspondence, notices, citations and all other documents received from, sent to or in the Seller's possession in connection with any governmental authority (including, without limitation, federal, state, county or regional environmental protection, air or water quality control, occupational health and safety, land use, planning or zoning and any alcohol, beverage or fire prevention authorities).

(uuu) "<u>Representative</u>" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

(vvv) "<u>Sale Hearing</u>" means the hearing conducted in the Court to seek approval of the Sale Motion and the Contemplated Transactions.

-32-

(www)   "Sale Motion" means a motion filed by the Seller with the Court in connection with the Chapter 11 Case requesting the entry of the Sale Procedures Order and the Sale Order.

(xxx)   "Sale Order" means an order of the Court entered in the Chapter 11 Case consistent with the terms of this Agreement approving the Sale Motion and sale to the Buyer consistent with the terms of this Agreement and otherwise in form and substance satisfactory to the Buyer.

(yyy)   "Sale Order Deadline" means November 30, 2020.

(zzz)   "Sale Procedures Order" means an order of the Court approving the sale procedures relief requested in the Sale Motion in the form attached at Schedule 6.1(zzz).

(aaaa)   "Seller" means Engineered Propulsion Systems, Inc., a Delaware corporation, as set forth in the first paragraph to this Agreement.

(bbbb)   "Seller Released Party" has the meaning set forth in Section 5.11.

(cccc)   "Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

(dddd)   "Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(eeee)   "USBEF" has the meaning set forth in Section 2.2.

(ffff)   "USBEF Obligations" has the meaning set forth in Section 2.2.

-33-

(gggg)     "WEDC" has the meaning set forth in Section 2.2.

(hhhh)     "WEDC Obligations" has the meaning set forth in Section 2.2.

(iiii)   "Work-in-Progress" has the meaning set forth in Section 1.2(d).

(jjjj)   "Working Capital Lender" has the meaning set forth in the recitals.

(kkkk)     "Working Capital Loan" has the meaning set forth in the recitals.

6.2     Interpretation.   Unless otherwise expressly provided or unless the context requires otherwise:

(a)     all references in this Agreement to Articles, Sections, Schedules, and Exhibits shall mean and refer to Articles, Sections, Schedules, and Exhibits of this Agreement;

(b)     all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations;

(c)     words using the singular or plural number also shall include the plural and singular number, respectively;

(d)     references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement (including the Schedules and Exhibits hereto); and,

(e)     references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person).

**ARTICLE VII**
**CONDITIONS TO CLOSING**

7.1     Conditions to the Buyer's Obligations.   Subject to Section 7.3, the Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Seller and the Buyer in whole or in part to the extent permitted by applicable Law):

-34-

(a)      as of the date hereof and as of the Closing (in each case, except to the extent:  (1) for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date, (2) subject to any update to the schedules), (i) each representation or warranty contained in <u>Sections 3.1</u>, <u>3.2</u> or <u>3.3</u> hereof shall be true and correct in all respects other than *de minimis* exceptions, and, (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)      the Seller shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and the Seller shall have caused the documents and instruments required by <u>Section 2.4</u> to be delivered to the Buyer (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the amount of Cure Amounts paid with respect to the Assumed Contracts set forth on the Assumed Contracts List does not, in the aggregate, exceed the Cure Amount Cap;

(e)      the Sale Order shall have been entered by the Court and shall not be subject to a stay pending appeal;

(f)      no Default or Event of Default shall have occurred and be continuing under the DIP Loan Agreement (as such terms are used therein);

(g)      the DIP Order and DIP Loan Documents shall have been approved and shall not have been terminated;

(h)      from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(i)      the Contemplated Transactions have received CFIUS Clearance; and,

-35-

(j)    the Buyer shall have received all of the deliverables pursuant to <u>Section 2.4</u>.

7.2    <u>Conditions to Seller's Obligations</u>.  Subject to <u>Section 7.3</u>, the Seller's obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Seller and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Sections 4.1</u>, <u>4.2</u>, or <u>4.3</u> shall be true and correct in all respects other than *de minimis* exceptions, and, (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    The Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and the Buyer shall have caused the documents, instruments and payments required by <u>Section 2.5</u> to be delivered to the Seller (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have been entered by the Court and shall not be subject to a stay pending appeal; and,

(e)    the Seller shall have received all of the deliverables pursuant to <u>Section 2.5</u>.

-36-

7.3    <u>No Frustration of Closing Conditions</u>.  Neither the Buyer nor the Seller may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in <u>Section 7.1</u> or <u>7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

7.4    <u>Waiver of Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

8.1    <u>Termination of Agreement</u>.  This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "<u>Termination Event</u>"):

(a)    by the mutual written consent of the Buyer, on the one hand, and the Seller, on the other hand;

(b)    by written notice of either the Buyer or the Seller, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either the Buyer or the Seller, if the Closing shall not have occurred on or before the Outside Date;

(d)    by written notice of either the Buyer or the Seller, if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Chapter 11 Case;

-37-

(e)      by the Buyer, if (i) the Sale Procedures Order shall not have been entered by the Court on or before such date as provided in the DIP Loan Documents, (ii) the Auction has not concluded by midnight on such date as provided in the DIP Loan Documents, (iii) the Sale Order shall not have been entered by the Court on or before such date as provided in the DIP Loan Documents, (iv) at any time after entry of the Sale Procedures Order, such Sale Procedures Order (including, without limitation, the provisions therein relating to the bid protections) is reversed, stayed, vacated or otherwise modified by the Court, or, (v) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(f)      by the Buyer by giving written notice to the Seller at any time prior to the Closing (i) in the event the Seller has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, the Buyer has notified the Seller of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of the Buyer have been satisfied or, (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of the Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by the Buyer;

(g)      by the Seller by giving written notice to the Buyer at any time prior to Closing in the event the Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, the Seller has notified the Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of the Seller have been satisfied or, (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of the Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by the Seller;

(h)      by written notice from the Buyer to the Seller upon the occurrence of any Event of Default (as defined in the DIP Order or any DIP Loan Documents);

(i)      by the Buyer if any secured creditor of the Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

-38-

(j)      by the Buyer if any Affiliates of the Seller that, directly or indirectly through one or more intermediaries, controls the Seller, files for relief pursuant to the Code;

(k)      by the Buyer if, at any time on or before the expiration of the Due Diligence Period, the Buyer becomes aware of any matter as a result of its due diligence investigation (including by way of information delivered or made available by the Seller hereunder or on a Schedule hereto or any update to a Schedule) that the Buyer determines is unacceptable in its sole discretion; or,

(m)      automatically and without any action or notice by the Seller to the Buyer, or the Buyer to the Seller, immediately upon:  (i) the Seller's entry into a stalking horse agreement with another purchaser for the Purchased Assets consistent with the terms of the Sale Procedures Order; (ii) approval by the Court of an Alternate Transaction, unless the Buyer has agreed to be a "back-up bidder" under the Sale Order; or, (iii) consummation of an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

8.2    <u>Procedure Upon Termination</u>.    In the event of termination and abandonment by the Buyer, on the one hand, or the Seller, on the other hand, or both, pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by the Buyer or the Seller.

8.3    <u>Effect of Termination</u>.    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Buyer or the Seller; provided, however, that <u>Section 8.1</u>, <u>Section 8.2</u>, this <u>Section 8.3</u>, Article IX and the Sale Procedures Order (if entered) shall survive any such termination and shall be enforceable hereunder.    In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

8.4    <u>Break-Up Fee; Expense Reimbursement</u>.    The Seller recognizes that the Buyer has and will incur substantial expenses in negotiating this Agreement, performing its required due diligence, and forming one or more entities for the

operation of the Business.  In recognition of the Buyer's time and expenses, and to induce the Buyer to proceed as the first buyer, as a "stalking horse" bidder, the Seller agrees that if, subsequent to the Seller's acceptance of this Agreement, the Court determines that it is in the best interests of the Seller's bankruptcy estate to sell all or substantially all of the Purchased Assets to a third-party purchaser, upon closing such sale to such third-party purchaser, the Seller shall pay to the Buyer (a) a break-up fee in the amount of $150,000.00 (the "Break-Up Fee"), and (b) an expense reimbursement in the amount of $250,000.00 (the "Expense Reimbursement").

# ARTICLE IX
## MISCELLANEOUS

9.1   <u>Survival of Representations and Warranties</u>.  All of the representations and warranties of the parties contained in this Agreement shall survive the Closing hereunder.

9.2   <u>Benefit and Assignment</u>.  This Agreement, once approved by the Court, shall be binding upon and inure to the benefit of the parties hereto, their heirs, successors, assignees, and beneficiaries in interest, including any trustee appointed by the Court in the Chapter 11 Case; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by the Seller without the prior written consent of the Buyer.  The Buyer may assign the Buyer's rights and obligations to one or more entities, so long as any such assignee is duly authorized and qualified to enter into, perform and complete the transactions contemplated by this Agreement, and subject to the provisions contained in <u>Section 4.2.</u>

9.3   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin (regardless of such State's conflict of laws principles), and the order of the Court that approved the sale, and without reference to any rules of construction regarding the party responsible for the drafting hereof.  Jurisdiction and venue over this sale shall initially vest in the Court that approved the sale.

9.4   <u>Expenses</u>.  Except as otherwise herein provided, all expenses incurred in connection with this Agreement or the transactions herein provided for shall be paid by the party incurring such expenses and costs and shall not constitute a charge or expense of the other party.

9.5   <u>Notices</u>.  Any and all notices, demands, and communications provided for herein or made hereunder shall be given in writing and shall be deemed given to a party at the earlier of:

US_145152957v13

(a)    when actually delivered to such party, or,

(b)    when mailed to such party by registered or certified U.S. Mail (return receipt requested), or,

(c)    sent by overnight courier, confirmed by receipt, and addressed to such party at the address designated below for such party (or to such other address for such party as such party may have substituted by notice pursuant to this <u>Section 9.5</u>), or,

(d)    when conveyed by facsimile or e-mail (utilizing PDF formatting):

|     |     |     |
|-----|-----|-----|
| i.  | If to the Buyer: | EPS Engineered Propulsion Systems, Inc.<br>Attn: Wei (Tavy) Wu<br>362 West 127th Street, Apt #3B<br>New York, NY  10027<br>E-mail address: tavy.wu@windecker.com.cn |
| ii. | With a copy to: | Katten Muchin Rosenman LLP<br>Attn: John P. Sieger<br>525 W. Monroe St.<br>Chicago, IL 606610-3693<br>E-mail address: john.sieger@katten.com |
| iii.| If to the Seller: | Engineered Propulsion Systems, Inc.<br>Attn: Michael Fuchs, President<br>625 W. Hangar Rd, Hangar 11-18<br>New Richmond, WI 54017<br>E-mail address: Michael.Fuchs@eps.aero; |
| iv. | With a copy to: | Steinhilber Swanson LLP<br>Attn: Attorney James D. Sweet<br>122 West Washington Ave., Ste.  850<br>Madison, WI 53703-2732<br>E-mail address:<br>jsweet@steinhilberswanson.com. |

9.6    <u>Counterparts; Execution</u>.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, provided that all such counterparts, in the aggregate, shall contain the signatures of

US_145152957v13

all parties hereto.  Signatures of the parties may be conveyed via facsimile or e-mail and in one or more counterparts and all such facsimile or e-mail counterparts taken together shall constitute one and the same instrument, with the same effect as the delivery of an original.

9.7    <u>Headings</u>.  All Section headings herein are inserted for convenience and reference only and shall not modify or affect the construction or interpretation of any provision of this Agreement.

9.8    <u>Amendment, Modification and Waiver</u>.  This Agreement may not be modified, amended, or supplemented except by mutual written agreement of all the parties hereto.  Any party may waive in writing any term, notice, time period or condition contained in this Agreement and intended to be for its benefit; <u>provided</u>, <u>however</u>, that no waiver by any party, whether by conduct or otherwise, in any one or more instances, shall be deemed or construed as a further or continuing waiver of any such term or condition.  Each amendment, modification, supplement, or waiver shall be made in writing signed by the party or the parties to be charged.  It is specifically understood by the parties that the process of developing <u>Schedules 1.2(b), (d), and (e)</u> and <u>Schedule 2.2</u> is ongoing at the execution of this Agreement.  Within ten (10) days following the execution of this Agreement, the parties shall update, revise, and finalize such Schedules.

9.9    <u>Incorporation of Schedules and Exhibits</u>.  The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

9.10    <u>Severability</u>.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the Contemplated Transactions is not affected in a manner adverse to any Party.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

US_145152957v13

9.11    Entire Agreement.  This Agreement and the Exhibits and Schedules attached hereto (as updated, revised and finalized) represent the full and complete agreement of the parties with respect to the subject matter hereof and supersede and replace any prior understandings and agreements among the parties with respect to the subject matter hereof and no provision or document of any kind shall be included in or form a part of such agreement unless signed and delivered to the other party by the parties to be charged.

9.12    Third-Party Beneficiaries.  Except as provided herein, no third parties are intended to benefit from this Agreement, and no third-party beneficiary rights shall be implied from anything contained in this Agreement.

9.13    Cooperation.  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from the Seller to the Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

9.14    Remedies.  The Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries.  The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants.  If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law.  The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants.  The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

9.15    Further Assurances.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to

the Buyer all of the Purchased Assets, to confirm the Buyer's assumption of the Assumed Liabilities and to confirm the Seller's retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 9.15, to the extent that either the Buyer or the Seller discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to the Buyer as Purchased Assets but were not so transferred or assigned, the Buyer and the Seller shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to the Buyer.

9.16   Insurance Policies.   Other than as set forth above, upon Closing, the Seller shall use commercially reasonable efforts to cause the assignment of all rights of the Seller in and to all insurance coverage provided in relation to the Seller and the Purchased Assets that is maintained by the Seller or its Affiliates (whether such policies are maintained with third party insurers or with the Seller or its Affiliates) to the Buyer as soon as reasonably practicable (and in no event within forty-five (45) days following the Closing). To the extent that any current or prior Insurance Policy is not transferable to the Buyer at the Closing in accordance with the terms thereof, the Seller shall hold such Insurance Policy for the benefit of the Buyer, shall reasonably cooperate with the Buyer (at the Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to the Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities. In the event the Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, the Seller shall reasonably cooperate with the Buyer to terminate such Insurance Policy to the extent only applicable to the Purchased Assets, and the Seller shall, at the option of the Buyer, promptly pay over to the Buyer any refunded or returned insurance premiums received by the Seller in connection therewith (or, if applicable, the Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by the Buyer.

9.17   Collection of Accounts Receivable.

(a)   As of the Closing Date, the Seller hereby (i) authorizes the Buyer to open any and all mail addressed to the Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to the Buyer if received on or after the Closing Date and (ii) appoints the Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by the Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, made payable or endorsed to the Seller or the Seller's order, for the Buyer's own account.

-44-

(b)    As of the Closing Date, the Seller agrees that any monies, checks or negotiable instruments received by the Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, shall be held in trust by the Seller for the Buyer's benefit and account, and promptly upon receipt by the Seller of any such payment (but in any event within five (5) Business Days of such receipt), the Seller shall pay over to the Buyer or its designee the amount of such payments.  In addition, the Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to the Seller, from time to time as and when received by the Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that the Buyer or its Affiliates may receive on or after the Closing which properly belongs to the Seller hereunder, including any Excluded Assets.

(c)    As of the Closing Date, the Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by the Buyer after the Closing.

9.18    <u>Use of Name and Marks</u>.  Neither the Seller or any of its Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

-45-

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**EPS ENGINEERED PROPULSION SYSTEMS, INC.**, as the Buyer

By: _____

Its: _____

**ENGINEERED PROPULSION SYSTEMS, INC.**, as the Seller

By: _____

Michael Fuchs, President

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

EPS ENGINEERED PROPULSION SYSTEMS, INC., a. the Buyers

By: _____ Wei Wu/s/

Its: Sole Director _____

ENGINEERED PROPULSION SYSTEMS, INC., as the Seller

By: _____
    Michael Fuchs, President

# EXHIBIT B

| Note Holder | Note Terms | Principal | Principal & Interest as of Petition Date | Signing Date | Current Maturity Date | Priority |
|---|---|---|---|---|---|---|
| Alite GmbH | 7% | $192,307.69 | $262,839.95 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Alite GmbH | 7% | $115,384.62 | $139,031.83 | 11/22/2017 | 12/31/2020 | 4th Priority |
| Alite GmbH | 7% | $500,000.00 | $602,470.87 | 11/22/2017 | 12/31/2020 | 4th Priority |
| Alite GmbH | 7% | $549,750.00 | $646,618.36 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Alite GmbH | 7% | $450,250.00 | $528,476.04 | 4/9/2018 | 3/31/2021 | 4th Priority |
| BAYBAN | 7% | $30,000.00 | $31,035.83 | 7/2/2018 | 3/31/2021 | 4th Priority |
| Bill Lawson | 7% | $50,000.00 | $68,338.36 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Bill Lawson | 7% | $50,000.00 | $60,247.06 | 11/22/2017 | 12/31/2020 | 4th Priority |
| Bill Lawson | 7% | $50,000.00 | $59,235.99 | 2/19/2018 | 12/31/2020 | 4th Priority |
| Bill Lawson | 7% | $30,000.00 | $34,588.49 | 7/12/2018 | 3/31/2021 | 4th Priority |
| Brose Revocable Trust | 7% | $50,000.00 | $59,235.99 | 2/19/2018 | 12/31/2020 | 4th Priority |
| Claire Johnson | 7% | $200,000.00 | $206,905.58 | 3/13/2020 | 2/1/2020 | 4th Priority |
| CVAIN #8 LLC | 7% | $250,500.00 | $300,124.96 | 12/22/2017 | 12/31/2020 | 4th Priority |
| CVAIN #8 LLC | 7% | $75,000.00 | $77,589.60 | 2/19/2018 | 12/31/2020 | 4th Priority |
| CVAIN #8 LLC | 7% | $219,600.00 | $253,864.56 | 6/28/2018 | 3/31/2021 | 4th Priority |
| Daniel Dusich | 7% | $50,000.00 | $59,905.20 | 12/22/2017 | 12/31/2020 | 4th Priority |
| Douglas Larson | 7% | $300,000.00 | $359,431.06 | 12/22/2017 | 12/31/2020 | 4th Priority |
| Eleven Grand, LLC (former Holly & Thomas) | 7% | $100,000.00 | $119,810.35 | 12/22/2017 | 12/31/2020 | 4th Priority |
| Eleven Grand, LLC (former Holly & Thomas) | 7% | $100,000.00 | $115,933.52 | 6/13/2018 | 3/31/2021 | 4th Priority |
| Peter Fong and Ning Liu (Joel Hall) | 7% | $38,461.54 | $52,568.03 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Peter Fong and Ning Liu (Joel Hall) | 7% | $23,076.92 | $27,806.39 | 11/22/2017 | 12/31/2020 | 4th Priority |
| Peter Fong and Ning Liu | 7% | $200,000.00 | $235,240.82 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Peter Fong and Ning Liu | 7% | $150,000.00 | $159,620.39 | 8/30/2019 | 3/31/2022 | 4th Priority |
| Peter Fong and Ning Liu | 7% | $39,000.00 | $40,372.46 | 1/28/2020 | 3/31/2022 | 5th Priority |
| Gary and Sue Roberts | 7% | $100,000.00 | $103,452.81 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Gregg Stone | 7% | $50,000.00 | $58,810.23 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Horace Whitney Boggs III | 7% | $100,000.00 | $136,676.77 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Horace Whitney Boggs III | 7% | $20,000.00 | $23,059.00 | 7/12/2018 | 3/31/2021 | 4th Priority |
| James Rice | 7% | $50,000.00 | $58,686.97 | 4/9/2018 | 3/31/2021 | 4th Priority |
| John Grady | 7% | $50,000.00 | $58,810.23 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Larry and Jane Weber | 7% | $595,000.00 | $736,699.55 | 7/2/2015 | 2/1/2020 | 4th Priority |
| Larry and Jane Weber | 7% | $500,000.00 | $615,420.41 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Larry and Jane Weber | 7% | $1,000,000.00 | $1,204,941.94 | 11/22/2017 | 12/31/2020 | 4th Priority |
| Larry and Jane Weber | 7% | $549,750.00 | $646,618.36 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Larry and Jane Weber | 7% | $450,250.00 | $528,476.04 | 4/9/2018 | 3/31/2021 | 4th Priority |
| Larry and Jane Weber | 7% | $50,000.00 | $57,405.37 | 8/3/2018 | 3/31/2021 | 4th Priority |
| Larry and Jane Weber (Joel Hall) | 7% | $230,769.23 | $315,407.94 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Larry and Jane Weber (Joel Hall) | 7% | $138,461.54 | $166,838.08 | 11/22/2017 | 12/31/2020 | 4th Priority |
| Tobriner Family Trust | 7% | $100,000.00 | $118,472.07 | 2/19/2018 | 12/31/2020 | 4th Priority |
| Marcus Taylor Trust | 7% | $50,000.00 | $58,435.40 | 1/28/2016 | 2/1/2020 | 4th Priority |
| Marcus Taylor Trust | 7% | $50,000.00 | $58,810.23 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Michael and Monika Fuchs | 7% | $50,000.00 | $58,810.23 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Rodney Green | 7% | $50,000.00 | $59,235.99 | 2/19/2018 | 12/31/2020 | 4th Priority |
| Saleh Obaid | 7% | $75,000.00 | $88,215.29 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Saleh Obaid | 7% | $50,000.00 | $58,810.23 | 3/29/2018 | 12/31/2020 | 4th Priority |
| Windecker-Tong Liao | 7% | $100,000.00 | $114,810.72 | 8/3/2018 | 3/31/2021 | 4th Priority |
| Windecker GA Power, LLC | 7% | $8,392,127.64 | $9,459,077.43 | 8/30/2019 | 3/31/2021 | 4th Priority |
| Total | | $16,614,689.18 | $19,287,272.98 | | | |

| | |
|---|---|
| 1st Priority | First National Community Bank |
| 1st Priority | U.S. Bank (PMSI) |
| 2nd Priority | WEDC |
| 3rd Priority | DIP |
| 4th Priority | Convertible Note Holders Senior |
| 5th Priority | Convertible Note Holders after Nov. 2018 Junior |
| 6th Priority | Stock Pledge |

## Convertible Notes - Priority 5

| Note Holder | Note Terms | Principal | Principal & Interest as of Petition Date | Signing Date | Current Maturity Date | Priority |
|---|---|---|---|---|---|---|
| Alite GmbH | 7% | $150,000.00 | $155,049.18 | 2/5/2020 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $600,000.00 | $632,037.77 | 10/25/2019 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $100,000.00 | $104,994.42 | 11/12/2019 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $250,000.00 | $261,862.77 | 11/25/2019 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $400,000.00 | $417,753.02 | 12/11/2019 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $100,000.00 | $103,786.88 | 1/14/2020 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $50,000.00 | $51,826.51 | 1/21/2020 | 3/31/2022 | 5th Priority |
| Windecker GA Power, LLC | 7% | $100,000.00 | $103,366.12 | 2/5/2020 | 3/31/2022 | 5th Priority |
| Xin Zhu and Feng Liu | 7% | $100,000.00 | $106,413.60 | 8/30/2019 | 3/31/2022 | 5th Priority |
| Total | | $1,850,000.00 | $1,937,090.27 | | | |

## Short Term Loans Secured - Priority 6

| Note Holder | Note Terms | Principal | Principal & Interest as of Petition Date | Signing Date | Current Maturity Date | Priority |
|---|---|---|---|---|---|---|
| Alite GmbH | 7% | $200,000.00 | $205,405.57 | 3/13/2020 | 3/13/2021 | 6th Priority |
| Alite GmbH | 7% | $80,000.00 | $81,897.78 | 3/30/2020 | 4/30/2020 | 6th Priority |
| Total | | $280,000.00 | $287,303.35 | | | |

## Total  Convertible Notes & Secured Loans

| | Principal | Principal & Interest as of Petition Date |
|---|---|---|
| Total | $18,744,689.18 | $21,511,666.60 |

## Total  Convertible Notes & Secured Loans  "Alite"

| | Principal | Principal & Interest as of Petition Date |
|---|---|---|
| Total | $2,237,692.31 | $2,621,789.58 |

## Total  Convertible Notes & Secured Loans  "Windecker"

| | Principal | Principal & Interest as of Petition Date |
|---|---|---|
| Total | $10,092,127.64 | $11,249,515.64 |

## Promissary Note secured by 6 share form each founder

| Note Holder | Note Terms | Principal | Principal & Interest as of Petition Date | | | |
|---|---|---|---|---|---|---|
| Ed Netherton | 10% | $126,000.00 | $209,981.78 | 5/27/2015 | 2/27/2020 | No Priority |
| Total | | $126,000.00 | $209,981.78 | | | |

## Short Term Loans Unsecured

| Note Holder | Note Terms | Principal | Principal & Interest as of Petition Date | | | |
|---|---|---|---|---|---|---|
| Justus von Wedel | 10% | $200,000.00 | $211,814.63 | 9/27/2019 | 2/27/2020 | Unsecured |
| Peter Fong | 7% | $50,000.00 | $52,926.39 | 10/3/2019 | 2/3/2020 | Unsecured |
| Feng Liu | 7% | $50,000.00 | $52,926.39 | 10/3/2019 | 2/3/2020 | Unsecured |
| Total | | $300,000.00 | $317,667.41 | | | |

# EXHIBIT C

## ENGINEERED PROPULSION SYSTEMS, INC.
## BIDDING PROCEDURES[1]

### A.    INTRODUCTION AND BACKGROUND

Engineered Propulsion Systems, Inc. ("EPS" or the "Debtor") is the debtor and debtor-in-possession in Case No. 20-11957, pending in the United States Bankruptcy Court for Western District of Wisconsin (the "Bankruptcy Court").

The Bankruptcy Court has authorized the Debtor to enter into an agreement for the sale of assets of the Debtor to EPS Engineered Propulsion Systems, Inc. (the "Stalking Horse") pursuant to that certain Asset Purchase Agreement (the "Asset Purchase Agreement" or the "APA" or the "Stalking Horse Bid") between EPS, named therein as Seller, and the Stalking Horse, named therein as Buyer, but subject to and in accordance with the process described in the procedures set forth below (the "Bidding Procedures").

The Auction (as defined below) will be managed by Steinhilber Swanson LLP ("SSLLP"). A description of the business assets that are to be sold is contained in a series of Schedules attached to the APA, as described in more detail below.

### B.    KEY DATES

The key dates for this process are as follows:

- November 8, 2020[2]            Sale Procedures Hearing
- November 20, 2020            Due dates for bids
- November 24, 2020            Auction
- November 25, 2020[3]            Sale approval hearing
- December 4, 2020[4]            Closing

### C.    STALKING HORSE BID

On October 15, 2020, the Debtor entered into the APA with the Stalking Horse. A copy of the APA is available through SSLLP or EPS management, or may be reviewed on the Electronic Case Filing System maintained by the Bankruptcy Court as an

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement or the Sale Motion, as applicable, each as described and defined below.

attachment to the Notice of Motion and Motion for Orders: (1) authorizing Debtor to sell assets free and clear of liens, claims, interests and encumbrances; (2) authorizing assumption and assignment or rejection of unexpired leases and executory contracts; (3) approving bidding procedures and auction; (4) approving the Break-Up Fee and Expense Reimbursement (both as defined below); (5) approving the form and manner of notice; and (6) scheduling further hearing that was filed on October 15, 2020 (the "Sale Motion").

The APA provides for payment to the Stalking Horse of, depending on the circumstances as set forth in the APA: (a) a break-up fee in the amount of $150,000 (the "Break-Up Fee"), and (b) an expense reimbursement in the amount of $250,000.00 (the "Expense Reimbursement").

The Debtor is offering to sell assets to be acquired as described in the APA, free and clear of all liens, claims, interests, and other encumbrances.  Other interested bidders will have opportunities to bid on the assets described in the APA.

## D.    QUALIFIED BIDDER

To be allowed to participate in the sale process, to conduct due diligence, and to be entitled to submit a bid, a party interested in purchasing the assets must deliver to EPS management and SSLLP the following:

1.    a signed Confidentiality Agreement, in form and substance reasonably satisfactory to SSLLP and EPS management;

2.    evidence, satisfactory to SSLLP and EPS management, after consultation with counsel to the DIP Lender (the "Consultation Party"), demonstrating: (a) that the bidder has the financial ability to close the sale proposed by such bidder in its bid; and, (b) no further corporate action by the bidder is required for it to consummate its purchase as proposed by its bid;

3.    audited (if in existence) or reviewed financial statements and/or other forms of financial disclosure acceptable to SSLLP and EPS management, after consultation with the Consultation Party, demonstrating the putative bidder's financial ability to close; and,

4.    the Deposit (as defined below).

A party who submits all of these documents and the Deposit is deemed to be a Qualified Bidder (as defined below) who is eligible to submit a Qualified Bid (as defined below).

## E.    DUE DILLIGENCE

Qualified Bidders may be offered the opportunity to conduct reasonable due diligence so long as the sale process is ongoing and until the Bid Deadline.

## F.    BID DEADLINE

The deadline (the "Bid Deadline") for Qualified Bidders to submit a bid shall be November 20, 2020 at 4:00 o'clock p.m. CST, or such other later date and time to which the Bid Deadline may be extended by the Bankruptcy Court; provided, however, that such extended date shall be not later than November 23, 2020.

All bids must be submitted, on or prior to the Bid Deadline, to Michael Fuchs, President of EPS, 1345 Campus Dr., Baldwin, WI 54017, and to James D. Sweet, Steinhilber Swanson LLP, 122 West Washington Ave., Suite 850, Madison, Wisconsin 53703-2732 (Phone: 608-310-5501, Fax: 608-630-8991, jsweet@steinhilberswanson.com ). The Debtor shall deliver copies of any such bids to the Consultation Party and the Stalking Horse upon its receipt of any such bids.

## G.    QUALIFIED BID

To be eligible to participate in the Auction, a Qualified Bidder must, on or prior to the Bid Deadline (as may be extended in accordance with Section F, above), submit to the parties listed in F., above, a package (the "Bid Package") that includes all of the following items:

      a.      A signed Confidentiality Agreement in the form provided.

      b.      A written acknowledgement that the Qualified Bidder agrees (i) to all of the terms set forth in these Bidding Procedures, (ii) that its bid constitutes an irrevocable offer and is binding on the Qualified Bidder until the earlier of 48 hours after the sale of the assets has closed or thirty (30) days after the Sale Approval Hearing, and (iii) to perform as a Back-Up Bidder (as defined below) in the event its Qualified Bid is not the Prevailing Bid (as defined below).

c.     Written evidence it has obtained authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission of such Qualified Bidder's bid and acceptance of the terms of sale set forth in these Bidding Procedures, or representations that no such authorization or approval is required.

d.     Financial statements and/or written evidence of an irrevocable financing commitment or other evidence, satisfactory to SSLLP and EPS management, after consultation with the Consulting Parties, of the financial ability to close under its Asset Purchase Agreement within the deadline described above (provided, however, that the closing of the sale shall not be contingent in any way on the Qualified Bidder financing).

e.     A signed Asset Purchase Agreement in the form of the Asset Purchase Agreement signed by the Stalking Horse "redlined" to show any modifications required by the Qualified Bidder, including any modifications to the schedules and exhibits (the "Competing Bid"), that:

    i.    discloses of the identity of each entity submitting the Competing Bid or otherwise participating in the Competing Bid, and the complete terms of any such participation;

   ii.    proposes to purchase the same (or in all material respects the same) assets to be acquired by the Stalking Horse; provided, however, that, a bid for other assets or another combination of assets may be treated as a Competing Bid by EPS management, in consultation with the Consultation Party;

  iii.    is without contingency for financing or further due diligence and shall not contain a break-up fee or expense reimbursement;

  iv.    includes a list of all unexpired leases and executory contracts to be assumed and assigned to the Qualified Bidder;

   v.    is not subject to conditions, representations, or terms that the Debtor determines, in consultation with the Consultation Party, to be unacceptable;

  vi.    is at least equal in value to the purchase price payable at closing in connection with the Stalking Horse Bid, plus:  (A) the amount of

the Break-Up Fee, plus, (B) the amount of the Expense Reimbursement, plus, (C) an initial overbid of $100,000;

vii.   is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment;

viii.   does not contain any condition to closing of the transaction relating to the receipt of any third-party approvals (excluding required Bankruptcy Court and required regulatory approval);

ix.   expressly acknowledges and represents that the Qualified Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Assets and the proposed transaction prior to making its bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and the assets in making its bid or that of any of its legal, financial or other advisors, and, (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Debtor; and,

x.   contains other information reasonably requested by the Debtor.

f.   Evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code).

g.   A deposit ("Deposit") in an amount equal to ten percent (10%) of the amount of the bid in the form of a cashier's check, made payable to the order of Steinhilber Swanson LLP Special Trust Account, delivered to counsel for EPS, or a wire transfer or ACH to the Steinhilber Swanson LLP Special Trust Account, established for this purpose, which will be returnable to the Qualified Bidder, as set forth in Paragraph J.  All Deposits will be held in the segregated trust account designated above.

Notwithstanding anything to the contrary herein, or in the APA submitted by the Stalking Horse, if any bid submitted by a Qualified Bidder includes material assets not included in the Stalking Horse Bid, or excludes material assets included in the Stalking Horse Bid, is accepted as a Qualified Bid by EPS, after consultation with the Consultation Parties, then: (i) at any time prior to the Auction, the Stalking Horse may, without terminating its current APA, submit a new APA (the "New APA") in substantially the same form as its current APA except for changes with respect to the purchase price to be paid in the scope of the assets and liabilities to be purchased, and any other modifications reasonably related to such changes; (ii) such New APA shall be deemed to be a Qualified Bid and the Stalking Horse would be deemed to be a Qualified Bidder with respect to the New APA and for all purposes and requirements pursuant to these Bidding Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder; and, (iii) the Stalking Horse will be permitted to credit bid the Break-Up Fee and the Expense Reimbursement as part of its bidding in the Auction.

After the Bid Deadline, EPS management, in consultation with the Consultation Party, will analyze each Competing Bid based on the criteria detailed above to determine which bids will be treated as "Qualified Bids" entitled to participate at the Auction, based on the capability of the Qualified Bidder to close a transaction, the Competing Bid's impact on all constituents of the Debtor, and the amount of the Competing Bid.    SSLLP may, at any time after consulting with EPS and the Consultation Party, contact Qualified Bidders to discuss or clarify terms and to indicate any terms, which may need to be modified in order to conform the Competing Bid to a Qualified Bid or to negotiate terms.  SSLLP shall provide a list of Qualified Bids and each corresponding Bid Package to:  (a) counsel for the Stalking Horse, (b) counsel for the DIP Lender and (c) each Qualified Bidder no later than the earlier of one (1) day after the Bid Deadline and at least one (1) day before the Auction.  For the purposes of the Auction, the APA submitted by the Stalking Horse is a Qualified Bid and the Stalking Horse is a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder.  The Stalking Horse shall not be required to take any further action to participate in the Auction, or if Stalking Horse Bid is the Prevailing Bid (as defined below) or the Back-Up Bid (as defined below) to be named the Prevailing Bidder (as defined below) or the Back-Up Bidder (as defined below), as applicable.

After the Bid Deadline, the Debtor, in consultation with the Consultation Party, shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder").  Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid.

SSLLP and EPS management may, in their reasonable business judgment, and after consultation with the Consultation Party, reject any bid if such bid is, among other things:

a.  on terms that are more burdensome or conditional than the terms of the APA;

b.  not received by the Bid Deadline; and/or,

c.  is subject to any due diligence, financing condition, or other contingencies (including representations, warranties, covenants, and timing requirements), or an estimated time to close which materially affects the value of the bid.

Any bid rejected pursuant to this Paragraph shall not be deemed to be a Qualified Bid and shall not be permitted to participate in the Auction.

## H.  AUCTION

1.  Qualified Bidders who are deemed to have submitted a Qualified Bid will convene on November 24, 2020, at 1:00 o'clock P. M. CST at the office of SSLLP, or at such other location selected by SSLLP with written notice to each party that has submitted a Qualified Bid for the Auction (the "Auction").  The Auction may also be held by Zoom or some comparable video conferencing platform if the Seller so designates.

2.  If no Qualified Bid is timely received other than the Stalking Horse Bid, no Auction will take place.

3.  The Auction may be postponed by announcement by SSLLP, after consultation with the Consultation Party, by not more than three (3) business days, except with the consent of the Consultation Party.

4.  The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder who submitted a Qualified Bid (the "Auction Participants").  While only the Auction Participants may bid at the Auction, the Auction may be attended by the Debtor, the Debtor's advisors, the Consultation Party, the U.S. Trustee, along with any other party the Debtor deems appropriate.  All creditors of the Debtor's estate shall be permitted to attend; *provided*, *however*, that in order to attend the Auction, a creditor must advise the Debtor in writing no later than 48 hours prior to the Auction; provided, further, however, that

the Debtor may seek relief from the Bankruptcy Court in the event that they object to such creditor's attendance.

5.      The Debtor is authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Debtor, in consultation with the Consultation Party, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further bids are timely made or otherwise.

6.      The Qualified Bid that is deemed the Initial Highest Bid shall be the first Qualified Bid to begin the Auction.  The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid plus at least $100,000 (the "Minimum Bid Increment").  Thereafter, the Auction will continue in the manner set forth herein and as otherwise determined by the Debtor in accordance with these Bidding Procedures, in consultation with the Consultation Party.  Notwithstanding anything to the contrary provided herein, the Stalking Horse being permitted to credit bid the Break-Up Fee and the Expense Reimbursement as part of any subsequent bidding.

7.      The amount of each subsequent Qualified Bid will be made known to all other Qualified Bidders.

8.      When such bidding has ceased, the bids that are deemed by SSLLP, on behalf of the Debtor, after consultation with the Consultation Party, to be the highest and best bid(s) will be announced at the close of bidding.

9.      Subject to the provision set forth above, SSLLP, on behalf of the Debtor, after consultation with the Consultation Party, also conduct auctions for other assets or combinations of assets to determine which is the winning bid or bids.

10.     The highest and best bid(s) is referred to herein as the "Prevailing Bid(s)" and the maker(s) of such bid(s) the "Prevailing Bidder(s)."

11.     The next highest and best bid will be the "Back-Up Bid(s)" and the maker of the Back-Up Bid will be the "Back-Up Bidder(s)."

12.     If the Stalking Horse Bid is not the Prevailing Bid or the Back-Up Bid, either of which ultimately becomes the successful buyer or as otherwise provided in the APA, the Break-Up Fee shall be paid and the Stalking Horse shall be entitled to the return of its Deposit as described in the APA.

13.     No additional bids will be considered after the end of the Auction.

14.     In determining which bid constitutes the "Prevailing Bid" or the "Prevailing Bids" and the "Back-Up Bid" or "Back-Up Bids," the Debtor, in consultation with the Consultation Party, will use its reasonable business judgment and may consider, among other things: (i) the purchase price offered in the Qualifying Bid; (ii) the Qualified Bidder's financial situation and wherewithal; (iii) the probability of a prompt closing; (iv) the ability to demonstrate adequate assurance of future performance on all contracts to be assumed; and, (v) the best interest of holders of claims and interests.  The Debtor may also consider different combinations of bids.

15.     EPS and SSLLP will inform all persons identified on the short service list concerning the sale process and the foregoing decision.

16.     **EACH QUALIFIED BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON EACH QUALIFIED BIDDER(S) FROM THE TIME THE BID IS SUBMITTED UNTIL THE EARLIER OF 48 HOURS AFTER THE SALE OF THE ASSETS HAS CLOSED OR THIRTY (30) DAYS AFTER THE APPROVAL HEARING.**

17.     All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court with respect to the Debtor and its assets and to have waived any right to a jury trial in connection with any dispute relating to the Auction, the sale of the assets, and the construction and enforcement of the APA.

## I.    APPROVAL OF SALE HEARING

On _____ , 2020, the Bankruptcy Court will hold a hearing ("Approval of Sale Hearing") at which the Debtor will seek Bankruptcy Court approval of the Prevailing Bid(s) and of the Back-Up Bid(s).  In the event that a Prevailing Bidder(s) cannot or refuses to consummate the sale because of the breach or failure on the part of the Prevailing Bidder(s), and not because of any default by the Debtor, the Debtor will be permitted to close with the Back-Up Bidder(s) on the Back-Up Bid(s) without further order of the Bankruptcy Court.  The Debtor's presentation to the Bankruptcy Court for approval of those particular bids did not constitute acceptance of any bids.  The Debtor has accepted a bid only when the Bankruptcy Court, following the Sale Approval Hearing, has approved the sale pursuant to a Final Order.  No additional bids will be considered at the end of the Auction.

## J.    CLOSING

Closing (the "Closing") shall occur within five (5) business days after the Bankruptcy Court has entered a final order approving the sale and other conditions are

met, all consistent with the APA, subject to the right of the Debtor and the Prevailing Bidder or the Back-Up Bidder as the case may be, to extend such date as consistent with the applicable APA(s).

Each Deposit submitted pursuant to these Bidding Procedures will be held in escrow until:

1.      As to other bidders, the selection of the Prevailing Bidder(s) and the Back-Up Bidder(s); or,

2.      As to the Back-Up Bidder(s), the earlier of 48 hours after Closing of the sale of the assets to the Prevailing Bidder(s) or thirty (30) days after the Sale Approval Hearing.

The Deposits received from the Prevailing Bidder(s) or the Back-Up Bidder(s) as the case may be shall constitute liquidated damages in the event that the Bankruptcy Court approves the Asset Purchase Agreement to which the Prevailing Bidder(s) or Back-Up Bidder(s), as applies, is a party, but the sale is not consummated, such bidder's Deposit shall be forfeited to the Debtor and such forfeited Deposit shall constitute collateral of the DIP Lender, and be subject to the debtor-in-possession financing orders.

## K.      GENERAL

These Bidding Procedures are subject to modification from time to time by SSLLP as circumstances may warrant, after consultation with the Consultation Party and the Stalking Horse.  In the event that a material modification is not consented to by the Stalking Horse, such modification shall permit the Stalking Horse to withdraw its bid without any liability and to receive return of its deposit and to obtain payment of the Break-Up Fee and the Expense Reimbursement to the extent payable under the terms of the APA.  The Debtor shall promptly notify parties in interest and prospective bidders of any such modifications.  Except as provided in the APA, no bidder has any rights against the Debtor and its estate, the DIP Lender, or any of their respective professionals, advisors or agents by virtue of any modification of these Bidding Procedures, or by virtue of having or not having its bid accepted by the Debtor or approved by the Bankruptcy Court.

## L.      TERMS OF SALE

Sale of the assets shall be on an "As Is, Where Is" basis and without representation or warranties of any kind, nature or description by the Debtor or its

agents, except as provided in an Asset Purchase Agreement accepted by the Debtor and approved by the Bankruptcy Court in a sale order.  All of the Debtor's right, title and interest in and to the assets shall be sold free and clear of all liens and encumbrances, claims, and interests to the full extent available under Bankruptcy Code Section 363(f) including, without limitation, the interest of any secured creditor, unsecured creditor, equity interest holder, or any other person holding an interest in or claim against said assets with such interest to attach to the net proceeds of the sale.

## M.    RESERVATION OF RIGHTS

The Debtor, in consultation with the Consultation Party, may: (a) determine in its reasonable business judgment and based on the criteria outlined herein, which bids are the highest and best bids for the assets and in the best interest of the Debtor's estate; and, (b) reject at any time before entry of an order by the Bankruptcy Court approving a Prevailing Bid (or Back-Up Bid) any bid (other than the Stalking Horse Bid) that, in the Debtor's discretion, exercising its reasonable business judgment, is: (i) inadequate or insufficient based on the criteria outlined herein, (ii) not in conformity with these procedures whether the requirements of the Bankruptcy Code, or, (iii) contrary to the best interest of the Debtor and the Debtor's estate; and, (c) subject to the provisions of Paragraph K modify these procedures as set forth herein as required to best accomplish the sale of the assets of the debtor.

Dated this 15th day of October, 2020.    **STEINHILBER SWANSON LLP**

By:  _/s/ James D. Sweet_
⠀⠀⠀James D. Sweet
⠀⠀⠀Virginia E. George
⠀⠀⠀Eliza M. Reyes
⠀⠀⠀Attorneys for the Debtor
⠀⠀⠀122 W. Washington Ave., Suite 850
⠀⠀⠀Madison, WI 53703-2718
⠀⠀⠀Tel: (608) 630-8990; Fax: (608) 630-8991
⠀⠀⠀jsweet@steinhilberswanson.com
⠀⠀⠀vgeorge@steinhilberswanson.com
⠀⠀⠀ereyes@steinhilberswanson.com