**THIS ORDER IS SIGNED AND ENTERED.**
Dated: July 2, 2021

The statements following "**HEREBY FINDS**" and before "**HEREBY ORDERS**" result from their inclusion in a proposed order approved by parties who, after notice, expressed an interest in the sale motion. No one requested an evidentiary hearing; the court did not receive evidence. Assertions not otherwise established by the record result from party agreement with the proposed order. This qualification does not limit the order's effect. "Exhibit 1" refers to the first attached **EXHIBIT** A and its attachments.



**UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF WISCONSIN**

---

In re:   **ENGINEERED PROPULSION SYSTEMS, INC.,**          Case No. 20-11957-gmh

　　　　　　　　Debtor.                                                    Chapter 11

---

### ORDER AUTHORIZING SALE OF ASSETS UNDER 11 U.S.C. §363

---

Upon the motion (the "Motion") of the above-captioned debtor (the "Debtor") for entry of

an order (this "Sale Order") approving the sale ("Sale") of certain assets of the Debtor (the

"Assets") free and clear of all Liens (as defined below) to General Atomics Aeronautical

Systems, Inc. (together with its successors, designees and assigns, the "Buyer"); and it appearing

that Buyer has submitted the highest or otherwise best bid for the Assets; and upon adequate and

sufficient notice of the Motion, the Agreement, and the Sale; and the Court having reviewed and

considered the Motion and all relief related thereto and any objections thereto; and upon the full

record in support of the relief requested by the Debtor in the Motion; and this Court having

jurisdiction to enter a final order approving the Sale and the Agreement consistent with Article III

of the United States Constitution; and after due deliberation thereon, and good and sufficient

cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

A.    Notice of the Sale Hearing and Transaction was timely, proper, and reasonable.

B.    The agreement that governs the Sale (the "Agreement"[1]), attached to this Sale

Order as **Exhibit 1**, was negotiated, proposed, and entered into by the Debtor and the Buyer

without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor

nor the Buyer has engaged in any conduct that would cause or permit the Sale to be avoided

under Bankruptcy Code section 363(n). The Buyer is a good faith buyer within the meaning of

section 363(m) of the Bankruptcy Code and is not an "insider" of the Debtor.

C.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied with

respect to each and every lien (as that term is defined in section 101(37) of the Bankruptcy Code),

including the DIP Liens[2], and other encumbrance that has been or could be asserted with respect

to the Assets, (collectively, "Liens").

D.    There is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h)

and 6006(d) with regard to the transactions contemplated by this Sale Order.

**THE COURT HEREBY ORDERS THAT:**

1.    The Agreement, all other ancillary documents, the Sale, and all other relief

requested in the Motion are approved, except as set forth in this Order, pursuant to sections

105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Agreement.

[2] "DIP Liens" has the meaning assigned to it in this Court's *Final Order: (I) Authorizing the Debtor to Use Cash Collateral; (II) Authorizing the Debtor to Obtain Senior Secured Postpetition (DIP) Financing; (III) Granting Liens and Superpriority Administrative Claim Status to the DIP Lender; (IV) Granting Adequate Protection to the Prepetition Secured Parties; and (V) Granting Related Relief*, dated September 8, 2020, ECF No. 124 (the "First DIP Order," and, collectively with the further orders of the Court dated December 17, 2020, ECF No. 237, and April 8, 2021, ECF No. 306, the "DIP Orders"). In the event of any conflict between this Sale Order and the terms of the DIP Orders, this Sale Order controls.

12759449v.4

2.      Insofar as it pertains to the allocation of the Purchase Price, the Court defers

consideration of the limited objection to the Motion filed by EPS Engineered Propulsion Systems,

Inc. (the "DIP Lender") (ECF No. 360) (provided, however, that to the extent such objection

objects to the Sale itself, to the transfer of the Assets free and clear of the DIP Liens or any other

Liens, or to the payments to First National Community Bank, Wisconsin Economic Development

Corporation, or US Bank Equipment Finance that are contemplated by the Agreement, then such

objection is overruled, and with respect to the UST fees, premium for the D&O tail policy, and

personal property taxes, such objection is rendered moot by agreement of the DIP Lender to

payment of such amounts).

3.      The *Limited Objection to Second Section 363 Motion and Proposed Order* filed by

First National Community Bank (ECF No. 351) has been withdrawn, subject to the agreement of

all parties that Section 2.2(a)(2) of the Agreement is revised to read as follows:

> In the event that the amounts described in Section 2.2(a)(1) exceed the
> Purchase Price Cushion, then the Buyer ~~may elect to~~ *shall* increase the
> Purchase Price to fund such additional amounts or terminate this
> Agreement pursuant to Section 8.1(j).

Contingent on receipt of the full payoff sum owed to First National Community Bank at

Sale Closing, First National Community Bank has consented to the surcharge of its

collateral for the Carveout for Professionals, as set forth in Schedule 2.2 of the Agreement,

and further consents to the surcharge of its collateral for the payment of the quarterly fees

owed to the United States Trustee, the policy premium for the tail insurance, personal

property taxes and the pre-paid $161,300 deposit.

4.      Other than the amount of the Purchase Price to be distributed to First National

Community Bank, Wisconsin Economic Development Corporation, US Bank Equipment

Finance, D&O tail insurance, UST fees, and personal property taxes, the remaining amount

allocated in the Agreement for Carveout for Professionals in the sum of $718, 538.00 plus the Post-Petition A/P of $35,098.00 (the "Sequestered Funds") shall be sequestered in the trust account of Steinhilber Swanson, LLP, pending entry by this Court of an order directing the disbursement of any of the Sequestered Funds or written agreement by the DIP Lender.

5. Any other objections to the Motion that have not been withdrawn, waived, or settled are hereby denied with prejudice. Parties that did not object, or withdrew their objection, to the Motion have consented to the Sale pursuant to Bankruptcy Code section 363(f)(2).

6. Pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtor is authorized to transfer the Assets to the Buyer in accordance with the terms of the Agreement. Such transfer shall constitute a legal, valid, binding, and effective sale and shall vest the Buyer with title to the Assets. The transfer of the Assets is free and clear of all Liens, claims, or other interests of any kind or nature whatsoever, with all such Liens, claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, claims, or other interests are asserted.

7. The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreement, all amendments thereto, and any waivers and consents thereunder, and to adjudicate any and all disputes concerning or relating in any way to the Sale (including, without limitation, determining the allocation of the Sequestered Funds).

8. To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in this chapter 11 case, the terms of this Sale Order shall govern.

9. This Sale Order is not subject to the 14-day stay imposed by Bankruptcy Rules 6004(h) and shall be effective immediately upon entry.

### #

4

**EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

dated as of June 1, 2021,

by and between

**General Atomics Aeronautical Systems, Inc.,**

as the Buyer

and

**Engineered Propulsion Systems, Inc.,**

as the Seller

12569612v.24

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of June 1, 2021, by and between General Atomics Aeronautical Systems, Inc. (together with its successors, designees and assigns, the "Buyer") and Engineered Propulsion Systems, Inc., a Delaware corporation (hereinafter referred to as the "Seller," and together with the Buyer, the "Parties," and each, a "Party").

## RECITALS

**WHEREAS,** the Seller is engaged in the business of research and development, as well as the design and engineering of aviation propulsion systems (the "Business") and is operating the Business as "debtor-in-possession" under chapter 11 bankruptcy proceedings (the "Chapter 11 Case") filed on July 29, 2020 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Wisconsin (the "Court"), in Case No. 20-11957;

**WHEREAS,** the Buyer is a Delaware corporation;

**WHEREAS,** the Seller previously sought to sell certain assets of the Business (the "Prior Proposed Transaction") to EPS Engineered Propulsion Systems, Inc. (the "Prior Proposed Purchaser") pursuant to a sale agreement (the "Prior Transaction Agreement") that was approved by the Court pursuant to that certain *Order Authorizing Asset Sale Under 11 U.S.C. §363* dated December 2, 2020 [Docket No. 224] (the "Prior Sale Order");

**WHEREAS,** on April 28, 2021, the Prior Proposed Purchaser provided written notice to Seller of its termination of the Prior Proposed Transaction;

**WHEREAS,** on April 28, 2021, the Prior Proposed Purchaser provided written notice to Seller that (i) the debtor-in-possession loan facility previously approved in the DIP Order has been terminated and (ii) the funds are no longer be available to Seller under such facility;

**WHEREAS,** Seller therefore approached other prospective purchasers, including Buyer, about acquiring certain assets of the Business);

**WHEREAS,** Buyer is the only prospective purchaser that has expressed an interest in purchasing the Purchased Assets (as defined below) on terms acceptable to the Seller;

12569612v.24

**WHEREAS**, the Buyer desires to purchase the Purchased Assets, and the Seller desires to sell and transfer to the Buyer the Purchased Assets pursuant to Section 363 (b) and (f) of the Code (as defined below), free and clear of all Liens (as defined below);

**WHEREAS**, other than the Purchased Assets, the Buyer is not offering to purchase any other assets of the Seller and such other assets shall remain with the Seller;

**WHEREAS**, the Seller will seek entry of the New Sale Order (as defined below) authorizing the Seller to consummate the Contemplated Transactions (as defined below) pursuant to the terms and subject to the conditions set forth in this Agreement and in the New Sale Order;

**WHEREAS**, the board of directors or other applicable governing body of the Seller has determined that it is advisable and in the best interests of the Seller's estate and the beneficiaries of such estate to consummate the Contemplated Transactions provided for herein pursuant to the New Sale Order, and has, therefore, approved the Contemplated Transactions and this Agreement; and

**WHEREAS**, the Contemplated Transactions are subject to the approval of the Court and will be consummated only upon or following entry of the New Sale Order by the Court.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual agreements and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and subject to the approval of the Court under such procedures and according to such timing as the Court may direct, the Buyer and the Seller hereby agree as follows:

**ARTICLE I**
**PURCHASE AND SALE OF ASSETS**

1.1    <u>Defined Terms</u>.  Capitalized terms used herein have the meanings set forth in <u>Section 6.1</u> hereof.

1.2    <u>Purchased Assets</u>.  Pursuant to Sections 105, 363 and 365 of the Code, pursuant to the terms and subject to the conditions of this Agreement, and in reliance upon the representations, warranties, covenants and agreements made in this Agreement by the Seller and the Buyer, the Buyer hereby agrees that it shall purchase, accept and acquire from the Seller, at the Closing, and the Seller shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing, the assets, properties, both

-2-

real and personal, rights and interests of the Seller, whether tangible or intangible, and wherever located, described below (the "Purchased Assets"), free and clear of all Liens:

(a)     all raw material inventories of whatever kind, including, without limitation, supplies and accessories used in the Business that are owned by the Seller as of the date of the Closing, including all rights of the Seller to receive such raw material inventories (the "Inventories");

(b)     all equipment, appliances, industrial artwork, computers, computer terminals and printers, engine testing hardware and software, factory machinery, tooling, fixtures and equipment, tools, all materials handling and, and all other tangible personal property of every kind and description, located in the Hangars owned by Seller or in the possession of any vendor to Seller (hereinafter, the "Equipment"), including all such Equipment listed on Schedule 1.2(b); provided that such Equipment includes software only to the extent of Seller's rights, if any, in such software as of the Closing Date;

(c)     the contracts, leases, subleases, arrangements, commitments, and other agreements of the Seller, including, without limitation, customer agreements, vendor agreements, purchase orders, sales orders, installation and maintenance agreements, hardware lease or rental agreements, and other arrangements and understandings related to the Business, as more specifically described in Sections 1.3 and 2.3, below;

(d)     all work in progress of the Business, in whatever stage of completion and wherever located (the "Work-in-Progress") as of the date of the Closing, including, without limitation, that which is specifically described on Schedule 1.2 (d);

(e)     all Intellectual Property, and all goodwill associated with the Business, including, without limitation, that which is specifically described on Schedule 3.11(a), along with all associated licenses and sublicenses granted[i] and obtained with respect thereto and rights thereunder, remedies against infringements thereof and rights to protection of interests therein under the laws of all jurisdictions and all rights under any confidentiality agreements executed by any third party for the benefit of the Seller to the extent relating to the Purchased Assets and/or Assumed Liabilities, and all Records related to Intellectual Property, including any legal files maintained by Seller or its counsel;

(f)    to the extent legally transferable, all qualifications, registrations, filings, privileges, immunities, certifications, accreditations, consents, licenses, permits, authorizations and approvals of Governmental Entities and non-Governmental Entities, which are used or required, authorizing the Seller to own and operate the Business, including, without limitation, all certificates of occupancy and certificates, licenses and permits relating to zoning, building, housing, safety, Environmental Laws, fire and health (the "Permits");

(g)    all Records of the Business related to the creation and development of the Purchased Assets, but the remainder of the Records of the Business not so related are deemed to be Excluded Assets, subject to the access provisions of Section 5.9, below;

(h)    all sales, marketing and development and expansion plans, strategic plans, projections, studies, reports and other documents and data (including, without limitation, creative materials, advertising and promotional matters, and current and past lists of customers, suppliers, vendors, and sources), and all training materials and marketing brochures, in each case, related to the Business;

(i)    all the Seller's rights and remedies on and after the Closing Date, under warranty or otherwise, against a manufacturer, vendor, supplier, contractor, or other Person for any defects in any Purchased Asset and/or Assumed Liabilities;

(j)    all causes of action, choses in action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of the Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) and rights of recovery with respect to any of the foregoing, but any such rights, causes of action, choses in action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, and defenses arising under Chapter 5 of Title 11, U.S.C. are specifically deemed to be Excluded Assets;

(k)    the Hangars;

(l)    Reserved;

-4-

12569612v.24

(m)     all Accounts Receivable of the Seller as of the Closing;

(n)     without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of the Seller, but specifically excluding any Advance Deposits, retainer payments or analogous monies deposited with or paid to any legal counsel for the Seller;

(o)     all rights of the Seller under any non-disclosure or confidentiality, noncompete, or non-solicitation agreements with current or former employees, directors, consultants, independent contractors, and agents of the Seller to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(p)     the amount of, and all rights to any, insurance proceeds received by the Seller after the date hereof in respect of (i) the loss, destruction, or condemnation of any of the Purchased Assets, occurring on or after the Closing or (ii) any Assumed Liabilities; and

(q)     Reserved;

(r)     all testing and analytical data and files generated out of or in connection with the Seller's prime contracts with the United States Air Force.

All assets owned by the Seller that are not included within the list of Purchased Assets, and specifically all Records of the Business that are not Purchased Assets, shall remain the assets of the Seller following the consummation of the Contemplated Transactions (the "Excluded Assets").

1.3     Assumption of Assumed Liabilities.

(a)     Pursuant to the terms and subject to the conditions of this Agreement and the New Sale Order, at the Closing, the Buyer shall assume from the Seller, and the Seller shall irrevocably convey, transfer, and assign to the Buyer, the Liabilities under contracts, notes, and obligations assumed by the Buyer that are specifically listed on Schedule 1.3(a), if any (the "Assumed Liabilities").

(b)     Not earlier than five (5) days prior to the Closing, nor less than two (2) days prior to the Closing, the Buyer shall deliver to the Seller the Exhibits to Schedule 1.3(a), hereof, setting forth the specific contracts and obligations being assumed, if any. The Buyer's obligation hereunder is to assume all obligations categorized in Schedule

-5-

1.3(a), and the Exhibits to that Schedule that shall provide the detail of the liabilities being assumed.

1.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that the Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of the Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all Liabilities, other than the Assumed Liabilities, being referred to collectively as the "Excluded Liabilities"). For the avoidance of doubt, "Excluded Liabilities" shall include, without limitations, any Liabilities, debts or obligations of the Seller of any kind whatsoever (including the DIP Obligations, the DIP Liens, any obligations of Seller to the Equipment Finance Lenders other than those obligations expressly set forth in Section 2.2, and any Liens asserted by the Equipment Finance Lenders), that is in existence at the time of the Closing, whether actual, contingent, accrued, known or unknown, including, without limitation, any relating to interest-bearing debt, interest and termination penalties on indebtedness, taxes, employee compensation, severance, pension, profit-sharing, health insurance, disability insurance or other employee benefit plans and programs, worker's compensation, breach or negligent performance of any contract, or breach of warranty relating thereto, Liabilities resulting from breach of contract, torts (including, without limitation, product liability claims), illegal activity, unlawful employment or business practice, infringement of intellectual property rights, claim for environmental liability or remediation or any other Liability or obligation whatsoever.    All Excluded Liabilities shall remain the responsibility of the Seller, which shall pay and discharge the same when and as due and shall be restricted as liability against the Seller under Section 363(f) of the Code.

## ARTICLE II

## PURCHASE PRICE

2.1    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets shall take place at the offices of Steinhilber Swanson LLP, or at such other place and manner, including remotely by electronic exchange of counterpart signature pages, as the Parties may agree on or before (a) five (5) days following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or (b) at such other date and time as the Parties may agree (the "Closing Date").

-6-

2.2    Purchase Price.

(a)    The aggregate purchase price (the "Purchase Price") for the Purchased Assets shall be composed of the following: (i) cash equal to $1,034,399.00, a portion of which will be paid by Buyer to Seller prior to Closing in the form of one or more deposits in such amounts and on such dates to be reasonably agreed between Buyer and Seller, and with the remainder to be paid at Closing; (ii) assumption by the Buyer of the Assumed Liabilities, if any, and (iii) the satisfaction of up to $1,653,010.00 of the Seller's obligations to the Equipment Finance Lenders as of the Closing Date; provided, however, that to the extent the Seller's obligations to the Equipment Finance Lenders as of the Closing Date are less than $1,653,010.00, then the difference between $1,653,010.00 and such lesser amount shall be credited against the Purchase Price and any amounts otherwise payable by Buyer at the Closing Date.

1.    The Purchase Price is subject to increase by an amount not more than the Purchase Price Cushion if (x) the Seller's obligations to the Equipment Finance Lenders as of the Closing are greater than the amount set forth in Section 2.2(a)(iii) and/or (y) the Debtor's utility bills, insurance premium, professional fees or other expenses exceed the budgeted amounts set forth on Schedule 2.2.

2.    In the event that the amounts described in Section 2.2(a)(1) exceed the Purchase Price Cushion, then the Buyer may elect to increase the Purchase Price to fund such additional amounts or terminate this Agreement pursuant to Section 8.1(j).

(b)    At the Closing, Buyer shall pay to Seller cash equal to $2,687,409.00 *less* any deposit(s) previously paid by Buyer to Seller in accordance with Section 2.2(a)(i). Buyer shall satisfy the Purchase Price as to any Assumed Liabilities described in Schedule 1.3(a) by assuming such Assumed Liabilities pursuant to the Assignment, Assumption and Bill of Sale (as defined below).

(c)    The Purchase Price shall be allocated as set forth on Schedule 2.2.

2.3    Pre-Closing Deliveries by Buyer; Assumed Contracts and Leases.

-7-

(a)    Schedule 2.3(a) sets forth a list of all executory contracts and unexpired leases to which the Seller is a party. Prior to Closing, Seller will certify that such list is complete and accurate or provide an update to make such list complete and accurate.

(b)    Schedule 2.3(b) sets forth a complete list of the executory contracts and unexpired leases that the Buyer wishes for the Seller to assume and assign to the Buyer under Section 365 of the Code (the "Assumed Contract List"). Buyer may remove any contract or lease from the Assumed Contract List at any time prior to the date that is two (2) days before the Closing. Buyer may add any contract or lease to the Assumed Contract List at any time prior to the date that is two (2) days before the Closing (whereupon Seller's obligations set forth in Section 2.3(c) shall also apply to such additional contracts or leases).

(c)    The Seller shall promptly take all reasonable and necessary steps to file and pursue the assumption and assignment of the contracts and leases set forth on the Assumed Contract List to the Buyer, and to undertake such negotiations with the relevant contract counterparties, including any landlords, to effectuate the assumption and assignment of such contracts and leases to the Buyer.

(d)    The Closing shall not be contingent upon the assumption and assignment of the contracts and leases on the Assumed Contract List; it being the duty of the Seller to use its best efforts to assume and assign such contracts and leases. Notwithstanding the foregoing, in the event the Seller is unable to assign such contracts and leases to the Buyer pursuant to an order of the Court, then the parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from third parties necessary to assume and assign such contracts and leases to the Buyer.

(e)    Reserved.

2.4    Closing Deliveries by the Seller. At the Closing, the Seller shall deliver the following documents or other items, duly executed by the Seller, as necessary, to the Buyer:

(a)    the Assignment, Assumption and Bill of Sale in substantially the form of Exhibit A (the "Assignment, Assumption and Bill of Sale"), conveying to the Buyer, the Purchased Assets, free and clear of all Liens, and the *Assignment & Assumption of Hangar Lot Leases* and the *Hangar Bill of Sale*

-8-

12569612v.24

*and Assignment*, each substantially in the forms of <u>Exhibits B-1</u> and <u>B-2</u>, conveying the Hangars to the Buyer;

(b) a certificate of the President of the Seller certifying as to the incumbency of the Seller's officer who is authorized to execute the Assignment, Assumption and Bill of Sale;

(c) a certified copy of the New Sale Order from the Court approving the terms of the sale;

(d) instruments of assignment in form and substance to be agreed to by the parties in their reasonable discretion for each registered trademark and patent, respectively, transferred or assigned hereby and for each pending application therefor, and general assignments of all other Intellectual Property of the Seller;

(e) such other bills of sale, special deeds, completed transfer tax returns, title affidavits, assignments of leases, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Buyer (in each case signed and acknowledged as appropriate), as the Buyer may reasonably request to vest in the Buyer all the right, title and interest of the Seller in, to or under any or all the Purchased Assets; provided that all of the reasonable and documented out-of-pocket post-Closing costs incurred by the Seller in preparing and delivering the foregoing shall be borne by the Buyer and paid promptly after demand therefor and receipt of supporting invoices;

(f) originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to the Buyer;

(g) physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(h) certificates of title and title transfer documents to all titled aircraft, if any, included within the Purchased Assets;

(i) a certificate of the President of the Seller certifying that any EPS proprietary property, both tangible and intangible, has been destroyed

-9-

(in the case of tangible property) or has been erased and over-written (in the case of intangible and Intellectual Property);

(j)     all other previously undelivered certificates, agreements and other documents, instruments and writings reasonably requested by the Buyer to be delivered by the Seller at or prior to the Closing pursuant to this Agreement; and,

(k)     such other documentation as the parties may reasonably agree is necessary to convey good and merchantable title to the Buyer.

2.5     <u>Closing Deliveries by the Buyer</u>. At the Closing, the Buyer shall deliver the following documents or other items, duly executed by the Buyer, as necessary, to the Seller:

(a)     an executed copy of the Assignment, Assumption and Bill of Sale;

(b)     a certificate of an officer of the Buyer certifying as to the incumbency of the Buyer's officer who is authorized to execute the Assignment, Assumption and Bill of Sale; and,

(c)     all other documents reasonably requested by counsel for the Seller to consummate the transactions herein contemplated.

2.6     <u>Sales, Transfer and Property Taxes</u>. The Seller shall pay from sale proceeds, at Closing, all transfer, sales, purchase, use, value added, excise or similar tax imposed under the laws of the United States, or any state or political subdivision thereof, which arises out of the transfer by the Seller to the Buyer of any of the Purchased Assets, subject to any exemption therefrom contained in the Code. The Seller shall also pay from sale proceeds, at Closing, all delinquent personal property taxes for the year, if any.

## ARTICLE III

## LIMITED REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

To induce the Buyer to enter this Agreement, the Seller makes the following limited representations and warranties to the Buyer (which representations and warranties shall survive the Closing), each of which shall be deemed to be independently material and relied upon by the Buyer, regardless of any investigation made by, or information known to, the Buyer.

-10-

12569612v.24

3.1    <u>Organization; Authorization</u>. The Seller is a Delaware corporation and, as such, has the necessary power and authority to enter and perform the transactions contemplated hereby in accordance with the terms and conditions hereof, subject to approval by the Court.  The execution and delivery of this Agreement, and the performance by the Seller of its obligations contained herein, when approved by the Court, have been duly authorized by all corporate actions.

3.2    <u>Enforceability</u>. This Agreement and all other agreements of the Seller contemplated hereby are or, upon the approval of the Court and upon the execution and delivery of this Agreement, will be the valid and binding obligations of the Seller, enforceable against it in accordance with their terms.

3.3    <u>Title to Assets</u>. To the Seller's Knowledge, as of immediately prior to the Closing, the Seller has good and marketable fee simple title to all the Purchased Assets and following entry of the New Sale Order approving the sale of the Purchased Assets, such title may be conveyed to Buyer, free and clear of any Liens.

3.4    <u>Third-Party Consents</u>. Except for the approval of the Court, the Seller has no knowledge of any third-party consents, approvals, or authorizations necessary for the execution and consummation of the transactions contemplated hereby, or of any such consents, approvals or authorizations that are required for any of the Purchased Assets to be conveyed to the Buyer.

3.5    <u>Litigation</u>. Except as disclosed in the papers filed by the Seller with the Court as part of its bankruptcy filing, there is no litigation, claim, proceeding, or investigation pending, or, to the Seller's knowledge, threatened against or relating to the Seller, its properties or Business, or the Seller's ability to perform its obligations under this Agreement. The parties understand that the automatic stay will become or became effective against any such action brought or threatened against the Seller when the Chapter 11 Case was filed and that it prohibits any further litigation against the Seller outside of the context of the Chapter 11 Case.

3.6    <u>Authorization</u>. The Court has jurisdiction to authorize the Seller to convey the assets to the Buyer pursuant to applicable bankruptcy law.

3.7    <u>Purchased Assets</u>. The Seller makes no representation or warranty to the Buyer concerning the condition or merchantability of the Purchased Assets to be sold to the Buyer herein.  The Buyer has satisfied itself that the Purchased Assets include all the assets it believes are necessary to carry on the operations of the Business as the Buyer, in its sole discretion, intends to carry it out.  The Buyer is purchasing all the Purchased Assets in their current condition, "as is, where is", on

-11-

the Closing Date, and without any representation or warranty from the Seller that such Assets are usable in the ordinary course of business, are good and merchantable, or free from material defects.

3.8    Reserved.

3.9    Compliance with Laws. To the Seller's Knowledge, the Seller is in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects. As of the date hereof, the Seller has not received any written notice of violation of any Law with respect to the Seller, the Business or the Purchased Assets and there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation. The Seller has been contacted by the United States Department of Treasury on behalf of CFIUS regarding its historical financing matters. There has been correspondence related to the same, but no allegation or other indication that the Seller is in violation of any applicable Law.

3.10    Contracts. Except as set forth on Schedule 3.10, Seller has not assigned, delegated, or otherwise transferred to any third party any of its rights or obligations with respect to any executory contract or unexpired lease listed on Schedule 2.3(a). The Seller has not, and, to the Seller's Knowledge, no other party to any executory contract or unexpired lease has, commenced any action against the Seller and the Seller has not given or received any written notice of any material default or violation under any executory contract or unexpired lease that has not been withdrawn or dismissed. To the Seller's Knowledge, each executory contract or unexpired lease to be assumed and assigned to the Buyer is, or will be upon the Closing valid, binding and in full force and effect in accordance with its terms. There is not, and upon the Closing there will not be, any Cure Amount due with respect to any Assumed Contract. For the avoidance of doubt, after the Closing, the Seller may assume or reject any executory contracts and unexpired leases not on the Assumed Contract List in the Seller's discretion.

3.11.    Intellectual Property. Schedule 3.11(a) sets forth a true and complete list of (i) all Intellectual Property that is owned, or purported to be owned, by the Seller ("Seller-Owned IP"), (ii) all executory contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. The Seller owns all Seller-Owned IP, free and clear of all Liens (except for Permitted Liens), and all such Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting the Seller's use thereof or rights thereto, nor are any rights granted to, or held by, any Governmental Entity with

-12-

12569612v.24

respect to such Seller-Owned IP except as set forth on Schedule 3.11(b). To the Seller's Knowledge and except as set forth on Schedule 3.11(c), none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by the Seller or any of its Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To the Seller's Knowledge, no third party is infringing any Intellectual Property owned by the Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect. Seller and Buyer agree to cooperate in good faith both prior to and, to the extent necessary, after the Closing to perform such ongoing diligence or corrective filings as may reasonably be required by Buyer.

3.12.  Real Property. The Seller does not own any real property (other than to the extent that the Hangars may be considered "real property" under applicable state law).

3.13.  Purchased Inventory.  No Inventory that is Purchased Inventory is damaged in any way or subject to a current or past product recall, except for any such damage or any such recall which would not be material to the Purchased Inventory taken as a whole.  To the Seller's Knowledge, the Purchased Inventory is (a) in material compliance with United States federal and applicable state guidelines for such products as of the date hereof; and (b) in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be.

3.14.  Environmental Matters.  Except as set forth in Schedule 3.14, (a) the Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws; (b) the Seller has not received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws; (c) to the Seller's Knowledge, no Hazardous Substance has been released by the Seller at any current or former real property owned or leased in violation of any Environmental Law; and (d) the Seller has made available to the Buyer copies of all material environmental audits, assessments and reports in its possession relating to any actual or potential Liabilities under Environmental Laws with respect to any current or former real property leased or owned by the Seller.

3.15  Reserved.

-13-

12569612v.24

3.16.  <u>No other Agreements to Purchase</u>.  Other than the Prior Transaction Agreement, the Seller has not entered into any agreement with any other Person (written or oral) which grants such third party the right or option to purchase or acquire from the Seller any Purchased Asset, other than purchase orders for Inventory accepted by the Seller in the Ordinary Course of Business.

3.17.  <u>Reserved</u>.

## ARTICLE IV

## REPRESENTATIONS OF THE BUYER

To induce the Seller to enter this Agreement, the Buyer makes the following representations and warranties to the Seller (which representations and warranties shall survive the Closing), each of which shall be deemed to be independently material and relied upon by the Seller and the Court, regardless of any investigation made by, or information known to, the Seller.

4.1    <u>Organization; Authorization</u>.  The Buyer is a Delaware corporation and, as such, has the necessary power and authority to enter and perform the transactions contemplated herein in accordance with the terms and conditions hereof, subject to entry of the New Sale Order, in form and substance acceptable to the Buyer.  The execution and delivery of this Agreement, and the performance by the Buyer of its obligations contained herein, when approved by the Court, have been or will be duly authorized by all required corporate actions.

4.2    <u>Enforceability</u>.  This Agreement and all other agreements of the Buyer contemplated hereby are or, upon the execution thereof and approval of the Court, will be the valid and binding obligations of the Buyer enforceable against it in accordance with their terms, subject to entry of the New Sale Order, in form and substance acceptable to the Buyer.  Even if the Buyer assigns this Agreement to another party, as is its right to do, the Buyer remains liable to the Seller for all obligations that are required of the Buyer at Closing in the event that the Buyer's assignee fails to complete the transaction.

4.3    <u>Conflicting Obligations</u>.  The execution and delivery of this Agreement do not, and the consummation of the sale and purchase of the Purchased Assets and the Business contemplated hereby will not:

(a)    conflict with or violate any provisions of the organization of any entity formed by the Buyer; or,

-14-

12569612v.24

(b)     conflict with or violate any provisions of, or result in the maturation or acceleration of, any obligations under any contract, agreement, instrument, document, lease, license, permit, indenture, or obligation, or any law, statute, ordinance, rule, regulation, code, guideline, order, arbitration award, judgment, or decree, to which the Buyer is subject or to which the Buyer is a party.

4.4     <u>Litigation</u>.  There is no litigation, claim, proceeding, or investigation pending, or to the Buyer's knowledge, threatened against the Buyer relating to the Buyer's ability to perform its obligations under this Agreement.

**ARTICLE V**

**OTHER COVENANTS, CONTINGENCIES,
RISK OF LOSS AND EMPLOYMENT**

5.1     <u>New Sale Order</u>.

(a)     The New Sale Order must be approved by Buyer, in its sole and absolute discretion.

(b)     Following entry of the New Sale Order by the Court, in the event of any conflict between this Agreement and the New Sale Order, the New Sale Order will control.

(c)     The New Sale Order shall provide, *inter alia*, that the Buyer is acquiring the Purchased Assets, free and clear of all Liens.

(d)     The Seller and the Buyer agree, and the New Sale Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best offer for the Purchased Assets.

5.2     <u>Risk of Loss</u>.  The risk of loss or damage to the Purchased Assets to be sold hereunder due to fire, theft, or other casualty shall be upon the Seller at all times prior to the Closing Date. In the event of loss or damage to any of the Purchased Assets due to fire, theft, or other casualty while the risk of such loss or damage is on the Seller, the Buyer shall be entitled to terminate this Agreement upon written notice to the Seller, and the obligations of the parties shall thereupon be discharged. The rights conferred

12569612v.24

upon the Buyer in this <u>Section 5.2</u> shall constitute the Buyer's sole remedy in the event that such loss or damage occurs while the risk thereof is on the Seller.

5.3    <u>Employment of Seller's Employees</u>.    Nothing in this Agreement, express or implied, requires Buyer to employ, or offer to employ, any Former Employee or Current Employee for any period, or to confer upon any such Former Employee or Current Employee or their eligible dependents any right, benefit, or remedy of any nature whatsoever, including any right to a particular term or condition of employment. Notwithstanding anything to the foregoing, nothing in this Section 5.3 shall preclude Buyer, at its sole discretion, from soliciting for employment or hiring any Former Employee, Current Employee or any former or current contractor or consultant of Seller.

5.4    <u>Reserved</u>.

5.5    <u>Timing/Expiration of this Agreement</u>. Once executed, subject to the rights of Buyer set forth in <u>Section 8.1</u>, this Agreement shall remain binding and enforceable in accordance with its terms against Buyer through the process of seeking and procuring approval of the Court for Seller to convey the assets to be conveyed hereunder, unless otherwise terminated as set forth in this Agreement.

5.6    <u>Bankruptcy Actions</u>.

(a)    The Seller shall file the New Sale Motion on or before June 1, 2021.

(b)    The Seller will provide the Buyer, with at least two (2) business days to review and comment prior to submission, all motions, applications, and supporting papers relating to the Contemplated Transactions prepared by the Seller prior to the filing thereof in the Chapter 11 Case. Subject to Section 5.1(a), all motions, applications, and supporting papers prepared by the Seller and relating to the Contemplated Transactions to be filed on behalf of the Seller after the date hereof must be approved in form and substance by the Buyer, which approval shall not be unreasonably withheld or delayed.

(c)    Each of the Buyer and the Seller shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(d)    Each of the Buyer and the Seller will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the New Sale Order, including furnishing affidavits or other documents

-16-

or information for filing with the Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and demonstrating that the Buyer is a good faith buyer under Section 363(m) of the Code.

(e)    The Seller shall use commercially reasonable efforts to provide appropriate notice of the hearing on the New Sale Motion to all Persons entitled to notice, including, but not limited to, the Prior Proposed Purchaser and DIP Lender, all Persons that have asserted Liens in the Purchased Assets or who Seller knows may reasonably assert any such Lien, including without limitation all Other Secured Parties, all parties to the executory contracts and unexpired leases, and all Taxing authorities in jurisdictions applicable to the Seller and as otherwise required by the Code.

(f)    The Seller shall serve a cure notice by first class mail on all non-debtor counterparties to all executory contracts and unexpired leases as required by the New Sale Order and provide a copy of the same to the Buyer.

5.7    Conduct of Business. Until the earlier of the termination of this Agreement and the Closing, except with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

(a)    Reserved.

(b)    the Seller shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business and shall maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and the Seller on the Petition Date;

(c)    the Seller shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of

12569612v.24

the Seller or the Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(d)    except as permitted by this Agreement or as required by applicable Bankruptcy law, the Seller shall not, directly, or indirectly, sell or otherwise transfer or dispose, or offer, agree, or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business;

(e)    the Seller shall not, directly, or indirectly, permit, offer, agree, or commit to permit, any of the Purchased Assets to become subject, directly, or indirectly, to any Lien or Claim except for Permitted Liens;

(f)    the Seller shall not assume, reject, or assign any executory contract or unexpired lease that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to the Buyer;

(g)    the Seller shall not enter new executory contracts or leases or amend or modify any executory contracts or unexpired leases, or amend, modify, extend, renew, or terminate any lease, nor enter any new lease, in each case other than in the Ordinary Course of Business;

(h)    the Seller shall not remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business);

(i)    the Seller shall make all post-petition payments related to any executory contracts and unexpired leases to be assumed and assigned to the Buyer (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof;

(j)    the Seller shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset; and

(k)    the Seller shall not, directly, or indirectly, cancel, forgive, or compromise any material debt or claim or waive or release any material right of the Seller, in each case that constitutes a Purchased Asset.

12569612v.24

Nothing contained in this Agreement is intended to give the Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of the Seller prior to the Closing.

5.8.    Notice of Developments. From the date hereof until the Closing Date, the Seller shall promptly disclose to the Buyer, on the one hand, and the Buyer shall promptly disclose to the Seller, on the other hand, in writing (in the form of an update to the Schedules, if applicable) after attaining knowledge (as applicable to each of the Seller and Buyer) of any real or alleged failure of any of the Seller or the Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.8 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

5.9    Access. Upon reasonable advance written request by the Buyer, the Seller shall permit the Buyer and its Representatives to have reasonable access to, and make reasonable investigation of, during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the Seller, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Seller related to the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law. The Seller shall cause its officers, employees, consultants, agents, accountants, attorneys, and other representatives to cooperate with the Buyer and its Representatives in connection with such investigation and examination, and the Buyer and its Representatives shall cooperate with the Seller and its Representatives and shall use their reasonable efforts to minimize any disruption to the Business.

5.10.    Bulk Transfer Laws. The Buyer acknowledges that the Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Contemplated Transactions, and hereby waives all claims related to the noncompliance therewith. The Parties intend that pursuant to Section 363(f) of the Code, the transfer of the Purchased Assets shall be free and clear of any Liens, and the Parties shall take such steps as may be necessary or appropriate to so provide in the New Sale Order.

12569612v.24

5.11    <u>Release of Claims</u>. Notwithstanding anything contained herein to the contrary, effective as of the Closing, (i) the Seller shall deliver to the Buyer, irrevocable and unconditional releases of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against the Buyer and its respective current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns, and affiliates, each of the foregoing in their capacity as such (individually and collectively, the "<u>Buyer</u> Released Parties"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Seller ever had, now have, or may have against Buyer Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing; and (ii) the Buyer shall, deliver full, irrevocable and unconditional releases of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against the Seller and its current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns, and affiliates, each of the foregoing in their capacity as such (individually and collectively, the "<u>Seller Released Parties</u>"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Buyer ever had, now have, or may have against Seller Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing, other than claims against a Party under this Agreement and the other agreements or instruments being executed and delivered pursuant to the terms hereof to give effect to the Contemplated Transactions.

## ARTICLE VI
## DEFINITIONS

6.1    <u>Certain Defined Terms</u>. In addition to terms defined throughout this Agreement, as used in this Agreement, the following terms shall have the meanings specified in this <u>Section 6.1</u>, unless the context otherwise requires:

(a)    "<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel

paper, and vendor and supplier rebates of the Seller in connection with the Business as conducted by the Seller and (b) any security interest, claim, remedy or other right related to any of the foregoing. Except, Seller will retain the AON D&O premium refund upon cancellation of the existing D&O policy at closing.

(b)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(c)     "Agreement" means this Asset Purchase Agreement, together with all Exhibits and Schedules hereto, as amended, restated, supplemented, or otherwise modified from time to time (including changes made pursuant to court order) in accordance with the terms hereof.

(d)     "Assignment, Assumption and Bill of Sale" has the meaning set forth in Section 2.4(a).

(e)     "Assumed Contract List" has the meaning set forth in Section 2.3(a).

(f)     "Assumed Contracts" means those executory contracts and unexpired leases that have been assumed by the Seller and assigned to the Buyer pursuant to this Agreement and Section 365 of the Code.

(g)     "Assumed Liabilities" has the meaning set forth in Section 1.3.

(h)     "Business" has the meaning set forth in the recitals to this Agreement.

(i)     "Buyer" means General Atomics Aeronautical Systems, Inc. or its permitted successors, designees, and assigns, as set forth in the first paragraph to this Agreement.

(j)     "Buyer Released Parties" has the meaning set forth in Section 5.11.

(k)     "CFIUS" means the Committee on Foreign Investment in the United States.

(l)     "Chapter 11 Case" has the meaning set forth in the recitals.

(m)     "Claim" means a "claim" as defined in Section 101(5) of the Code, whether arising before or after the Petition Date.

(n)     "Closing" has the meaning set forth in Section 2.1.

(o)     "Closing Date" has the meaning set forth in Section 2.1.

(p)     "Code" means the United States Bankruptcy Code and its constituent parts, located at 11 U.S.C. Sections 101, *et seq.*, and the Federal Rules of Bankruptcy Procedure, as may be applicable.

(q)     "Contemplated Transactions" means the sale by the Seller to the Buyer, and the purchase by the Buyer from the Seller, of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities pursuant to the terms and subject to the conditions of this Agreement.

(r)     "Court" means the United State Bankruptcy Court for the Western District of Wisconsin, as set forth in the recitals.

(s)     "Cure Amount" means the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under any executory contract or unexpired lease on the Assumed Contract List, in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Code and any Decree of the Court.

(t)     Reserved

(u)     "Current Employees" means all individuals employed by the Seller as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

(v)     "Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order, or any other order of any Governmental Entity.

(w)     "Deposit" has the meaning set forth in Section 2.2(a).

(x)     "DIP Lender" means the Prior Proposed Purchaser, in its capacity as the entity agreeing to provide a debtor-in-possession loan facility to Seller pursuant to the DIP Order.

(y)     "DIP Liens" has the meaning set forth in the DIP Order.

-22-

12569612v.24

(z)    "DIP Obligations" has the meaning set forth in the DIP Order.

(aa)    "DIP Order" means the Court's *Final Order: (I) Authorizing the Debtor to Use Cash Collateral; (II) Authorizing the Debtor to Obtain Senior Secured Post-petition (DIP) Financing; (III) Granting Liens and Superpriority Administrative Claim Status to the DIP Lender;(IV) Granting Adequate Protection to the Prepetition Secured Parties; and*

> *(V) Granting Related Relief,* dated September 8, 2020 [Docket No. 124], including any prior iterations thereof, and as the same shall have been or in the future may be modified, supplemented, or amended.

(bb)    "Employee Benefit Plan" means: (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement and, (c) any other benefit or compensation plan, program, agreement or arrangement of any kind, providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case, maintained or contributed to by the Seller or in which the Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

(cc)    "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

(dd)    "Equipment" has the meaning set forth in Section 1.2(b).

(ee)    "Equipment Finance Lenders" means First National Community Bank, Wisconsin Economic Development Corporation, and US Bank Equipment Finance.

(ff)    "Excluded Assets" has the meaning set forth in Section 1.2.

(gg)    "Excluded Liabilities" has the meaning set forth in Section 1.4.

(hh)    "Financial Statements" has the meaning set forth in Section 3.15.

(ii)    "Former Employee" means all individuals who have been employed by the Seller who are not Current Employees.

12569612v.24

(jj) "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(kk) "Governmental Entity" means any United States federal, state, or local or non-United States governmental or regulatory authority, agency, commission, court, body, or other governmental entity.

(ll) "Hangars" means two airplane hangars and the associated ground leases related thereto, all as more particularly described on Schedule 1.2(k).

(mm) "Hazardous Substance" means any toxic or hazardous material, substance, or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

(nn) "Intellectual Property" means, all intellectual property, including, without limitation:

    i.    inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof;

    ii.    trademarks, service marks, trade dress, logos, trade names, brand names, corporate names, and other electronic communication identifications, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith;

    iii.    copyrightable works, copyrights, and applications, registrations, and renewals in connection therewith;

    iv.    trade secrets and confidential business information (including ideas, research, and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals);

    v.    all computer software (including data and related documentation);

-24-

vi.     all other intellectual proprietary rights; and,

vii.    all copies and tangible embodiments thereof (in whatever form or medium).

(oo)  "Inventories" has the meaning set forth in Section 1.2 (a).

(pp)  "IRC" means the United States Internal Revenue Code of 1986, as amended.

(qq)  "Knowledge" means, with respect to any party, the actual knowledge of such party after reasonable inquiry and, if such party fails to make such inquiry, shall include the constructive knowledge of such facts as would have been learned had such reasonable inquiry been made.

(rr)  "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

(ss)  "Liability" or "Liabilities" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including, without limitation, any liability for Taxes in existence as of the Closing.

(tt)  "Lien" means any lien (as defined in section 101(37) of the Code), encumbrance, claim (as defined in section 101(5) of the Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, and conditional sale or other title retention agreements, or other security interest of any kind, including but not limited to the DIP Liens, the DIP Obligations, any liens asserted by any of the Equipment Finance Lenders, and any liens asserted by the Other Secured Parties.

(uu)  "Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or

-25-

occurrences), that (a) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) any effect resulting from the filing, announcement, or pendency of the Chapter 11 Case, including (1) the Seller's inability to pay certain prepetition obligations as a result of the commencement of the Chapter 11 Case, (2) any Decree of the Court, (3) any action or omission of the Seller taken or not taken in order to avoid violation of any Decree or objections of the Court, or (4) any other effect, directly or indirectly, related thereto; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters); (v) changes in Law or in GAAP or interpretations thereof; (vi) any actions taken by the Buyer or any of its Affiliates (other than those expressly permitted to be taken hereunder); (vii) inaction by the Seller due to the Buyer's refusal to consent to a request for consent by the Seller under Section 5.3; or (viii) the negotiation, announcement or pendency of this Agreement or the consummation of the sale and assumption contemplated hereby or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of the Seller to consummate the Contemplated Transactions on the terms set forth herein and therein.

(vv)   "New Sale Motion" means a motion filed by the Seller with the Court in connection with the Chapter 11 Case requesting the entry of the New Sale Order.

(ww)   "New Sale Order" means an order of the Court entered in the Chapter 11 Case consistent with the terms and conditions of this Agreement, vacating the Prior Sale Order, approving the New Sale Motion and sale to the Buyer consistent

12569612v.24

-26-

with the terms and conditions of this Agreement, in substantially the form attached hereto as Exhibit C.

(xx) "Ordinary Course of Business" means the ordinary and usual course of business of the Seller taken as a whole consistent with past custom and practice and considering the commencement of the Chapter 11 Case and the Seller's current distressed financial condition.

(yy) "Other Secured Parties" means Alite GmbH, Bayban, Bill Lawson, Brose Revocable Trust, Claire Johnson, CVAIN #8 LLC, Daniel Dusich, Douglas Larson, Eleven Grand, LLC formerly Holly & Thomas LLC, Peter Fong and Ning Liu (Joel Hall, Gary and Sue Roberts, Gregg Stone, Horace Whitney Boggs III, James Rice, John Grady, Larry and Jane Weber, Larry and Jane Weber (Joel Hall), Tobriner Family Trust, Marcus Taylor Trust, Michael and Monika Fuchs, Rodney Green, Saleh Obaid, Windecker-Tong Liao, Windecker GA Power, LLC. Xin Zhu and Feng Liu,

(zz) "Outside Date" means July 15, 2021.

(aaa) "Permits" has the meaning set forth in Section 1.2(f).

(bbb) "Permitted Liens" means (a) Liens for Taxes which are (i) being contested in good faith by appropriate proceedings or (ii) not due and payable as of the Closing Date and which shall be prorated or otherwise released at Closing, and, in each case of clauses (i) and (ii), for which adequate reserves have been made on the Financial Statements in accordance with GAAP and which shall be prorated or otherwise released at Closing; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings for which adequate reserves have been made on the Financial Statements in accordance with GAAP and which shall be prorated or otherwise released at Closing; (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other

encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (e) with respect to leasehold improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable lease; (f) any Liens associated with or arising in connection with any Assumed Liabilities; and, (g) Liens that will be released or removed by operation of the New Sale Order.

(ccc)   "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

(ddd)   "Petition Date" means the date of the filing of the Chapter 11 Case.

(eee)   "Plan" means a plan of reorganization or liquidation proposed by the Seller.

(fff)   "Prior Proposed Purchaser" means EPS Engineered Propulsion Systems, Inc., a Delaware corporation, as set forth in the recitals.

(ggg)   "Prior Proposed Transaction" has the meaning set forth in the recitals.

(hhh)   "Prior Sale Order" has the meaning set forth in the recitals.

(iii)   "Purchased Assets" has the meaning set forth in Section 1.2.

(jjj)   "Purchased Inventory" means Inventory that is part of the Purchased Assets.

(kkk)   "Purchase Price" has the meaning set forth in Section 2.2.

(lll)   "Purchase Price Cushion" means (i) $50,000, if the Closing occurs on or before June 30, 2021, and (ii) $60,000, if the Closing occurs between July 1 and July 15, 2021.

(mmm)   "Records" means books of account, ledgers, forms, records, documents, files, invoices, vendor or supplier lists, plans and other data which are necessary to or desirable for the ownership, use, maintenance or operation of the Business and which are owned or used by any Seller, including, without limitation, all blueprints and specifications, all manuals, all confidentiality and non-disclosure agreements and records, all invention disclosures and documentation relating to Seller's Intellectual Property, all environmental

-28-

control records, environmental impact reports, statements, studies and related documents, handbooks, technical manuals and data, engineering specifications and work papers, all pricing and cost information, all sales records, all accounting and financial records, all sales and use tax returns, reports, files and records, asset history records and files, all data entry and accounting systems used to conduct the day-to-day operations of the Business, all maintenance and repair records, all correspondence, notices, citations and all other documents received from, sent to or in the Seller's possession in connection with any governmental authority (including, without limitation, federal, state, county or regional environmental protection, air or water quality control, occupational health and safety, land use, planning or zoning and any alcohol, beverage or fire prevention authorities).

(nnn)  "<u>Representative</u>" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

(ooo)  "<u>Sale Hearing</u>" means the hearing conducted in the Court to seek approval of the New Sale Motion and the Contemplated Transactions.

(ppp)  "<u>Seller</u>" means Engineered Propulsion Systems, Inc., a Delaware corporation, as set forth in the first paragraph to this Agreement.

(qqq)  "<u>Seller-Owned IP</u>" has the meaning set forth in <u>Section 3.11</u>.

(rrr)  "<u>Seller Released Parties</u>" has the meaning set forth in <u>Section 5.11</u>.

(sss)  "<u>Tax</u>" or "<u>Taxes</u>" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

(ttt)  "<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

-29-

(uuu) "Termination Event" has the meaning set forth in Section 8.1.

(vvv) "Work-in-Progress" has the meaning set forth in Section 1.2(d).

6.2    Interpretation.    Unless otherwise expressly provided or unless the context requires otherwise:

(a)    all references in this Agreement to Articles, Sections, Schedules, and Exhibits shall mean and refer to Articles, Sections, Schedules, and Exhibits of this Agreement;

(b)    all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations;

(c)    words using the singular or plural number also shall include the plural and singular number, respectively;

(d)    references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement (including the Schedules and Exhibits hereto); and,

(e)    references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person).

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    Conditions to the Buyer's Obligations.    Subject to Section 7.3, the Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Seller and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)    as of the date hereof and as of the Closing (in each case, except to the extent: (1) for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date, (2) subject to any update to the schedules), (i) each representation or warranty contained in Sections 3.1, 3.2 or 3.3 hereof shall be true and correct in all respects other than *de minimis* exceptions, and, (ii) each other

-30-

12569612v.24

representation or warranty set forth in Article III shall be true and correct in all material respects; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     the Seller shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and the Seller shall have caused the documents and instruments required by <u>Section 2.4</u> to be delivered to the Buyer (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     reserved;

(e)     the New Sale Order shall (i) shall have been entered by the Court, (ii) shall not be subject to a stay pending appeal and (iii) shall not have been reversed, stayed, vacated, or otherwise modified by a court of competent jurisdiction;

(f)     reserved;

(g)     from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(h)     the Buyer shall have received all of the deliverables pursuant to <u>Section 2.4</u>.

7.2     <u>Conditions to Seller's Obligations</u>.  Subject to <u>Section 7.3</u>, the Seller's obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Seller and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or

12569612v.24

warranty contained in Sections 4.1, 4.2, or 4.3 shall be true and correct in all respects other than *de minimis* exceptions, and, (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     the Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and the Buyer shall have caused the documents, instruments and payments required by Section 2.5 to be delivered to the Seller (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     the New Sale Order shall (i) shall have been entered by the Court, (ii) shall not be subject to a stay pending appeal and (iii) shall not have been reversed, stayed, vacated, or otherwise modified by a court of competent jurisdiction;

(e)     the Seller shall have received all the deliverables pursuant to Sections 2.2(b) and 2.5.

7.3     No Frustration of Closing Conditions. Neither the Buyer nor the Seller may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

12569612v.24

7.4    <u>Waiver of Conditions</u>.    Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

**ARTICLE VIII**
**TERMINATION**

8.1    <u>Termination of Agreement</u>.    This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "<u>Termination Event</u>"):

(a)    by the mutual written consent of the Buyer, on the one hand, and the Seller, on the other hand;

(b)    by written notice of either the Buyer or the Seller, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either the Buyer or the Seller, if the Closing shall not have occurred on or before the Outside Date;

(d)    by written notice of the Buyer to the Seller, if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Chapter 11 Case;

(e)    by the Buyer, (i) if the Seller has not filed the New Sale Motion on or before June 1, 2021, (ii) if the Court has not entered the New Sale Order on or before June 30, 2021, or (iii) if the New Sales Order is reversed, stayed, vacated or otherwise modified by a court of competent jurisdiction following the entry of the New Sale Order..

(f)    by the Buyer by giving written notice to the Seller at any time prior to the Closing (i) in the event the Seller has breached any representation,

warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, the Buyer has notified the Seller of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of the Buyer have been satisfied or, (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of the Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by the Buyer;

(g)    by the Seller by giving written notice to the Buyer at any time prior to Closing in the event the Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, the Seller has notified the Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of the Seller have been satisfied or, (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of the Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by the Seller;

(h)    by the Buyer if any secured creditor of the Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

(i)    by the Buyer if any Affiliates of the Seller that, directly or indirectly through one or more intermediaries, controls the Seller, files for relief pursuant to the Code; and

(j)    by the Buyer if, the Buyer becomes aware of any matter as a result of its due diligence investigation (including by way of information delivered or made available by the Seller hereunder or on a Schedule hereto or any update to a Schedule) that the Buyer determines is unacceptable in its sole discretion;

Notwithstanding anything to the contrary contained herein, a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable

12569612v.24

-34-

Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

8.2    <u>Procedure Upon Termination</u>.    In the event of termination and abandonment by the Buyer, on the one hand, or the Seller, on the other hand, or both, pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by the Buyer or the Seller.

8.3    <u>Effect of Termination</u>.    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Buyer or the Seller; provided, however, that <u>Section 8.1</u>, <u>Section 8.2</u>, this <u>Section 8.3</u>, Article IX shall survive any such termination and shall be enforceable hereunder.    In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

## ARTICLE IX
## MISCELLANEOUS

9.1    <u>Survival of Representations and Warranties</u>.    All the representations and warranties of the parties contained in this Agreement shall survive the Closing hereunder.

9.2    <u>Benefit and Assignment</u>.    This Agreement, once approved by the Court, shall be binding upon and inure to the benefit of the parties hereto, their heirs, successors, assignees, and beneficiaries in interest, including any trustee appointed by the Court in the Chapter 11 Case, or, in the event of the conversion of the Chapter 11 Case to a case under Chapter 7, upon any trustee appointed in such Chapter 7 case; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by the Seller without the prior written consent of the Buyer.    The Buyer may assign the Buyer's rights and obligations to one or more entities, so long as any such assignee is duly authorized and qualified to enter, perform, and complete the transactions contemplated by this Agreement, and subject to the provisions contained in <u>Section 4.2</u>.

9.3    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin (regardless of such State's conflict of laws principles), and the order of the Court that approved the sale, and without reference to any rules of construction regarding the party responsible for the

-35-

12569612v.24

drafting hereof. Jurisdiction and venue over this sale shall initially vest in the Court that approved the sale.

9.4 <u>Expenses</u>. All expenses incurred in connection with this Agreement, or the transactions herein provided for shall be paid by the party incurring such expenses and costs and shall not constitute a charge or expense of the other party.

9.5 <u>Notices</u>. All notices, demands, and communications provided for herein or made hereunder shall be given in writing and shall be deemed given to a party at the earlier of:

(a) when actually delivered to such party, or,

(b) when mailed to such party by registered or certified U.S. Mail (return receipt requested), or,

(c) sent by overnight courier, confirmed by receipt, and addressed to such party at the address designated below for such party (or to such other address for such party as such party may have substituted by notice pursuant to this <u>Section 9.5</u>), or,

(d) when conveyed by facsimile:

    i.    If to the Buyer:    General Atomics Aeronautical Systems, Inc.
    Attn: General Counsel
    3550 General Atomics Court
    San Diego, CA 92121
    Facsimile: (858) 455-3213

    ii.    With a copy to:    Patterson Belknap Webb & Tyler LLP
    Attn: Daniel A. Lowenthal
    1133 Avenue of the Americas
    New York, NY  10036
    Facsimile: (212) 336-1253
    E-Mail: dalowenthal@pbwt.com

    iii.    If to the Seller:    Engineered Propulsion Systems, Inc.
    Attn: Michael Fuchs, President
    625 W. Hangar Rd, Hangar 11-18
    New Richmond, WI 54017
    E-mail: Michael.Fuchs@eps.aero

-36-

|  iv. | With a copy to: | Steinhilber Swanson LLP |
|---|---|---|

    Attn: Attorney James D. Sweet
    122 West Washington Ave., Ste. 850
    Madison, WI 53703-2732
    E-Mail: jsweet@steinhilberswanson.com
        vgeorge@steinhilberswandon.com

9.6    Counterparts; Execution.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, provided that all such counterparts, in the aggregate, shall contain the signatures of all parties hereto.  Signatures of the parties may be conveyed via facsimile or e-mail and in one or more counterparts and all such facsimile or e-mail counterparts taken together shall constitute one and the same instrument, with the same effect as the delivery of an original.

9.7    Headings.  All Section headings herein are inserted for convenience and reference only and shall not modify or affect the construction or interpretation of any provision of this Agreement.

9.8    Amendment, Modification and Waiver.  This Agreement may not be modified, amended, or supplemented except by mutual written agreement of all the parties hereto.  Any party may waive in writing any term, notice, time, or condition contained in this Agreement and intended to be for its benefit; provided, however, that no waiver by any party, whether by conduct or otherwise, in any one or more instances, shall be deemed or construed as a further or continuing waiver of any such term or condition.  Each amendment, modification, supplement, or waiver shall be made in writing signed by the party or the parties to be charged.  It is specifically understood by the parties that the process of developing the Schedules and Exhibits hereto is ongoing at the execution of this Agreement.  Within five (5) days prior to the Closing, the parties shall update, revise, and finalize such Schedules and Exhibits.

9.9    Incorporation of Schedules and Exhibits.  The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

9.10    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the Contemplated Transactions is not

-37-

affected in a manner adverse to any Party. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.11    Entire Agreement. This Agreement and the Exhibits and Schedules attached hereto (as updated, revised and finalized) represent the full and complete agreement of the parties with respect to the subject matter hereof and supersede and replace any prior understandings and agreements among the parties with respect to the subject matter hereof and no provision or document of any kind shall be included in or form a part of such agreement unless signed and delivered to the other party by the parties to be charged.

9.12    Third-Party Beneficiaries. Except as provided herein, no third parties are intended to benefit from this Agreement, and no third-party beneficiary rights shall be implied from anything contained in this Agreement.

9.13    Cooperation. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from the Seller to the Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

9.14    Remedies. The Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries. The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. The Parties agree that the only permitted objection that they may raise in response to any action for specific

-38-

performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

9.15    <u>Further Assurances</u>. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the New Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to the Buyer all of the Purchased Assets, to confirm the Buyer's assumption of the Assumed Liabilities and to confirm the Seller's retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this <u>Section 9.15</u>, to the extent that either the Buyer or the Seller discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to the Buyer as Purchased Assets but were not so transferred or assigned, the Buyer and the Seller shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to the Buyer.

9.16    <u>Insurance Policies</u>. Other than as set forth above, upon Closing, the Seller shall use commercially reasonable efforts to cause the assignment of all rights of the Seller in and to all insurance coverage provided in relation to the Seller and the Purchased Assets that is maintained by the Seller or its Affiliates (whether such policies are maintained with third party insurers or with the Seller or its Affiliates) to the Buyer as soon as reasonably practicable (and in no event within forty-five (45) days following the Closing). To the extent that any current or prior Insurance Policy is not transferable to the Buyer at the Closing in accordance with the terms thereof, the Seller shall hold such Insurance Policy for the benefit of the Buyer, shall reasonably cooperate with the Buyer (at the Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to the Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities. In the event the Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, the Seller shall reasonably cooperate with the Buyer to terminate such Insurance Policy to the extent only applicable to the Purchased Assets, and the Seller shall, at the option of the Buyer, promptly pay over to the Buyer any refunded or returned insurance premiums received by the Seller in connection therewith (or, if applicable, the Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by the Buyer.

12569612v.24

9.17    Collection of Accounts Receivable.

(a)    As of the Closing Date, the Seller hereby (i) authorizes the Buyer to open any and all mail addressed to the Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to the Buyer if received on or after the Closing Date and (ii) appoints the Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by the Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, made payable or endorsed to the Seller or the Seller's order, for the Buyer's own account.

(b)    As of the Closing Date, the Seller agrees that any monies, checks or negotiable instruments received by the Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, shall be held in trust by the Seller for the Buyer's benefit and account, and promptly upon receipt by the Seller of any such payment (but in any event within five (5) business days of such receipt), the Seller shall pay over to the Buyer or its designee the amount of such payments. In addition, the Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to the Seller, from time to time as and when received by the Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that the Buyer or its Affiliates may receive on or after the Closing which properly belongs to the Seller hereunder, including any Excluded Assets.

(c)    As of the Closing Date, the Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by the Buyer after the Closing.

9.18    Use of Name and Marks.  Neither the Seller or any of its Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

12569612v.24

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

> **GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.**, as the Buyer
>
> By: _____
> Kristopher George, Assistant Treasurer
>
> **ENGINEERED PROPULSION SYSTEMS, INC.**, as the Seller
>
> By: _____
> Michael Fuchs, President

12569612v.24

# EXHIBIT A

Assignment, Assumption and Bill of Sale

## ASSIGNMENT, ASSUMPTION AND BILL OF SALE

THIS ASSIGNMENT, ASSUMPTION AND BILL OF SALE (this "**Agreement**"), effective as of June [•], 2021 (the "**Effective Date**"), is entered into by General Atomics Aeronautical Systems, Inc., (the "**Buyer**") and Engineered Propulsion Systems, Inc., (the "**Seller**").

WHEREAS, the Buyer and the Seller are parties to an Asset Purchase Agreement, dated as of June [•], 2021 (as amended) (the "**Purchase Agreement**"), pursuant to which, among other things, at the Closing (as such term is defined in the Purchase Agreement), (x) the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer, free and clear of any and all Liens other than Permitted Liens, all of the Purchased Assets and (y) the Buyer agrees to assume from the Seller, and the Seller agrees to assign and transfer to the Buyer all Assumed Contracts and all Assumed Liabilities, if any.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Capitalized Terms.** Capitalized terms used in this Agreement and not otherwise defined shall have the meanings specified in the Purchase Agreement.

2.      **Bill of Sale/Assignment**.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants, terms and conditions set forth in the Purchase Agreement, the Seller hereby sells, transfers, assigns, conveys and delivers to the Buyer and its successors and assigns forever all the Seller's right, title, and interest in and to the Purchased Assets and the Assumed Contracts.

3.      **Assumption**.  As of the Effective Date, the Buyer hereby accepts such assignment and assumes the Assumed Liabilities, if any, and Assumed Contracts and agrees to pay, perform, or discharge, as the case may be, when due or required to be performed or discharged, all the Seller's duties and obligations arising on account of the Assumed Liabilities, if any, and the Assumed Contracts.

4.      **Further Assurances**.  At any time and from time to time after the date of this Agreement, at the request of either party hereto and without further consideration, the other party hereto shall execute and deliver such other instruments of assignment, assumption and confirmation and take such other action as the

12569612v.24

requesting party may reasonably request as necessary or desirable to more effectively transfer and assign to the Buyer the Purchased Assets and have the Buyer assume the Assumed Liabilities.

5.    **Terms of the Purchase Agreement**.  The parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and provisions of this Agreement and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

6.    **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the respective successors and assigns of the parties hereto.

7.    **Governing Law**. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Wisconsin without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Wisconsin.

8.    **Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the parties hereto.  No failure on the part of any party hereto to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any party hereto in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

9.    **Counterparts**. This Agreement may be executed by facsimile or electronic transmission in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

12569612v.24

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.,** as the Buyer

By: _____

**ENGINEERED PROPULSION SYSTEMS, INC.,** as the Seller

By: _____

Michael Fuchs, President

12569612v.24

## Exhibit B-1

Assignment & Assumption of Hangar Lot Leases

## ASSIGNMENT & ASSUMPTION OF HANGAR LOT LEASES

THIS ASSIGNMENT & ASSUMPTION OF HANGAR LOT LEASES (this "**Agreement**"), effective as of May [•], 2021 (the "**Effective Date**"), is entered into by General Atomics Aeronautical Systems, Inc., (the "**Buyer**") and Engineered Propulsion Systems, Inc., (the "**Seller**").

WHEREAS, the Buyer and the Seller are parties to an Asset Purchase Agreement, dated as of May [•], 2021 (as amended) (the "**Purchase Agreement**"), pursuant to which, among other things, at the Closing (as such term is defined in the Purchase Agreement), the Seller agrees to sell and assign to the Buyer, and the Buyer wishes to purchase and assume from the Seller, free and clear of any and all Liens other than Permitted Liens, all of Seller's right, title, and interest in, to, and under those certain Hanger Lot Leases listed on Exhibit A hereto (collectively, the "**Hanger Lot Leases**").

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Capitalized Terms.** Capitalized terms used in this Agreement and not otherwise defined shall have the meanings specified in the Purchase Agreement.

2.    **Assignment**. Seller hereby sells, transfers, assigns, conveys and delivers to the Buyer and its successors and assigns forever all the Seller's right, title, and interest in, to, and under the Hangar Lot Leases, free and clear of any and all Liens other than Permitted Liens.  Whenever Seller receives any notice or demand pursuant to the Lease, Seller shall agrees to promptly provide Tenant with a copy of such notice.

3.    **Assumption**.  As of the Effective Date, the Buyer hereby accepts such assignment and assumes the Hangar Lot Leases, if any, and agrees to pay, perform, or discharge, as the case may be, when due or required to be performed or discharged, all of the Seller's duties and obligations arising on account of the assumed Hangar Lot Leases, if any; provided Buyer is not assuming any debt, Liability, obligation, cost or expense arising out of, or relating to the Hangar Lot Leases, which arose prior to the Effective Date and Seller agrees to indemnify, defend and hold Buyer harmless from and against the same.

4.    **Further Assurances**.  At any time and from time to time after the date of this Agreement, at the request of Buyer and without further consideration, Seller shall execute and deliver such other instruments of assignment, assumption and

-2-

12569612v.24

confirmation and take such other action as the requesting party may reasonably request as necessary or desirable to more effectively convey, transfer, assign, and vest in Buyer good and marketable Title to the Hangar Lot Leases free and clear or any and all Liens other than Permitted Liens.

5.    **Terms of the Purchase Agreement**.  The parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of a conflict between the terms and provisions of this Agreement and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

6.    **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the respective successors and assigns of the parties hereto.

7.    **Governing Law**. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Wisconsin without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Wisconsin.

8.    **Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the parties hereto.  No failure on the part of any party hereto to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any party hereto in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

9.    **Counterparts**.  This Agreement may be executed by facsimile or electronic transmission in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

10.    **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12569612v.24

11.    **Representations and Warranties**.    Seller hereby represents and warrants that: (a) the Leases attached as Exhibit C are true, correct, and complete copies of the Hangar Lot Leases, (c) the Hanger Lot Leases have not been amended or modified except as set forth in Exhibit B, and the Hanger Lot Leases are now in full force and effect; (b) neither Landlord nor Tenant is in default under the Hanger Lot Leases, nor has any event occurred which with the passage of time or the giving of notice or both, would constitute a breach or default by Landlord or Tenant under the terms of the Lease; (c) all rent has been paid in accordance with the terms of the Lease; and (d) Buyer, its successors and/or assignees shall have the right to exercise any options to extend granted to the Tenant under the Lease.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.**, as the Buyer

By: _____

**ENGINEERED PROPULSION SYSTEMS, INC.**, as the Seller

By: _____

Michael Fuchs, President

This Agreement and assignment of lease consented to and accepted by _____ in his capacity as Airport Manager for the City of New Richmond.

By: _____

_____, _____

**[ADD NOTARY BLOCKS]**

-5-

## EXHIBIT A

## HANGAR LOT LEASES

1. Hangar Lot Lease, by and between City of New Richmond, as Lessor, and Engineered Propulsion Systems, Inc., as Lessee, dated 1/13/2017, for a parcel of land containing 14,400 square foot located at Lot 16, Row 11, New Richmond Municipal Airport, New Richmond, WI 54017 (and recorded 1/31/2017, as St. Croix County Document No. 1042803 St. Croix County).

2. Hangar Lot Lease, by and between City of New Richmond, as Lessor, and Engineered Propulsion Systems, Inc., as Lessee, dated 1/13/2017, for a parcel of land containing 14,400 square foot located at Lot 18, Row 11, New Richmond Municipal Airport, New Richmond, WI 54017 (and recorded 2/6/2017, as St. Croix County Document No. 1043146 St. Croix County).

## Exhibit B-2

Hangar Bill of Sale and Assignment

## HANGAR BILL OF SALE AND ASSIGNMENT

THIS HANGAR BILL OF SALE AND ASSIGNMENT (this "**Agreement**"), effective as of May [•], 2021 (the "**Effective Date**"), is entered into by General Atomics Aeronautical Systems, Inc., (the "**Buyer**") and Engineered Propulsion Systems, Inc., (the "**Seller**").

WHEREAS, the Buyer and the Seller are parties to an Asset Purchase Agreement, dated as of May [•], 2021 (as amended) (the "**Purchase Agreement**"), pursuant to which, among other things, at the Closing (as such term is defined in the Purchase Agreement), the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer, free and clear of any and all Liens other than Permitted Liens, all of Seller's right, title and interest in and to two airplane hangars (the "**Hangars**"), all as more particularly described on Exhibit A hereto;

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Capitalized Terms.** Capitalized terms used in this Agreement and not otherwise defined shall have the meanings specified in the Purchase Agreement.

2. **Bill of Sale/Assignment.** For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants, terms and conditions set forth in the Purchase Agreement, the Seller hereby sells, transfers, conveys, assigns and delivers to Buyer, its successors and permitted assigns, all of Seller's right, title and interest in and to the Hangars free and clear of any and all Liens other than Permitted Liens. Buyer is not assuming any debt, Liability, obligation, cost or expense arising out of, or relating to the Hangars, which arose prior the date hereof.

3. **Further Assurances.** At any time and from time to time after the date of this Agreement, at the request of either party hereto and without further consideration, the other party hereto shall execute and deliver such other instruments of assignment, assumption and confirmation and take such other action as the requesting party may reasonably request as necessary or desirable to more effectively transfer, assign, and vest in Buyer, to the best of Seller's knowledge, good and marketable Title to the Hangars free and clear or any and all Liens other than Permitted Liens.

4. **Terms of the Purchase Agreement.** The parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities

8

contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and provisions of this Agreement and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

5.    **Binding Effect**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the respective successors and assigns of the parties hereto.

6.    **Governing Law**. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Wisconsin without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Wisconsin.

7.    **Amendments and Waivers.** No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the parties hereto. No failure on the part of any party hereto to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any party hereto in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

8.    **Counterparts**. This Agreement may be executed by facsimile or electronic transmission in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

9.    **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.    **Recordation.** Either party may, at its option, choose to record this instrument with the Register of Deeds of St. Croix County, Wisconsin. The act of recording alone is not determinative of the real or personal property status of the Hangars.

12569612v.24

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

GENERAL ATOMICS AERONAUTICAL
SYSTEMS, INC., as the Buyer


By: _____



ENGINEERED PROPULSION SYSTEMS,
INC., as the Seller


By: _____

Michael Fuchs, President

12569612v.24

## Exhibit A

## Hangars

The airplane hangar located upon the premises commonly referred to as Lot 18 Row 11 of the New Richmond Municipal Airport, New Richmond Wisconsin, and more specifically described as:

> LOT 18, ROW 11 OF THE AIRPORT LAYOUT PLAN DATED SEPTEMBER 1, 1989, BEING PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER (S 1/2 OF NE 1/4) AND THE NORTH HALF OF THE SOUTHEAST QUARTER (N 1/2 OF THE SE 1/4) AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER (SW 1/4 OF THE SW 1/4) OF SECTION TWENTY-FIVE (525), TOWNSHIP THIRTY-ONE NORTH (T31N), RANGE EIGHTEEN WEST (R18W), IN THE CITY OF NEW RICHMOND, ST. CROIX COUNTY, WISCONSIN.

The airplane hangar located upon the premises commonly referred to as Lot 16 Row 11 of the New Richmond Municipal Airport, New Richmond Wisconsin, and more specifically described as:

> LOT 16, ROW 11 OF THE AIRPORT LAYOUT PLAN DATED SEPTEMBER 1, 1989, BEING PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER (S 1/2 OF NE 1/4) AND THE NORTH HALF OF THE SOUTHEAST QUARTER (N 1/2 OF THE SE 1/4) AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER (SW 1/4 OF THE SW 1/4) OF SECTION TWENTY-FIVE (S25), TOWNSHIP THIRTY-ONE NORTH (T31N), RANGE EIGHTEEN WEST (R18W), IN THE CITY OF NEW RICHMOND, ST. CROIX COUNTY, WISCONSIN.

11

## EXHIBIT C

**Proposed New Sale Order**

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

In re:  **ENGINEERED PROPULSION SYSTEMS, INC.,**    Case No. 20-11957-gmh

Debtor.    Chapter 11

## ORDER AUTHORIZING SALE OF ASSETS UNDER 11 U.S.C. §363

Upon the motion (the "Motion") of the above-captioned debtor (the "Debtor")

for entry of an order (this "Sale Order") approving the sale ("Sale") of certain assets

of the Debtor (the "Assets") free and clear of all Liens (as defined below) to General

Atomics Aeronautical Systems, Inc. (together with its successors, designees and

assigns, the "Buyer"); and it appearing that Buyer has submitted the highest or

otherwise best bid for the Assets; and upon adequate and sufficient notice of the

Motion, the Agreement, and the Sale; and the Court having reviewed and

considered the Motion and all relief related thereto and any objections thereto; and

upon the full record in support of the relief requested by the Debtor in the Motion;

and this Court having jurisdiction to enter a final order approving the Sale and the

Agreement consistent with Article III of the United States Constitution; and after

due deliberation thereon, and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

A.      Notice of the Sale Hearing and Transaction was timely, proper, and

reasonable.

B.      The agreement that governs the Sale (the "Agreement"[1]), attached to

this Sale Order as **Exhibit 1**, was negotiated, proposed, and entered into by the

Debtor and the Buyer without collusion, in good faith, and from arm's-length

bargaining positions.  Neither the Debtor nor the Buyer has engaged in any conduct

that would cause or permit the Sale to be avoided under Bankruptcy Code section

363(n).  The Buyer is a good faith buyer within the meaning of section 363(m) of the

Bankruptcy Code and is not an "insider" of the Debtor.

C.      The conditions of section 363(f) of the Bankruptcy Code have been

satisfied with respect to each and every lien (as that term is defined in section

101(37) of the Bankruptcy Code), including the DIP Liens[2], and other encumbrance

that has been or could be asserted with respect to the Assets, (collectively, "Liens").

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Agreements.

[2] "DIP Liens" has the meaning assigned to it in this Court's *Final Order: (I) Authorizing the Debtor to Use Cash Collateral; (II) Authorizing the Debtor to Obtain Senior Secured Postpetition (DIP) Financing; (III) Granting Liens and Superpriority Administrative Claim Status to the DIP Lender;(IV) Granting Adequate Protection to the Prepetition Secured Parties; and (V) Granting Related Relief,* dated September 8, 2020, ECF No. 124 (the "First DIP Order," and, collectively with the further orders of the Court dated December 17, 2020, ECF No. 237,

D.    There is sufficient cause to lift the stay contemplated by Bankruptcy

Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Sale

Order.

**THE COURT HEREBY ORDERS THAT:**

1.    The Agreement, all other ancillary documents, the Sale, and all other

relief requested in the Motion are hereby approved, pursuant to sections 105(a), 363,

and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

2.    Any objections to the Motion that have not been withdrawn, waived, or

settled are hereby denied with prejudice. Parties that did not object, or withdrew

their objection, to the Motion have consented to the Sale pursuant to Bankruptcy

Code section 363(f)(2).

3.    Pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtor

is authorized to transfer the Assets to the Buyer in accordance with the terms of the

Agreement.  Such transfer shall constitute a legal, valid, binding, and effective sale

and shall vest the Buyer with title to the Assets.  **The transfer of the Assets is free**

**and clear of all Liens, claims, or other interests of any kind or nature whatsoever,**

**with all such Liens, claims, or other interests to attach to the cash proceeds of the**

---

and April 8, 2021, ECF No. 306, the "DIP Orders").  In the event of any conflict between this Sale Order
and the terms of the DIP Orders, this Sale Order controls.

**Purchase Price ultimately attributable to the property against or in which such Liens, claims, or other interests are asserted.**

4.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreement, all amendments thereto, and any waivers and consents thereunder, and to adjudicate any and all disputes concerning or relating in any way to the Sale.

5.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in this chapter 11 case, the terms of this Sale Order shall govern.

# # #

12569612v.24

## Schedule 1.2(b) Equipment

| Acct # | Asset ID Running Number | Asset |
|---|---|---|
| 15011 Machinery & Equipment (COGS) | | |
| 15011 | EPS 2010-278 | Torin Folding Shop Crane |
| 15011 | EPS 2010-279 | Sunex Engine Stand |
| 15011 | EPS 2011-003 | Canon Camera |
| 15011 | EPS 2011-004 | Presto Air Lift Table |
| 15011 | EPS 2011-005 | FlatBed Trailer |
| 15011 | EPS 2011-006 | Tombstone City Tools |
| 15011 | EPS 2011-007 | Miter Band Saw (Portable) |
| 15011 | EPS 2011-008 | BT40 Sem Iscar Cutter |
| 15011 | EPS 2011-009 | 200 PSI 2-GAL TANK |
| 15011 | EPS 2011-010 | MSC Industrial Tools (Hardness Tester & Roughness Tester) |
| 15011 | EPS 2011-011 | Cat40-750-FMX-6W Prec |
| 15011 | EPS 2011-012 | Hoff Auctions Tools (Fixture - Manufacturing) |
| 15011 | EPS 2011-014 | IDC Digimatic Indicator |
| 15011 | EPS 2011-016 | Floor Drill Press |
| 15011 | EPS 2011-017 | LCD Digital Multimeter |
| 15011 | EPS 2011-018 | Brake Tube Flaring Tool |
| 15011 | EPS 2011-019 | Tube Straightner |
| 15011 | EPS 2011-020 | Bead Form |
| 15011 | EPS 2011-021 | Driver and Socket Set |
| 15011 | EPS 2011-022 | 4 WorkBenches |
| 15011 | EPS 2012-042 | Scaffolding/Outriggers |
| 15011 | EPS 2012-043 | Trailer To Equip/Airbag |
| 15011 | EPS 2012-044 | Storage Cabinets/Bins |
| 15011 | EPS 2012-045 | Drill Set/ Caliper/Screwdr |
| 15011 | EPS 2012-046 | 20V Max Hammer Drill |
| 15011 | EPS 2012-047 | Test Equipment [Inert Gas Regulator] |
| 15011 | EPS 2012-048 | Thermal Wire Stripper |
| 15011 | EPS 2012-049 | Shop Tools |
| 15011 | EPS 2012-050 | DC Power Supply |
| 15011 | EPS 2012-051 | Heat Gun/Pliers |
| 15011 | EPS 2012-052 | Mobile Test Stand (Trailer) |
| 15011 | EPS 2013-078 | Iscar Boring Head |
| 15011 | EPS 2013-079 | Gage Metric Pin Set |
| 15011 | EPS 2013-080 | Iscar and Harvey Tool Tooling |
| 15011 | EPS 2013-083 | Components VFD & Control for Mobile Test Bed Blower |
| 15011 | EPS 2013-084 | Kaeser Compressor |
| 15011 | EPS 2013-085 | Rigging for Mori Seiki Lathe - NLX 2500SY |
| 15011 | EPS 2013-086 | Mori Seiki Lathe - NLX 2500SY |
| 15011 | EPS 2013-087 | Ellison Technologies freight and handling Mori Seiki - NLX 2500SY |
| 15011 | EPS 2013-088 | Rigging DMG |
| 15011 | EPS 2013-089 | DMU 65 MB DMG Vertical Milling Center (S/N: 121400038003) |
| 15011 | EPS 2013-089-1 | Coolant Nozzle for DMU 65 |
| 15011 | EPS 2013-089-2 | Modular Tooling Plate - DMU 65 |

| 15011 | EPS 2013-089-3 | Zero Clamp Quick Change - DMU 65 |
|-------|----------------|-----------------------------------|
| 15011 | EPS 2013-090 | Wiring Manuf for Machine DMG |
| 15011 | EPS 2013-091 | Wiring Manuf For Mori Seiki Lathe - NLX 2500SY |
| 15011 | EPS 2013-093 | Axial Drilling and Milling Head Benz Type DA |
| 15011 | EPS 2013-094 | Radial Drilling and Milling Head Benz Type Fax |
| 15011 | EPS 2013-095 | spindle Unit & freight |
| 15011 | EPS 2013-096 | Inspection tool permanent (borescope) - Medit Inc (Replaced a portion of EPS000840) |
| 15011 | EPS 2013-097 | Trailer Improvements |
| 15011 | EPS 2013-098 | Oil Diverter for Mori Seiki - NLX 2500SY |
| 15011 | EPS 2013-099 | Oil Diverter for DMG |
| 15011 | EPS 2013-100 | Tool Grinder (Pope) - located in Fab shop for Mfg use |
| 15011 | EPS 2013-101 | Mist Collector (DMG) (above DMG) |
| 15011 | EPS 2014-128 | Miller Dynasty 300 TiGrunner Serial# KK308530 (fabrication equipment that we will use for all projects) (EPS- 005) |
| 15011 | EPS 2014-129 | HN-218HD Heavy Duty Cylinder Hone with Stone Set - Goodson Brand (EPS-005) |
| 15011 | EPS 2014-130 | 4551082 ST3/4 MB20X6.69 ISCAR (EPS-011) |
| 15011 | EPS 2014-131 | 4559507 BHFI MB20-20X40 RV ISCAR (EPS-011) |
| 15011 | EPS 2014-132 | Werner Weitner Engine and Transmission Repair Stand, SKU: WW-MG600V (EPS-PO-2014-00157) (EPS-005) (FIX- 0050_0105 (SN2)) |
| 15011 | EPS 2014-133 | 3" STRAIGHT SHANK CONCENTRIC LIVE CENTERS - Tool for lathe (EPS-004) |
| 15011 | EPS 2014-134 | 48-71863 OD CUTTING HOLDER BOTH SIDES Y AXIS (EPS-004) |
| 15011 | EPS 2014-135 | 3101670 FDN D4.0-0.38-CF4-06 ISCAR (EPS-003) |
| 15011 | EPS 2014-138 | 695.1520655KB 6MM S5 ADAPTOR BENZ (EPS-004) |
| 15011 | EPS 2014-139 | 695.1520855KB 8MM S5 ADAPTOR BENZ (EPS-004) |
| 15011 | EPS 2014-140 | 695.1521260KB 12MM S5 ADAPTOR BENZ (EPS-004) |
| 15011 | EPS 2014-141 | Compressor Dryer Parts (EPS-011) |
| 15011 | EPS 2014-142 | Compressor Dryer (EPS-011) |
| 15011 | EPS 2014-143 | Compressor Dryer Parts (EPS-011) |
| 15011 | EPS 2014-144 | Compressor Dryer Parts (EPS-011) |
| 15011 | EPS 2014-145 | Lincoln Electric Precision TIG 185 Ready-Pac TIG Welder (EPS-005) |
| 15011 | EPS 2014-147 | PO 2014-00258: 4559419: ADJ-HYDRO-20-D70 ISCAR (EPS-004) |
| 15011 | EPS 2014-148 | PO 2014-00290: 48-71863: OD CUTTING HOLDER BOTH SIDES Y AXIS (EPS-004) |
| 15011 | EPS 2014-149 | PO 2014-00258: 411500008-690: GEAR HOBBING UNIT WTO-USA 2:1 GEAR RATIO/ENTERNAL COOLANT (EPS- 004) |
| 15011 | EPS 2014-150 | PO 2014-00258 - 3/4 ARBOR WTO (EPS-004) |
| 15011 | EPS 2014-154 | DMG DMC 85 Monoblock 5-Axis Vertical Machine, SN# 12280000053 |
| 15011 | EPS 2014-154-1 | Modular Tooling Plate - DMC 85 |
| 15011 | EPS 2014-154-2 | Zero Clamp Quick Change - DMC 85 |
| 15011 | EPS 2014-155 | DMG Sprint 20-8 Linear CNC Fanuc 310, SN# 8092000187B (EPS-014) |
| 15011 | EPS 2015-173 | E-SDUCR 10-2 ISCAR (EPS-004) |
| 15011 | EPS 2015-182 | 2MOD 20PA Class A TIN Coated M45 Material - Gear Hob Machine Tool (EPS-004) |
| 15011 | EPS 2015-183 | MNC 350-175 A32-189 09-5D ISCAR CUTTER, Qty 1 (EPS-011) |
| 15011 | EPS 2015-184 | 1/2 Cu Yd Gray Heavy Duty Self Dumping Forklift Hopper (EPS-011) |
| 15011 | EPS 2015-187 | 1627404 Pre-Grind, Bore Type Gear Hob #1 (EPS-011) |
| 15011 | EPS 2015-188 | 1627404 Pre-Grind, Bore Type Gear Hob #2 (EPS-011) |

| 15011 | EPS 2015-189 | Hob Finishing Non-Topping 3 mod 20PA Class A M45 Material TiN Coated (EPS-004) |
| 15011 | EPS 2015-190 | Hob Finishing Non-Topping 3 mod 20PA Class A M45 Material TiALN Coated (EPS-004) |
| 15011 | EPS 2015-191 | 1-1/4 ARBOR WTO (EPS-004) |
| 15011 | EPS 2015-192 | Zeiss Accura II Aktiv 900/1600/800  (EPS-016) |
| 15011 | EPS 2015-193 | HAW1 SK80BZIHS WR8,0 - EMERGENCY SPANTOP 80 8MM PILOT (EPS-015) |
| 15011 | EPS 2015-194 | 600664-8600-000 - Probe socket XTR (EPS-016) (Qty 7) |
| 15011 | EPS 2015-195 | 60355989 - Mitutoyo - 422-330 - Blade Micrometers Operation Type: Electronic Minimum Measurement (mm): 0.00 (EPS-017) |
| 15011 | EPS 2015-196 | SHM117.1416.3.08 for broach insert (EPS-004) |
| 15011 | EPS 2015-197 | Additions to Test Trailer |
| 15011 | EPS 2015-198 | Shims for CMM Machine |
| 15011 | EPS 2015-199 | Assembly Tool: 0201AT-A43-XAA (Piston Cooling Jet Alignment Plate) |
| 15011 | EPS 2015-200 | Assembly Tool: 0202AT-A43-XAA (Piston Cooling Jet Alignment Tool) |
| 15011 | EPS 2015-203 | KASTOwin A3.3 automatic bandsawing machine - Serial Number: 6705103053 Year:  2015 [In service & functional as of 8/3/2015] |
| 15011 | EPS 2015-205 | SCMX-425 VISE |
| 15011 | EPS 2015-208 | Hydraulic Post Table Capacity:  2,000 LBS, Platform Size: 32" W X 48" L, Platform |
| 15011 | EPS 2015-210 | Qty 2 -600664-9700-000 - adapter plate VAST XTR with cube |
| 15011 | EPS 2015-211 | qty 1 - 695.1521260KB - 12mm Solidfix S5 Shrink Fit Chuck |
| 15011 | EPS 2015-212 | qty 1 - 695.1521055KB - 10mm Solidfix S5 Shrink Fit Chuck |
| 15011 | EPS 2015-213 | Qty - 1 - PS17-NVK - Pro Hawkeye Slim 17" Borescope |
| 15011 | EPS 2015-216 | 1730MF-A43-XAA - Hobbing/Grinding Fixture - EPS004/EPS015 |
| 15011 | EPS 2015-216-1 | 1730MF-A43-XAA - Hobbing/Grinding Fixture - EPS004/EPS015 |
| 15011 | EPS 2015-217 | Qty - 1 - 5qp130002 - PALLET, 5 AXIS, QUICK CHANGE, 4 STUD, 130MM ROUND, 30MM X 130MM (EPS-013, EPS- 003) |
| 15011 | EPS 2015-217-1 | Qty - 1 - 5qp130002 - PALLET, 5 AXIS, QUICK CHANGE, 4 STUD, 130MM ROUND, 30MM X 130MM (EPS-013, EPS- 003) |
| 15011 | EPS 2015-224 | Qty 1 - SSER25-ISET - ER25 STEEL SEAL INCH SET HPI |
| 15011 | EPS 2015-225 | Qty 1 - 511089 - AXD7000R04002A-H63A MITS CUTTER |
| 15011 | EPS 2015-226 | Qty 1 - 511089 - AXD7000R04002A-H63A MITS CUTTER |
| 15011 | EPS 2015-228 | Test Trailer Additions (EPS-008) |
| 15011 | EPS 2016-282 | [NTX 1000] NTX1000/SZM MORI SEIKI LATHE S/N: NTX10150207 - Placed in Service 1/4/2016 |
| 15011 | EPS 2016-283 | [Wiring for EPS-014] Hooking up Bar Chamfer for the Sprint Linear 20-8 |
| 15011 | EPS 2016-286 | Qty - 1 - 115GAX03559S5 - Radial Driven Tool Benz (PO 2015-00859) |
| 15011 | EPS 2016-287 | 3793T52 - Steel Easy-Empty Hopper w/ polyurethane wheels |
| 15011 | EPS 2016-289 | 49U611 - ETALON Fixed/Friction Thimble Micrometer |
| 15011 | EPS 2016-295 | 511-922 - Bore Gage Services 511 18-150mm (inspection tool) |
| 15011 | EPS 2016-296 | Qty - 3 - GEHFUL 20-2-37769 - Custom Piston Tooling |
| 15011 | EPS 2016-297 | Qty - 3 - GEHFUL 20-3-37756 - Custom Piston Tooling |
| 15011 | EPS 2016-298 | Qty - 3 - GEHFUL 20-3-37759 - Custom Piston Tooling |
| 15011 | EPS 2016-299 | Qty - 3 - GEHFUL 20-3-37765 - Custom Piston Tooling |
| 15011 | EPS 2016-300 | Qty - 3 - GEHFUL 20-3-37768 - Custom Piston Tooling |
| 15011 | EPS 2016-301 | Qty - 3 - GEHFUL 20-3-37770 - Custom Piston Tooling |
| 15011 | EPS 2016-309 | SAND C5-ASHL3-36123-20 - Concept Holder MAT# 5727955 |
| 15011 | EPS 2016-320 | TEI6 142.651.64.315 - Capto C5 x SF 3/4 - 80mm |

12569612v.24

| 15011 | EPS 2016-322 | Qty 50 - 36002518M16, ZeroClamp clamping stud - reference quote 12153 |
| 15011 | EPS 2016-323 | Qty 7 - 36004010012-SET, Clamping pot Start - Kit f. Ø 120 mm   - INCLUDES: (4) 120mm pots  (10) connection- development sites for the air line (each plate requires an "in" and "out" and two points of connection on each pot) Each of your 30 pot plates will require 22 connection sites (1.5) meters (approximately 5') of hose (1) ZeroClamp quick-release coupling grade 10003 (1) Plug to go with coupling reference quote 12072 |
| 15011 | EPS 2016-324 | Qty 2 - 36004010012, ZeroClamp clamping pot Ø120mm - reference quote 12072 |
| 15011 | EPS 2016-325 | Qty 3 -36001712808, ZeroClamp connection block -  INCLUDES: (1) CONNECTION BLOCK With 2 connection ports G ¼ for the connection of release and blow-out air hoses reference quote 12072 |
| 15011 | EPS 2016-326 | Qty 8 - FIA1 V562M-L96 - Metric Vise 125mm x 150mm Self Centering- Lang 96 (Fifth Axis) |
| 15011 | EPS 2016-327 | WS 7000 - WS 700 -  Air flow: 694 CFM, Motor Efficiency per EISA 2007 / IE2 (hp): 1.27,     Weight: 121 lbs., Sound Level 71 db Suction Inlet 150mm / 6" (DMG 65) |
| 15011 | EPS 2016-329 | GLCI NZ2000-8311A-3/4 DBL - OD Holder Double Sided, Fits a Mori Seiki NTX1000 |
| 15011 | EPS 2016-330 | 600664-9700-000 - adapter plate VAST XTR with cube |
| 15011 | EPS 2016-332 | Qty 2 - 626105-6280-050 - Rotatable star element for styli DS1 |
| 15011 | EPS 2016-333 | EPS supplied Mist Collector and Stalling Switches for Mist collector for DMG 65 |
| 15011 | EPS 2016-343 | 4450001 - 840 F SNAP GAGE 1-2.36"/25-60 |
| 15011 | EPS 2016-344 | 4346000 - 2000 EXTRAMESS DIGITAL W/SPC OUTPUT |
| 15011 | EPS 2016-345 | Qty 2 - 4560135 -  TJS 20K-ER32-R ISCAR (speeder head) |
| 15011 | EPS 2016-346 | Qty 2 - 4560137 -  TJS 20K-ER32-R ISCAR, RPM DISPLAY FOR SPINJET HS SPINDLES PROMO TP601 |
| 15011 | EPS 2016-351 | Additions to Test Trailer |
| 15011 | EPS 2016-355 | Keyence Image Dimension Measuring System |
| 15011 | EPS 2016-359 | 3102483 - F45LN D160-12-40-R-N15 ISCAR HOLDER |
| 15011 | EPS 2016-360 | 1628752 - 2 mod x 20 deg pressure angle hob - add to 2013-086 |
| 15011 | EPS 2016-374 | 1656235 - 2 mod 30 deg pressure angle hob - add to 2013-086 |
| 15011 | EPS 2016-375 | 1707823 - 3mod x 20 deg pressure angle hob - add to 2013-086 |
| 15011 | EPS 2016-376 | 1707826 - 16/32 x 30 deg pressure angle hob - add to 2013-086 |
| 15011 | EPS 2016-377 | ORB2-CT/1.000 Adjustment Free Rotary Broach Holder 1" |
| 15011 | EPS 2016-378 | Esprit B Axix Mill Turn & Lathe (with add-on in front of unit) |
| 15011 | EPS 2016-379 | Esprit Post Processor - NTX-1000-SZM |
| 15011 | EPS 2016-380 | Esprit Post Processor - DMG Sprint 20-8 Series Swiss |
| 15011 | EPS 2016-387 | Job# 2028 - Fixed Asset - Test Trailer Improvements (EPS-008) - In Progress |
| 15011 | EPS 2016-389 | Fuel Cap for Test Trailer |
| 15011 | EPS 2016-390 | Go/No-Go Gage |
| 15011 | EPS 2016-397 | MarSurf XR1 Surface System |
| 15011 | EPS 2016-398 | Dual Patch Roughness Std with NIST teaceable Certification |
| 15011 | EPS 2016-399 | BFW Probe Arm A4-90-2/90 for bores larger than 4.5mm |
| 15011 | EPS 2016-400 | BFW Probe Arm A0.7-45-2/90 for bores larger than 0.9mm |
| 15011 | EPS 2016-401 | BRW Probe Arm A2.8-45-2/90-Q6.5 with sideways offset of 6.5mm |
| 15011 | EPS 2016-402 | BRW Probe Arm A2.8-45-2/60 with tip inclined at 32 deg for bores larger than 3.5mm |
| 15011 | EPS 2016-403 | Dig. Dimensionair, 832,2 Chan, Low Mag, 1-2-3 Jet, "NAFTA" |

12569612v.24

| 15011 | EPS 2016-405 | SHA-111, Handle, Air, AHA-15, 18" Long |
| 15011 | EPS 2016-406 | APTHRU - 75.0205mm Air Plug, DP-20, 2 Jet, Thru Hole |
| 15011 | EPS 2016-407 | APBLIND - 86.002mm Air Plug, DP-20, 2 Jet, Blind |
| 15011 | EPS 2016-408 | Job# 2028 - Fixed Asset - Test Trailer Improvements (EPS-008) |
| 15011 | EPS 2017-410 | Hardness Tester - Phase II+ 900-331D |
| 15011 | EPS 2017-430 | Spring Tester - Larson Systems ECT 200lb - High-Res Force |
| 15011 | EPS 2017-431 | Zeiss Adapter Plate - ZSH-70-R-24 (Qty 2) |
| 15011 | EPS 2017-432 | Zeiss Rack Holder - ZCR-070 (qty 4) |
| 15011 | EPS 2017-453 | Mitutoyo 324-252-30 Micrometer GMB-50MJB #84122837 |
| 15011 | EPS 2017-454 | 50-75 MM Digimatic Gear Micrometer #87118162 |
| 15011 | EPS 2017-455 | 324-254-30- Mitutoyo Digimatic Micrometer #00518621 |
| 15011 | EPS 2017-456 | 124-177 100-125MM Micrometer #83932269 |
| 15011 | EPS 2017-457 | 124-178 Gear Tooth Micrometer #68146521 |
| 15011 | EPS 2017-458 | 150-175MM Gear Tooth Micrometer #61893095 |
| 15011 | EPS 2017-459 | R&R Custom Aluminum Plate |
| 15011 | EPS 2017-460 | R&R Fixture Plate 13x450x450 |
| 15011 | EPS 2017-461 | R&R Fixture Plate 13x300x300 |
| 15011 | EPS 2017-462 | R&R Claming Kit B FSC-CB-8 |
| 15011 | EPS 2017-475 | MG-LK17-0959-01 (Shouldered Stylus - 602030-8065-000, Adapter Plates - 600664-9700-000, Extensions - 600341-8261-000, Qmark Disc Stylus) |
| 15011 | EPS 2017-476 | 91601708 - 175-200/.01MM GEAR MIC 124-180 MITUTOYO QIA |
| 15011 | EPS 2017-477 | Custom Face grooving blades for capto c5 holder - NTX1000 - GAFUL 8-5JHP-40148 |
| 15011 | EPS 2017-485 | TASKI Swingo 150, floor cleaner |
| 15011 | EPS 2017-486 | Nilfisk Advance VU500 Vacuum |
| 15011 | EPS 2017-487 | 600667-9611-000 Adapter plate MT/VAST with active ID-Chip, set of 2, 158g/pc |
| 15011 | EPS 2017-488 | ULT3 E16R-SDUCR3 1" Carbide Boring Bar 8" OAL  Brand: Ultra-Dex |
| 15011 | EPS 2017-489 | PRQ1 A-5439-0050-RBE Renishaw OMI-2T Optical Machine Interface |
| 15011 | EPS 2017-490 | PRQ1 ADV Fee MT |
| 15011 | EPS 2017-491 | 4559519 KIT BHF MB50-50 6-108 ITSBORE ISCAR |
| 15011 | EPS 2017-505 | B86004A11 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-506 | B86005A11 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-507 | B86006A10 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-508 | B860105A01 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-509 | B86001A11 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-510 | B86002A11 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-511 | B86003A11 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-512 | B86007A11 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-513 | B860106A01 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-514 | B86016A04 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-515 | B86017A04 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-516 | B86018A04 Hand Jaw for Gantry Loader |
| 15011 | EPS 2017-517 | Spare Belt for LTK-E1 |
| 15011 | EPS 2017-518 | Vibratory System for LTK-E1 |
| 15011 | EPS 2017-519 | LTK-E1 Electronic Piston Ring Tester w/ calibration |
| 15011 | EPS 2017-520 | Electronic Piston Profile Tester with all standard accessories |
| 15011 | EPS-2017-537 | Custom End Stop |
| 15011 | EPS-2017-538 | Segmented Clamping Bushing for Mando T212/T812 |

| 15011 | EPS-2017-539 | Custom Drawtube Adapter |
| 15011 | EPS-2017-540 | SnapTrac 8' monorail system & Accessories |
| 15011 | EPS-2017-541 | A02B-0326-R180 - PART PROGRAM STORAGE SIZE - 256KBYTE to 8MBYTE + TRAVEL AND INSTALL |
| 15011 | EPS-2017-542 | 9054431 BFW A 15-90-2/90 deg - q40 Probe Arm |
| 15011 | EPS-2017-548 | Ruger Reverse Style Stacker: 10CBWB with 24" x 36" Telescopic Flip Up Boom and Additional Counte... |
| 15011 | EPS-2017-549 | U8202421 27MG-7910-E-E-EN 27MG Digital Ultrasonic Thickness Gage. Standard Kit. |
| 15011 | EPS-2017-549.1 | U8880014 2214E Test Block 5 Step 1018 Carbon Steel |
| 15011 | EPS-2017-549.2 | U8880010 2213E Test Block 5 Step Aluminum |
| 15011 | EPS-2017-549.3 | U8780343 27MG-RPC 27MG Protective Rubber Boot with gage stand and shoulder straps |
| 15011 | EPS-2017-550 | M50 x 1.5-5H Go/NoGo Thread Plug Set w/ Calibration |
| 15011 | EPS-2017-566 | ThinkPad 230W Workstation Dock |
| 15011 | EPS-2017-567 | ThinkPad P51 |
| 15011 | EPS-2017-568 | HAW1 2702/0011 SPANNTOP nova chuck size 80 Combi pull-back [standard] Spindle nose: A2-8 Overall... |
| 15011 | EPS-2017-569 | HAW1 DRAWTUBE ADAPTER DRAWTUBE ADAPTER CUSTOMIZED Brand: Hainbuch |
| 15011 | EPS-2017-570 | HAW1 MQ80 Manual Changing Fixture-SPANNTOP Size 80 Pistol Grip Style Brand: Hainbuch |
| 15011 | EPS-2017-571 | HAW1 2524/0026 Mando Adapt T212 RD Size 2 For Spanntop 80 System Clamping range 36-54 MM Brand:... COT6 15.BMT19.05NZ - EWS STATIC TOOL 15.BMT19.05NZ Multi-purpose tool holder. Main and Sub. BMT ... SAND C5-ASHR3-36123-20 - Adapter EDP: 5728601 Brand: Sandvik 2802107 - C5 GHAD-8-JHP ISCAR |
| 15011 | EPS-2017-572 | COT6 15.BMT19.05NZ - EWS STATIC TOOL 15.BMT19.05NZ Multi-purpose tool holder. Main and Sub. BMT ... |
| 15011 | EPS-2017-573 | SAND C5-ASHR3-36123-20 - Adapter EDP: 5728601 Brand: Sandvik |
| 15011 | EPS-2017-574 | 2802107 - C5 GHAD-8-JHP ISCAR |
| 15011 | EPS-2017-588 | MPU.224.B20.OAO.SP205 Right angled live tooling head for Sprint 20-8 |
| 15011 | EPS-2017-589 | WFB.220.036M  er 20 collet adapter |
| 15011 | EPS-2017-594 | 626100-9025-000  probe cabinet MSC, with 30 sockets MT/VAST |
| 15011 | EPS-2017-595 | 600664-9700-000 - Adapter plate for VAST XTR with cube |
| 15011 | EPS-2017-596 | ELC9 HSK63-2TD-ST-T-11 - HSK63 SHANK |
| 15011 | EPS-2017-597 | 30876246 HSK-A063 SPECIAL PILOT TOOL PCD 022.508/37.000 HSK-A063 PER SKETCH 9143154-2 |
| 15011 | EPS-2017-598 | 30899026 022.500/23.011 SPECIAL FINE BORING TOOL SKETCH 9143154-1A |
| 15011 | EPS-2017-599 | 30898984 MOD080:HFS014 A=467.55 MAPAL SPECIAL REPLACEABLE HEAD ADAPTOR |
| 15011 | EPS-2017-600 | 30899008 MOD080:HFS014 A=485.55 MAPAL SPECIAL REPLACEABLE HEAD ADAPTOR |
| 15011 | EPS-2017-603 | 30319389 OS-AD-HSK-A063-MOD080-060-11 ADAPTOR |
| 15011 | EPS-2017-604 | 30854801 084.000/84.429 BORING TOOL MAPAL RADIAL INDEXABLE INSERTS. SIMILAR TO SKETCH 9140758-01 |
| 15011 | EPS-2017-605 | 30854802 085.600/86.029 SPECIAL FINE BORING TOOL WITH HX SYSTEM. SIMILAR TO SKETCH 9140758-02 |

| 15011 | EPS-2018-667 | HOUSING - WAPU, CAST PART (5175ca-a43-aa) |
| 15011 | EPS-2018-668 | ASY - EECU FIXTURE |
| 15011 | EPS-2018-669 | FIX-0008_0001 - ASY - FIXTURE, GASKET, HEAD (2800pa, 2810pa) |
| 15011 | EPS-2018-670 | FIX-0008_0002 - FIX - FLATTEN UHMW (2800pa, 2810pa) |
| 15011 | EPS-2018-671 | FIX-0008_0003 - FIX - FLATTEN WHMW (2800pa, 2810pa) |
| 15011 | EPS-2018-672 | FIX-0008_0004 - ASY - GASKET - HEAD, BK1,2 (2800pa, 2810pa) |
| 15011 | EPS-2018-673 | FIX-0013 - FIXTURE-PRESS BASE (1300bl-a43-aa) |
| 15011 | EPS-2018-674 | FIX-0017 - MULTIPLE PART FIXTURE PLATE |
| 15011 | EPS-2018-675 | FIX-0020_0001 - FIX - PTO COVER (9920pa, 9930ca) |
| 15011 | EPS-2018-676 | FIX-0020_0002 - FIXTURE FOR PTO FRONT COVER (9920pa, 9930ca) |
| 15011 | EPS-2018-677 | FIX-0021_0001 - FIX - ACC COVER, SIDE 1 (9920pa, 9930ca) |
| 15011 | EPS-2018-678 | FIX-0022_0001 - FIXTURE - COOLANT MANIFOLD, FIRST SIDE (5561ca, 5510pa) |
| 15011 | EPS-2018-679 | FIX-0022_0002 - FIXTURE - COOLANT MANIFOLD, SECOND SIDE (5561ca, 5510pa) |
| 15011 | EPS-2018-680.1 | FIX-0023_0001 - FIX - ACC COVER, SIDE 2 (9920pa, 9930ca) |
| 15011 | EPS-2018-680.2 | FIX-0023 - FIX - ACC COVER, SIDE 2 |
| 15011 | EPS-2018-681 | FIX-0026 - Fixture - Oil Pan 1 (3200pa, 3200ca) |
| 15011 | EPS-2018-682 | FIX-0027 - Fixture - Oil Pan 2 (3200pa, 3200ca) |
| 15011 | EPS-2018-683 | FIX-0028 - Fixture - Oil Pan 3 (3200pa, 3200ca) |
| 15011 | EPS-2018-684 | FIX-0036 - FIXTURE - SCAV PUMP - CAP (3825PA, 3825CA) |
| 15011 | EPS-2018-685 | FIX-0029 - PN 3120PA-A43 OIL PUMP (3120pa-a43-aa) |
| 15011 | EPS-2018-686 | FIX-0046 - FIXTURE - WAPU BUSHING PRESS (5171as-a43-aa) |
| 15011 | EPS-2018-687 | FIX-0050_0012 - THREADED ADJUSTMENT PART |
| 15011 | EPS-2018-688 | FIX-0050_0044 - CLAMP - BRG POSITIONING AXIAL |
| 15011 | EPS-2018-689 | FIX-0040 - ASY - FIX, PISTON |
| 15011 | EPS-2018-690 | FIX-0040_0020 - ASY - FIX, PIN, CIRCLIP |
| 15011 | EPS-2018-691 | FIX-0040_0050 - ASY - FIXTURE, PISTONS |
| 15011 | EPS-2018-692 | FIX-0050_0060 - ASY - FIXTURE, PISTON GRIP |
| 15011 | EPS-2018-693 | FIX-0050_0080 - FIX - TOOL, PLUG |
| 15011 | EPS-2018-694 | FIX-0050_0085 - FIX - TOOL - CIRCLIP, PENDULUM |
| 15011 | EPS-2018-695 | FIX-0016_0001 - ASY - FIX, BSH INSTALL, CRANKSHAFT PEND |
| 15011 | EPS-2018-696 | FIX-0041 - ARBOR PRESS PLATE FIXTURE |
| 15011 | EPS-2018-697 | FIX-0050_0031 - ASY - BLOCK OFF, OIL COOLER BASE, BK1 |
| 15011 | EPS-2018-698 | FIX-0050_0034 - ASY - BLOCK OFF, OIL COOLER BASE, BK2 |
| 15011 | EPS-2018-699 | FIX-0050_0042 - GUIDE - BLOCK, PLATE HDP |
| 15011 | EPS-2018-700 | FIX-0050_0043 - GUIDE - BLOCK, PLATE HDP |
| 15011 | EPS-2018-701 | FIX-0050 - FIXTURE - BLOCK ASSY/DISASSY |
| 15011 | EPS-2018-702 | FIX-0073_0001 - FIX - CYL HD MACHINING, BK 1, SAFETY WIRE (2210pa-a43-aa) |
| 15011 | EPS-2018-703 | FIX-0073_0002 - FIX - CYL HD MACHINING, BK 1, SAFETY WIRE 2 (2210pa-a43-aa) |
| 15011 | EPS-2018-704 | FIX-0074_0001 - FIX - CYL HD MACHINING, BK 2, SAFETY WIRE (2310pa-a43-aa) |
| 15011 | EPS-2018-705 | FIX-0074_0002 - FIX - CYL HD MACHINING, BK 2, SAFETY WIRE 2 (2310pa-a43-aa) |
| 15011 | EPS-2018-706 | FIX-0037_0001 - FIXTURE-MFLD-INTAKE, FINISHED, BK1 AND BK2 OP10 (6110pa, 6210ca) |
| 15011 | EPS-2018-707 | FIX-0053 - ASY - PRESS, GEAR/CAM FIXTURE |

12569612v.24

| 15011 | EPS-2018-708 | FIX-0037_0002 - FIXTURE-MFLD-INTAKE, FINISHED, BK1 AND BK2 OP20 (6110pa, 6210ca) |
|-------|--------------|-------------------------------------------------------------------|
| 15011 | EPS-2018-709 | FIX-0048 - ASY - FIXTURE - TORQUE TUBE ORIFICE (Orifice Installation) |
| 15011 | EPS-2018-710 | FIX-0060 - ASY - 46T STARTER GEAR/SHAFT PRESS |
| 15011 | EPS-2018-711 | FIX-0065 - ASY - 57T GEAR/SHAFT PRESS FIXTURE |
| 15011 | EPS-2018-712 | FIX-0066 - ASY - 35T GEAR/BUSHING PRESS FIXTURE |
| 15011 | EPS-2018-713 | FIX-0069 - ASY - PINION GEAR/BRNG PRESS FIXTURE |
| 15011 | EPS-2018-714 | FIX-0070 - ASY - PROPSHAFT SEAL CARRIER PRESS FIXTURE |
| 15011 | EPS-2018-715 | FIX-0080_00001 - FIXTURE - ASY, HSG, OIL PUMP |
| 15011 | EPS-2018-716 | FIX-0050_0047 - GUIDE - CON ROD, PISTON |
| 15011 | EPS-2018-717 | FIX-0050_0048 - GUIDE - CON ROD, PISTON |
| 15011 | EPS-2018-718 | FIX-0075_0001: FIX-0075_0001.3 - FIX-FUEL PUMP ADAPTER, OP10 |
| 15011 | EPS-2018-719 | FIX-0076_0001: FIX-0076_0001.2-FIX-FUEL PUMP ADAPTER, OP20 |
| 15011 | EPS-2018-720 | FIX-0079_0001-FIXTURE-CVR, ACC, REAR |
| 15011 | EPS-2018-721 | FIX-0084_0001-FIX-INSPECTION, WINDAGE TRAY |
| 15011 | EPS-2018-722 | EECU Flashing Station |
| 15011 | EPS-2018-723 | FIX-0093_0001.1 - FIX-MACHINING, COMPRESSOR HSG |
| 15011 | EPS-2018-772 | Midwest Industrial Tanks Double-Wall Storage Fuel Tank - 500-Gallon and fitting package |
| 15011 | EPS-2018-773 | Coffing® Electric Wire Rope Hoist 500 Lb. Capacity |
| 15011 | EPS-2018-774 | Abell-Howe® Light Duty Floor Crane 4S0003 500 Lb. Capacity |
| 15011 | EPS-2018-784 | Engine and Trans Repair Stand per quote m2795 (FIX-0050_0105 (SN3)) |
| 15011 | EPS-2018-788 | 1 set of 4 pallet clamps |
| 15011 | EPS-2018-791 | ABB 40HP VFD |
| 15011 | EPS-2018-794 | Micro LabCar test system |
| 15011 | EPS-2018-796.002 | Prop Cell 2 |
| 15011 | EPS-2018-796.003 | Prop Cell 2 - Add On |
| 15011 | EPS-2018-796.004 | ASY - PDM |
| 15011 | EPS-2018-796.005 | ASY - Test Stand |
| 15011 | EPS-2018-797.002 | Dyno Cell 01 |
| 15011 | EPS-2018-797.003 | Dyno Cell 01 |
| 15011 | EPS-2018-797.004 | Dyno Cell 01 |
| 15011 | EPS-2018-797.005 | Dyno Cell 01 |
| 15011 | EPS-2019-803 | FT4-8AEU2-LEA-0 - TURBINE FLOWMETER |
| 15011 | EPS-2019-804 | ULN-C-1-M4-1 - microLinK: Linearizing, Temperature Compensating Pickoff |
| 15011 | EPS-2019-805 | 19-100753-103 - uLinK to Flying Lead Cable Assembly |
| 15011 | EPS-2019-806 | ULD-2-1 - MicroLink Display, Dual Input and Cable w/Resistor (2m) |
| 15011 | EPS-2019-807 | DZ140 Controller |
| 15011 | EPS-2019-808 | Thermal Transfer Heat Exchanger 4 pass. Note: Updated PN as C series is now HC series |
| 15011 | EPS-2019-809 | Hikvision DS-2DE4A220IW-DE 2MP Network IR Mini PTZ Camera |
| 15011 | EPS-2019-810 | FIX-0015: FIX-0015_0000 |
| 15011 | EPS-2019-811 | 2009 John Deere X534 AM-CT 4WS NO DK TURF Stock# 01010009304N |
| 15011 | EPS-2019-811 | 2009 John Deere X534 AM-CT 4WS NO DK TURF Stock# 01010009304N |
| 15011 | EPS-2019-812 | John Deere X534 M-T 4WS NO DK Turf |
| 15011 | EPS-2019-812 | John Deere X534 M-T 4WS NO DK Turf |
| 15011 | EPS-2019-813 | CAN LIN Interface Module |
| 15011 | EPS-2019-814 | Machine-named license for INCA - Qty 2 |
| 15011 | EPS-2019-815 | ETK Interface Cable |

| 15011 | EPS-2019-816 | CAN Interface Cable |
|---|---|---|
| 15011 | EPS-2019-817 | CAN 120 Ohm Termination Resistor |
| 15011 | EPS-2019-818 | WW-MG-600v Gear Head Only Per Quote m2827 *freight TBD* (part of FIX-0050_0000) |
| 15011 | EPS-2019-821 | Bin Storage Cabinet - 36 x 24 x 78", 90 Blue Bins |
| 15011 | EPS-2019-822 | Triumph Fiber Laser Marking Machine 30w for Permanent Metal Parts Marking and Engraving with rot... |
| 15011 | EPS-2019-823 | Aluminum Prop 84 inches (J3F10750 - Ref: 9700AY-A43-A43-ZA) (Serial # FP9427B) |
| 15011 | EPS-2019-824 | 4114B1 - Line powered current sources 4-channel livm power unit; 2-20mA adjustable current; 115V... |
| 15011 | EPS-2019-825 | 3143D2 - accelerometer, triaxial, thru hole, 50mV/g, 4-pin connector - with sensor trade in |
| 15011 | EPS-2019-826 | 3143D2 - accelerometer, triaxial, thru hole, 50mV/g, 4-pin connector |
| 15011 | EPS-2019-827 | FIX-0072_0000-ASY - Propeller Oil Feed Tube Press Fixture - 1,000 parts - 1435AS-A43- |
| 15011 | EPS-2019-828 | FIX-0077_0000-ASY - Gear Lash ADJ Link - 1,000 parts 9085AY-A43-AA |
| 15011 | EPS-2019-850 | DYNO HARNESS (TWO FIREWALLS) |
| 15011 | EPS-2019-851 | 8660AY-A43-AA - WIRE HARNESS DIAG - DAQ (TEST STAND) |
| 15011 | EPS-2019-852.001 | DynoControl01 |
| 15011 | EPS-2019-853.001 | PROPCONTROL02 |
| 15011 | EPS-2019-854 | Shop Tooling - SPT-4004 - 3/4" Dr 40-400 Ft Lbs. / 54-542 Nm Digitool Electronic Torque Tester |
| 15011 | EPS-2019-856 | Prop Governor |
| 15011 | EPS-2019-872 | Mini Split for IT Prop Stand Area |
| 15011 | EPS-2020-894 | Job 4117 - 8630AY-A43-YA - DO-160 test Harness |
| 15011 | EPS-2020-895 | Job 4118 - 8630AY-A43-YA - DO-160 test Harness |
| 15011 | EPS-2020-896 | Job 4119 - 8630AY-A43-YA - DO-160 test Harness |
| 15011 | EPS-2020-897 | Job 4145 - DO160 Load Box 1 |
| 15011 | EPS-2020-898 | Job 4146 - DO160 Load Box 2 |
| 15011 | EPS-2020-899.001 | Prop Cell 1 |
| 15011 | EPS-2020-899.002 | Prop Cell 1 |
| 15011 | EPS-2020-899.003 | Prop Cell 1 |
| 15011 | EPS-2020-899.004 | Prop Cell 1 |
| 15011 | EPS-2020-899.005 | Prop Cell 1 |
| 15011 | EPS-2020-899.006 | Prop Cell 1 |
| 15011 | EPS-2020-899.007 | Prop Cell 1 |
| 15011 | EPS-2020-903 | Job 6138 - PROPCONTROL01 - Propeller Test Cell Controls 01 |
| **15011-1 Mach & Equip COGS - Outside Ven** | | |
| 15011-1 | EPS 2015-174 | P2011C-A43-XAA TOOLING |
| 15011-1 | EPS 2015-175 | P0160C-A43-XAA Tooling |
| 15011-1 | EPS 2015-176 | P0130C-A43-XAA Tooling |
| 15011-1 | EPS 2015-177 | P2001C-A43-XAA Tooling |
| 15011-1 | EPS 2015-178 | Tooling for 2800PA-A43-XZA (Head Gaskets - Bank 1) |
| 15011-1 | EPS 2015-179 | Tooling for 2810PA-A43-XZA (Head Gaskets - Bank 2) |
| 15011-1 | EPS 2015-180 | Tooling for 7360PA-A43-XZA (Exhaust Manifold Gasket) |
| 15011-1 | EPS 2015-181 | Tooling for 7370PA-A43-XZA (Turbo Exit Flange Gasket) |
| 15011-1 | EPS 2015-214 | 0220CA-A43-AA - GW35182 - Tooling modification for crank case - casting tool located at G&W |

| 15011 | EPS-2017-606 | 30863810 085.950 SPECIAL FINE BORING TOOL WITH HX SYSTEM. SIMILAR TO SKETCH 9140758-03 |
| 15011 | EPS-2017-607 | 30854803 060.000 CIRCULAR MILL MAPAL TANGENTIAL INDEXABLE INSERTS. SIMILAR TO SKETCH 9140758-04 |
| 15011 | EPS-2017-615 | 30878578 074.710 FINE BORING TOOL W/WP SYSTEM SKETCH 9140754.01 |
| 15011 | EPS-2017-616 | 30878987 074.710/75.010 FINE BORING TOOL W/WP SYS SKETCH 9140754-02 |
| 15011 | EPS-2017-617 | 30877475 MOD100:HSK-C050 A=462.45 ADAPTOR |
| 15011 | EPS-2017-618 | 30319390 OS-AD-HSK-A063-MOD100-065-11 ADAPTOR |
| 15011 | EPS-2017-619 | 30641280 DZ93R6-HC418 CARB INDEXABLE BLADE |
| 15011 | EPS-2017-620 | MS250-2/MN349-1 MS250-2/MN349-1 SETTING FIXTURE MASTERSET |
| 15011 | EPS-2017-621 | NR-1181 1003 / MILLIMESS +/-50 um DIAL INDICATOR |
| 15011 | EPS-2017-622 | NR-1064 CENTRE CAP FOR SPINDLE MAPAL MECHANICAL ACCESSORY/MOUNTING PART |
| 15011 | EPS-2017-623 | NR-1065 CENTER CAP FOR SPINDLE 040 MAPAL MECHANICAL ACCESSORY/MOUNTING PART |
| 15011 | EPS-2017-624 | 30018374 45L100 ANGLED HEAD MAPAL MECHANICAL ACCESSORY/MOUNTING PART |
| 15011 | EPS-2017-625 | 30018371 5R100 ANGLED HEAD MAPAL MECHANICAL ACCESSORY/MOUNTING PART |
| 15011 | EPS-2017-626 | NR-1161 2.5MM MEASURING SHOE MAPAL MECHATRONIC PART |
| 15011 | EPS-2017-627 | K13757-001 STAND FOR EQUIPMENT MAPAL |
| 15011 | EPS-2017-632 | Shelving |
| 15011 | EPS-2018-633 | Load Box EECU-AV8-1 |
| 15011 | EPS-2018-633.001 | Load Box EECU-AV8-1 - Addons |
| 15011 | EPS-2018-640 | Test stand, lever-operated, 30lbF / 150N Mark-10 |
| 15011 | EPS-2018-641 | Base plate with matrix of tapped holes Mark-10 |
| 15011 | EPS-2018-642 | Force gauge, 20 lbF / 320 ozF / 10 kgF / 10000 gF / 100N Mark-10 |
| 15011 | EPS-2018-643 | Force Gage, Tension AND Compression: 0 - 100 lbs. PQI Calibration |
| 15011 | EPS-2018-644 | Rotary Union Kit (repair to machine) |
| 15011 | EPS-2018-648 | CYLINDER BLOCK HONING FIXTURE (0100as-a43-aa) |
| 15011 | EPS-2018-649 | FIX-0009 - Assembly - Fixture, Conrod (0981bl-a43-ca & da) |
| 15011 | EPS-2018-650 | FIX-0009_0001 - Fixture - Conrod, OP 10 (0981bl-a43-ca & da) |
| 15011 | EPS-2018-651 | FIX-0009_0002 - Fixture - Conrod, OP 20 (0981bl-a43-ca & da) |
| 15011 | EPS-2018-652 | FIX-0009_0003 - Fixture - Conrod, OP 10 (0981bl-a43-ca & da) |
| 15011 | EPS-2018-653 | FIX-0009_0004 - Fixture - Conrod, OP 20 (0981bl-a43-ca & da) |
| 15011 | EPS-2018-654 | FIX-0018 - Fixture - HSG Thermostat (5413ca-a43-aa, 5413pa-a43-aa) |
| 15011 | EPS-2018-655 | FIX-0018 - Fixture - HSG Thermostat (5413ca-a43-aa, 5413pa-a43-aa) |
| 15011 | EPS-2018-656 | FIX-0019 - Fixture - Con Rod (contains FIX-0019_0004, _0005, _0006, _0007, _0008, _0009) (0980as) |
| 15011 | EPS-2018-657 | FIX-0019_0001 - 0980as-a43-ca_da-c0001_prep_op (0980as) |
| 15011 | EPS-2018-658 | FIX-0019_0002 - 0980as-a43-ca_c001_ (0980as) |
| 15011 | EPS-2018-659 | FIX-0019_0003 - 0980as-a43-ca_c001_asy-side 1 (0980as) |
| 15011 | EPS-2018-660 | FIX-0030 - 9940ca-a43 cvr starter drv (9940ca-a43-aa) |
| 15011 | EPS-2018-661 | FIX-0031 - Inspection, Head Gaskets (2810PA-A43-AA, 2800PA-A43-AA) |
| 15011 | EPS-2018-662 | FIX-0032 - FIXTURE - HSG, OIL PUMP (3160PA, 3160CA) |
| 15011 | EPS-2018-663 | FIX-0033 - FIXTURE - SCAV PUMP -CENTER SECTION (3725PA, 3725CA) |
| 15011 | EPS-2018-664 | Fix-0134_0003 - CYL BLK - MACHINED, BK 1 fixture (0220pa-a43-aa) |
| 15011 | EPS-2018-665 | Windage Tray Fixture (0450pa-a43-aa) |
| 15011 | EPS-2018-666 | INLET - WAPU, CAST PART (5135ca-a43-aa) |

| | | |
|---|---|---|
| 15011-1 | EPS 2015-215 | 0320CA-A43-AA - GW35183 - Tooling modification for crank case - casting tools located at G&W |
| 15011-1 | EPS 2015-218 | Qty 1 - GW31584 - Cylinder Head 1 tooling P2000-A43-XAA |
| 15011-1 | EPS 2015-219 | Qty 1 - GW31585 - Cylinder Head 2 tooling P2010-A43-XAA |
| 15011-1 | EPS 2015-220 | Qty 1 - GW31878 - Crank Case 1 tooling P0130-A43-XAA |
| 15011-1 | EPS 2015-221 | Qty 1 - GW31879 - Crank Case 2 tooling P0160-A43-XAA |
| 15011-1 | EPS 2015-222 | Qty 1 - GW33511 - Cam Cover 1 tooling P2011-A43-XAA |
| 15011-1 | EPS 2015-223 | Qty 1 - GW33293 - Cam Cover 2 tooling P2001-A43-XAA |
| 15011-1 | EPS 2016-310 | GW35106 - LH Cover Cyl HD bank1 tooling modification (from XAA to AA) |
| 15011-1 | EPS 2016-311 | GW35107 - RH Cover Cyl HD bank2 tooling modification (from XAA to AA) |
| 15011-1 | EPS 2016-312 | GW36736 - RH block/crank case bank2 tooling modification (for Rev.01) |
| 15011-1 | EPS 2016-313 | GW36735 - LH block/crank case bank1 tooling modification (for  Rev.01) |
| 15011-1 | EPS 2016-318 | GW35104 - LH cylinder head bank1 tooling modification (from XAA to AA) |
| 15011-1 | EPS 2016-319 | GW35105 - RH cylinder head bank2 tooling modification (from XAA to AA) |
| 15011-1 | EPS 2016-341 | Tooling for Exhaust Seat (reference quote WQ140260 Rev. 3) (2510PA-A43-AA) (Tool life 1,000,000 parts) |
| 15011-1 | EPS 2016-356 | Tooling Windage Tray |
| 15011-1 | EPS 2016-357 | Tooling Oil-Cooler-Base B1 |
| 15011-1 | EPS 2016-358 | Tooling Oil-Cooler-Base B2 |
| 15011-1 | EPS 2016-383 | Modified Tooling - Gehring Diato |
| 15011-1 | EPS 2017-411 | 1401FG-A43-AA - Tooling |
| 15011-1 | EPS 2017-412 | 5511CA-A43-AA - Tooling |
| 15011-1 | EPS 2017-413 | 5561CA-A43-AA - Tooling |
| 15011-1 | EPS 2017-414 | 5135PA-A43-AA - Tooling |
| 15011-1 | EPS 2017-433 | Tooling for 2800PA-A43-XZA & 2810PA-A43-XZA (Head Gaskets - Bank 1) (2016S1-R1) |
| 15011-1 | EPS 2017-434 | Tooling for 2800PA-A43-XZA & 2810PA-A43-XZA (Head Gaskets - Bank 1) (2016S2-R1) |
| 15011-1 | EPS 2017-435 | Tooling for 2800PA-A43-XZA & 2810PA-A43-XZA (Head Gaskets - Bank 1) (2016S3-R1) |
| 15011-1 | EPS 2017-436 | 2800PA-A43-XZA - Tooling Modification for Bank1 (2016T-R1) |
| 15011-1 | EPS 2017-437 | 2800PA-A43-XZA - Tooling Modification for Bank1 (2016B-R1) |
| 15011-1 | EPS 2017-438 | 2810PA-A43-XZA - Tooling Modification for Bank 2 (2017T-R1) |
| 15011-1 | EPS 2017-439 | 2810PA-A43-XZA - Tooling Modification for Bank 2 (2017B-R1) |
| 15011-1 | EPS 2017-440 | Casting Tool - 9830PA-A43-XAA - Cover - PTO |
| 15011-1 | EPS 2017-441 | Casting Tools for OIL PAN-3200CA-A43-AA OIL PAN |
| 15011-1 | EPS 2017-442 | Tooling (core boxes) for Thermostat-Housing - 5413ca-a43-aa |
| 15011-1 | EPS 2017-443 | Tooling (core boxes) for Water Pump - 5175ca-a43-aa |
| 15011-1 | EPS 2017-452 | Tooling for Boegra part # 1600002-010 (EPS # 0990PA-A43-AA) |
| 15011-1 | EPS 2017-472 | Tooling for Boegra part # MB 1096E (0506PA-A43-AA, 0507PA-A43-AA) |
| 15011-1 | EPS 2017-473 | Tooling for Boegra part # CB 1113F (0994PA-A43-AA, 0995PA-A43-AA) |
| 15011-1 | EPS 2017-474 | Tooling for Boegra part # TW 1187D (0508PA-A43-AA) |
| 15011-1 | EPS 2017-504 | Tooling for 0520AS-A43-BA |
| 15011-1 | EPS 2017-521 | Tooling Cost 9930CA-A43-AA |
| 15011-1 | EPS 2017-522 | Tooling for heat treatment of PTO COVER |
| 15011-1 | EPS 2017-523 | Tooling for heat treatment of OIL PAN-3200CA-A43-AA OIL PAN |
| 15011-1 | EPS 2017-524 | Tooling for straightening of OIL PAN-3200CA-A43-AA OIL PAN |
| 15011-1 | EPS-2017-546 | Tooling (Becker) for Scav Pump - Center Section, Casting |
| 15011-1 | EPS-2017-547 | Tooling (Becker) Scav Pump - Cap, Casting |

| 15011-1 | EPS-2017-556 | Tooling Cost 6211CA-A43-AA |
|---|---|---|
| 15011-1 | EPS-2017-557 | Casting Tool - 9830PA-A43-XAA - Cover - PTO |
| 15011-1 | EPS-2017-558 | Casting Tools for PSRU COVER - 9880CA-A43-AA COVER - PSRU |
| 15011-1 | EPS-2017-559 | Casting Tools for OIL PAN-3200CA-A43-AA OIL PAN |
| 15011-1 | EPS-2017-563 | Tooling for 9940CA-A43-AA - CVR - Starter Drive, Casting |
| 15011-1 | EPS-2017-587 | Casting Tools for Adapter - 4050CA-A43-AA PLATE - ADAPTER, FUEL PUMP |
| 15011-1 | EPS-2018-635 | Casting Pattern 7720PA-A43-AA |
| 15011-1 | EPS-2018-637 | Casting Pattern 7820PA-A43-AA |
| 15011-1 | EPS-2018-638 | Tooling 7370PA-A43-YA |
| 15011-1 | EPS-2018-639 | Tooling 7420PA-A43-AA |
| 15011-1 | EPS-2018-647 | CYLINDER BLOCK HONING FIXTURE (0100as-a43-aa) |
| 15011-1 | EPS-2018-724 | Gear - 61T Crankshaft ACC, Finish Gear Grind, Arbor, Collet, Ring (tooling for 1700PA-A43-AA) |
| 15011-1 | EPS-2018-725 | Gear - 61T C-Bal (HCR), Finish Gear Grind, Collet, Ring (tooling for 1710PA-A43-AA) |
| 15011-1 | EPS-2018-726 | Gear - 61T Fuel Pump (HCR), Finish Gear Grind, Arbor, Tailstock (tooling for 1720PA-A43-AA) |
| 15011-1 | EPS-2018-727 | Gear - 89T Starter, Finish Gear Grind, Collet, Ring (tooling for 1730PA-A43-AA) |
| 15011-1 | EPS-2018-728 | Gear - 29T Starter Reduction, Finish Gear Grind, Arbor, Collet, Ring (tooling for 1740PA-A43-AA) |
| 15011-1 | EPS-2018-729 | Gear - 46T Starter Reduction, Finish Gear Grind, Collet (tooling for 1750PA-A43-AA) |
| 15011-1 | EPS-2018-730 | Gear - 64T Front Main Cam Dr., Finish Gear Grind, Arbor (Tooling for 1600PA-A43-AA) |
| 15011-1 | EPS-2018-731 | Gear - 64T Counter Balancer, Finish Gear Grind, Collet, Ring (tooling for 1610PA-A43-AA) |
| 15011-1 | EPS-2018-732 | Gear - 57T Cam Idler, Finish Gear Grind, Collet, Ring (Tooling for 1630PA-A43-AA) |
| 15011-1 | EPS-2018-733 | Gear - 35T Idler, Finish Gear Grind, Collet, Ring (Tooling for 1640PA-A43-AA) |
| 15011-1 | EPS-2018-734 | Gear - 44T Camshaft, Finish Gear Grind, Collet, Ring (tooling for 1650PA-A43-AA) |
| 15011-1 | EPS-2018-735 | Live Center # 301414 |
| 15011-1 | EPS-2018-736 | Tooling for Gear # 1303as-a43-aa - Gear, Secondary 42T |
| 15011-1 | EPS-2018-737 | Tooling for Gear # 1303as-a43-aa |
| 15011-1 | EPS-2018-738 | Tooling for Gear # 1300-ay-a43-aa |
| 15011-1 | EPS-2018-739 | Tooling for Gear Part # 1200as-a43-00 - Gear Pinoin 29T - PreHeat Treat Hob, Hob, Stop, Collet &... |
| 15011-1 | EPS-2018-740 | Tooling for Gear Part # 1200as-a43-aa-p003 - Gear Pinoin 29T - PreHeat Treat Spline, Shaper, Chu... |
| 15011-1 | EPS-2018-741 | Tooling for Geat Part # 1200as-a43-xaa - Gear Pinoin 29T - Finish Grind Gear, Arbor |
| 15011-1 | EPS-2018-787 | Tooling for Assembly-Gaging Fixture Fuel Lines (Assembly Tooling for 4600) |
| 15011-1 | EPS-2019-798 | FIX-0042 - CON ROD HONING FIXTURE |
| 15011-1 | EPS-2019-870 | FIX-0043 - Fixture - Pendulum Balance |
| **15012 Machinery & Equipment (OH)** | | |
| 15012 | EPS 2013-117 | Floor scrubber |
| 15012 | EPS 2013-118 | Vertical Bandsaw |
| 15012 | EPS 2013-119 | Horizontal Bandsaw |
| 15012 | EPS 2015-262 | Reconditioned Komatsu FB25SH, 5000# Capacity. 36 V 4-Wheel Electric Rider Forklift |

| 15012 | EPS 2015-263 | Used JLG 1930ES, 19' Platform Height 25' Working Height, Electric Scissors Lift |
| 15012 | EPS 2015-264 | [Generac 22kw Generator Package & Installation], located at Hangar 11-16, PO 2015-00124 |
| 15012 | EPS 2015-265 | Qty 1 - 11-03820 - David Clark H10-13XL Headset |
| 15012 | EPS 2015-266 | Qty 5 - 11-03820 - David Clark H10-13XL Headset |
| 15012 | EPS 2016-291 | ESPAR Airtronic D2 24 Volt Diesel Heater |
| 15012 | EPS 2017-415 | Tensor ETV ST101-370-20 with PF4000 Graph Controller and RBU-Gold BackUp Unit (single user tools talk PF w10 license) |
| 15012 | EPS 2017-415.1 | Add on to 2017-415 - ST Tool Cable 7M |
| 15012 | EPS 2017-416 | Honda EU2000 Generator |
| 15012 | EPS 2017-428 | STWrench SmartHead with ratchets, battery adapters and 1 user ToolsTalk license |
| 15012 | EPS 2017-463 | Breakout box 128 pin Deutsch X1 #982-007525 |
| 15012 | EPS 2017-464 | Breakout box 24 pin Deutsch X3 #982-007526 |
| 15012 | EPS 2017-465 | Breakout box 37 pin Deutsch X5 #982-007527 |
| 15012 | EPS 2017-478 | P5514-E Axis PTZ Dome Network Camera |
| 15012 | EPS 2017-479 | Switches for testing (Qty =3) |
| 15012 | EPS 2017-492 | InfiniiVision DSOX1102G 100 MHz Oscilloscope |
| 15012 | EPS-2017-551 | WB241647 - I Beam Trolley 2,000 Pound Capacity |
| 15012 | EPS-2017-552 | WBB445184 - Milwaukee® 1 Ton Electric Chain Hoist 10' Lift 115/230V 1-Phase |
| 15012 | EPS-2017-553 | WB241324 - Vestil Steel Gantry Crane Adjustable Height 2000 Lb. Capacity |
| 15012 | EPS-2017-628 | Quincy Air Compressor, Milton Air Regulator, Air Hose, Air Filter Regulator |
| 15012 | EPS-2017-631 | Shelving |
| 15012 | EPS-2018-775 | Slugbuster Hydraulic Knockout Cutter Set 1/2" - 2" W/Case & Hand Pump |
| 15012 | EPS-2018-776 | Masterforce 41" x 24" Blue 11-Drawer Tool Cabinet |
| 15012 | EPS-2018-777 | TMB 8100 220 Volt Single Phase, 5hp 9kw INCLUDES THESE FEATURES:  11 Gauge Steel Cabinet  Gear ... |
| 15012 | EPS-2018-789 | backward inclined SWSI size 24 ACF Class 3 Arr-4 CW Rotation UB discharge 62% width |
| 15012 | EPS-2018-790 | backward inclined SWSI size 24 ACF Class 3 Arr-4 CW Rotation UB discharge 62% width |
| **15015 Mach & Equip - Fixtures** | | |
| 15015 | EPS-2019-799 | FIX-00039 - FIXTURE - CON ROD, PRESS |
| 15015 | EPS-2019-800 | FIX-0038 - Test Fixture for Piston - Cooling Jet |
| 15015 | EPS-2019-801 | FIX-0044 - FIXTURE 044 |
| 15015 | EPS-2019-802 | FIX-0078_0001 - FIXTURE - CVR, PROPSHAFT BRG |
| 15015 | EPS-2019-832 | Job 6142 - FIX-0050_0048 - Guide-Con Rod, Piston - 1,000 parts, qty 8 9090AY-A43-AA |
| 15015 | EPS-2019-833 | Job 6141 - FIX-0050_0047 - Guide-Con Rod, Piston - 1,000 parts, qty 8 9090AY-A43-AA |
| 15015 | EPS-2019-834 | Job 6110 - FIX-0015_0002 - Assembly Tool Gear, Presser Component - 1,000 parts qty 3 5171AY-A43-AA |
| 15015 | EPS-2019-835 | Job 6109 - FIX-0015_0010 - Assembly Tool Impeller - 1,000 parts qty 2 5171AY-A43-AA |
| 15015 | EPS-2019-836 | Job 6108 - FIX-0015_0009 - Assembly Tool Impeller - 1,000 parts qty 2 5171AY-A43-AA |
| 15015 | EPS-2019-837 | Job 6140 - FIX-0062_0001 - Guide-Cyl Head, Short - 5,000 parts 9085AY-A43-AA |

| 15015 | EPS-2019-838 | Job 6139 - FIX-0062_0000 - Guide-Cyl Head, Long - 5,000 parts 9085AY-A43-AA |
|---|---|---|
| 15015 | EPS-2019-839 | Job 1886 - FIX-0051_0000 - Asy-Bank 1, CBAL Gear Press Fixture - 2,000 parts qty 2 1611AY-A43-AA, 1612AY-A43- AA |
| 15015 | EPS-2019-842 | FIX-0071_0000 - ASY - PROPELLER SHAFT BRNG PRESS FIXTURE |
| 15015 | EPS-2019-843 | FIX-0103_0001 - FIX - MACHINING, PTO COVER |
| 15015 | EPS-2019-844 | FIX-0050_0062 - FIXTURE - PISTON GRIP |
| 15015 | EPS-2019-845 | FIX-0050_0061 - FIXTURE - PISTON GRIP |
| 15015 | EPS-2019-847 | FIX-0124_0001 - FIXTURE - ASY, WAPU, BUSHING INSTALL |
| 15015 | EPS-2019-848 | FIX-0125_0001 - FIXTURE - ASY, WAPU CHECKVALVE |
| 15015 | EPS-2019-849 | FIX-0110_0001 - FIX-INSPECTION, THERMOSTAT OUTLET |
| 15015 | EPS-2019-855 | Job 6147 - FIX-0117_0000 - 4140AY-A43-AA - 1,000 parts |
| 15015 | EPS-2019-858 | Job 6235 - FIX-0136_0001 - 1480PA-A43-AA - 1,000 parts |
| 15015 | EPS-2019-859 | Job 1835 - FIX-0035_0001 - 0730AY-A43-AA - 1,000 parts |
| 15015 | EPS-2019-860 | Job 6236 - FIX-0137_0001 - 1485PA-A43-AA - 1,000 parts |
| 15015 | EPS-2019-861 | Job 6015 - FIX-0097_0001 - 1000 parts 7015PA-A43-AA, 7025PA-A43-AA |
| 15015 | EPS-2019-862 | Job 6097 - FIX-0110_0001 - 1000 parts 5431PA-A43-AA |
| 15015 | EPS-2019-863 | Job 6136 - FIX-0113_0001 - 1000 parts 9870PA-A43-AA |
| 15015 | EPS-2019-864 | Job 6196 - FIX-0106_0001 - 1000 parts 0980AY-A43-CA, 0980AY-A43-CA |
| 15015 | EPS-2019-865 | Job 6197 - FIX-0106_0002 - 1000 parts 0980AY-A43-CA, 0980AY-A43-DA |
| 15015 | EPS-2019-866 | Job 6199 - FIX-0106_0003 - 1000 parts 0980AY-AV3-CA, 0980AY-AV3-DA |
| 15015 | EPS-2019-867 | Job 1163T - 2000 parts 3321PA-A43-AA |
| 15015 | EPS-2019-868 | Job 1979 - FIX-0052_0002 - 1000 parts 5431PA-A43-AA |
| 15015 | EPS-2019-869 | Job 1885 - EXT - Boring Heads - 2,500 uses, multiple parts |
| 15015 | EPS-2019-873 | Job 6177 - FIX-0020 - Fixture - PTO Cover - 1,000 parts 9820PA-A43-AA, 9830PA-A43-AA |
| 15015 | EPS-2019-874 | Job 1717 - FIX-0052 - Fixture - PSRU Cover 1,000 aprts 9870pa-a43-aa |
| 15015 | EPS-2019-875 | Job 6171 - FIX-0121 - Fixture - Machining, Comp HSG, Op 20 - 1,000 parts 7720PA-A43-AA, 7721PA-A43-AA |
| 15015 | EPS-2019-876 | Job 6244 - FIX-0138 - Fixture - ASY, Spray Check Cooling Jets - 1,000 parts 3640AS-A43-AA |
| 15015 | EPS-2019-877 | Job 6245 - FIX-0140_0001 - Fix-Machining, Oil Cooler Base, Rework, BK1/2 - 2,000 parts 3311PA-A43-AA, 3321PA- A43-AA |
| 15015 | EPS-2019-878 | Job 6137 - FIX-0114_0001 - Fixture - Leak Test, Intake Mfld BK 1 - 2,000 parts 6110PA-A43-AA, 6210PA-A43-AA |
| 15015 | EPS-2019-879 | Job 6167 - FIX-0120_0000 - Asy - Fixture, M14 Banjo Pressure Terst (LP Fuel lines) - 2,000 parts 4713AS, 4714AS, 4716AS, 4717AS, 4751AS |
| 15015 | EPS-2019-880 | Job 6283 - FIX-0007_0005 - FIX Bushing |
| 15015 | EPS-2019-881 | Job 6284 - FIX-0007_0006 - FIX PIN |
| 15015 | EPS-2019-882 | Job 6281 - FIX-0122_0100 - Fixture Prop Torque Meter Calibration |
| 15015 | EPS-2019-883 | Job 6286 - FIX-0147_0001 - FIXTURE - Fuel Pump Timing Tool (Assembly Tool) |
| 15015 | EPS-2019-884 | Job 1828 - FIX-0034_0001 - ASY -Fixture, BSH Installation (TVA PENDULUM) |
| 15015 | EPS-2019-885 | Job 1897 - FIX-0049_0000 - ASY - Crank Gear/Trigger Wheel Weld Fixture |
| 15015 | EPS-2019-886 | Job 4220 - FIX-0072_0004 - FIX - Press Sleeve, Inner |
| 15015 | EPS-2019-887 | Job 4221 - FIX-0072_0005 - FIX - Press Sleeve, Outer |
| 15015 | EPS-2019-888 | Job 6150 - FIX-0118_0001 - FIXTURE - INSP, EXHAUST Gasket |
| 15015 | EPS-2019-889 | Job 6151 - FIX-0119_0001 - FIXTURE - INSP, TURBO EXIT FLANGE |
| 15015 | EPS-2019-890.001 | Job 6248 - FIX-0141_0001 - FIX - ASSEMBLY, TC, BK1 |
| 15015 | EPS-2019-890.002 | Job 6248A - FIX-0141_00001 - FIX - ASSEMBLY, TC, BK1 |

| 15015 | EPS-2019-891.001 | Job 6249 - FIX - ASSEMBLY, TC, BK2 |
| 15015 | EPS-2019-891.002 | Job 6249A - FIX-0142_0001 - FIX - ASSEMBLY, TC, BK2 |
| 15015 | EPS-2020-892 | Job 1745 - FIX-0081_0001 - Water Jacket Leak Tester |
| 15015 | EPS-2020-893 | Job 4006 - FIX-0050_0070 - ASY - Short Block, Fixture |
| 15015 | EPS-2020-900 | Job 6029 - FIX-0104_0002 - Fix - Piece - CBAL BRG INSTALL, 2 |
| 15015 | EPS-2020-901 | Job 6090 - FIX-0100_0001 - Fix - Machining, Gauge (QTY 4) |
| 15015 | EPS-2020-902 | Job 6123 - FIX-0095_0001 - Fix - Inspection, PTO Cover |
| 15015 | EPS-2020-904 | Job 6228 - FIX-0132_0001 - Fixture - ALT Bracket Asy |
| 15015 | EPS-2020-905 | Job 6294 - FIX-0151_0001 - FIX - LEAK TEST, BLOCK BORES |
| 15015 | EPS-2020-906 | Job 1791 - FIX-0056_0000 - FIX - CRANKSHAFT, LOCKING FIXTURE (qty 3) |
| 15015 | EPS-2020-907 | Job 6230 - FIX-0132_0002 - FIXTURE - ALT BRACKET ASY, OP 2 |
| 15015 | EPS-2020-908 | Job 1801 - FIX-0045_0000 - ASY - CBAL FIXTURE (finished gear) |
| 15015 | EPS-2020-909 | Job 6318 - FIX-0153_0001 - FIX - BENDING, 3606PA SPRAY BAR, TUBE |

**15021 Furniture & Fixtures (OH)**

| 15021 | EPS 2012-068 | Tables and Chairs |
| 15021 | EPS 2012-069 | workbenches qty = 6, 6 drawer cabinet qty = 2, Shelving qty =7, 6 Level Rack qty = 1 |
| 15021 | EPS 2014-168 | Raw Materials Inventory Shelving in Fab Shop - Pallet Rack, Starter Unit & Add on Unit |
| 15021 | EPS 2015-251 | Inventory Racking |
| 15021 | EPS 2015-252 | Improvement to 4/16/15 Inventory Racking Purchase - Paint Racking & Materials) |
| 15021 | EPS 2015-253 | Qty - 1 - LPC - Luxxor Portable Camera Kit |
| 15021 | EPS 2015-254 | Toshiba IP PTZ Camera - IK-WB16A |
| 15021 | EPS 2016-290 | Heavy Duty Rack for Pipe and Bars, Complete Unit with One Usable Side, 54" X 84" X 31" (698.63 cost + 116.63 freight + 44.84 sales tax) |
| 15021 | EPS 2016-334 | Standard Flammable Storage Cabinet - Manual Doors, Yellow, 45 Gallon |
| 15021 | EPS-2017-554 | BK04041062 HOmak H2Pro 41in 6- drawer roller tool cabinet |
| 15021 | EPS-2017-575 | 399.063.03 Bekant Conference Table, Birch Veneer, Black |
| 15021 | EPS-2017-576 | 403.317.05 Millberget Swivel Chair, Bomstad Black |
| 15021 | EPS-2019-857 | DS-2DE4A220IW-DE Hikvision PTZ Camera |

**15022 Furniture & Fixtures (G&A)**

| 15022 | EPS 2015-240 | Coffee Machine - Refurbished Jura J9.3 One Touch TFT - Silver |
| 15022 | EPS 2015-241 | Office Chair |
| 15022 | EPS 2015-242 | Desk |
| 15022 | EPS 2016-392 | Refrigerator |
| 15022 | EPS 2016-393 | Microwave |
| 15022 | EPS 2016-394 | Dishwasher |
| 15022 | EPS-2019-846 | Qty 4 - Accounting Desk - Sit & Stand Desk with Screens |

**15031 Automobiles (OH)**

| 15031 | EPS 2011-031 | 2005 Ford E450(testing) with hitch |
| 15031 | EPS 2013-110 | Major Van repair |
| 15031 | EPS 2013-111 | Trailer |

**15040 Airplane**

| 15040 | EPS-2019-841 | Airplane |

**15051 Building Hangar 11-18**

| 15051 | EPS 2016-381 | Hangar 11-18 |

**15052 15052 - Bldg Improv 11-18**

| 15052 | EPS 2017-417 | Door Latches, Handles & Keys |

| | | |
|---|---|---|
| 15052 | EPS 2017-444.10 | Angle 6 X 4 X 1/2 X 20' |
| 15052 | EPS 2017-444.11 | Dyno Hookup |
| 15052 | EPS 2017-444.12 | Electrical Line Extension |
| 15052 | EPS 2017-444.13 | Materials for Build-out of Hangar 11-18 |
| 15052 | EPS 2017-444.14 | Materials & Labor for Build out of Hangar 11-18 |
| 15052 | EPS 2017-444.15 | Materials & Labor for Build out of Hangar 11-18 |
| 15052 | EPS 2017-444.16 | Materials & Labor for Build out of Hangar 11-18 |
| 15052 | EPS 2017-444.18 | TU 3x3x3/16 20' |
| 15052 | EPS 2017-444.19 | HRANG 1x1x1/8 20' |
| 15052 | EPS 2017-444.2 | Electrical Building Permit |
| 15052 | EPS 2017-444.20 | HR FL 1/4 x 6 20' |
| 15052 | EPS 2017-444.21 | Bend Plates Per Print |
| 15052 | EPS 2017-444.22 | 8x8 Compressor Room |
| 15052 | EPS 2017-444.23 | 50 x 20 Fabrication Room |
| 15052 | EPS 2017-444.24 | 36 x 20 Engine Rebuild Room |
| 15052 | EPS 2017-444.25 | WB241324 - Scratch Resistant Strip Door Curtain 10'W x 9"H |
| 15052 | EPS 2017-444.26 | Form steel plates |
| 15052 | EPS 2017-444.4 | Underground PVC for wiring from transformer to CT cabinet |
| 15052 | EPS 2017-444.6 | 400 Amp Service |
| 15052 | EPS 2017-444.7 | Fasteners for beams 113363 |
| 15052 | EPS 2017-444.8 | Fasteners for beams 110120435 |
| 15052 | EPS 2017-444.9 | WF Beam 12 x 22# |
| 15052 | EPS 2017-444.9 | WF Beam 12 x 22# |
| 15052 | EPS 2017-444.9 | WF Beam 12 x 22# |
| 15052 | EPS-2017-444.116 | Piping for cooling tower |
| 15052 | EPS-2017-444.117 | 1-Ventilation System for VFD Room |
| 15052 | EPS-2017-444.118 | Apply trawl applied 3/16" system in dyno area with TC. |
| 15052 | EPS-2017-444.119 | MDD8080-8 - 8'0" Width, 8'0" Height, 18 Gauge, Cold Roll Steel, Steelcraft Hinge, #8 Right Hand Reverse Active, (1) 4'0" X 8'0" Hollow Metal Door, Lock Prep, (1) 4'0" X 8'0" Hollow Metal Door (Inactive Door) With Astragal And (2) Flush Bolts Installed |
| 15052 | EPS-2017-444.120 | Qty 2 - MDD5080-8 - 5'0" Width, 8'0" Height, 18 Gauge, Cold Roll Steel, Steelcraft Hinge, #8 Right Hand Reverse Active, (1) 2'6" X 8'0" Hollow Metal Door, Lock Prep, (1) 2'6" X 8'0" Hollow Metal Door (Inactive Door) With Astragal And (2) Flush Bolts Installed |
| 15052 | EPS-2017-444.121 | Qty 2 - MDD5080-7 - 5'0" Width, 8'0" Height, 18 Gauge, Cold Roll Steel, Steelcraft Hinge, #7 Left Hand Reverse Active, (1) 2'6" X 8'0" Hollow Metal Door, Lock Prep, (1) 2'6" X 8'0" Hollow Metal Door (Inactive Door) With Astragal And (2) Flush Bolts Installed |
| 15052 | EPS-2017-444.122 | MD3070SC-161 - 3'0" Width, 7'0" Height, 35-3/4" x 83-1/4" Actual Size, Galvannealed, 18 Gauge, Steelcraft Hinge, 161 Lock Prep |
| 15052 | EPS-2017-444.123 | MD3070SC-161 - 3'0" Width, 7'0" Height, 35-3/4" x 83-1/4" Actual Size, Galvannealed, 18 Gauge, Steelcraft Hinge, 161 Lock Prep |
| 15052 | EPS-2017-444.124 | Prop Building Electrical, 100amp Service in IT room outside, Underground Piping to prop building, Wiring receptacles in IT room, 2 LED strip lights |
| 15052 | EPS-2017-444.125 | Piping and Electrical for Dyno Room, LED lights by garage door, Wiring |
| 15052 | EPS-2017-444.134 | Air Exchanger installed for upstairs offices |
| 15052 | EPS-2017-444.145 | Blinds For Viewing/testing room |
| 15052 | EPS-2017-444.157 | Chain Fence |

12569612v.24

| 15052 | EPS-2017-444.185 | 75345K27 - Washdown Enclosure with See-Through Cover Side Hinge and Slotted Latch, 30" x 24" x 12" (EPS- 022-6) |
| 15052 | EPS-2017-444.186 | 75345K27 - Washdown Enclosure with See-Through Cover Side Hinge and Slotted Latch, 30" x 24" x 12" (EPS- 022-7) |
| 15052 | EPS-2017-444.187 | monst outlets strip, hose heater, tube vinyl, pipe cut, hex busing, hose barb EPS-022-6 |
| 15052 | EPS-2017-444.188 | hose fuel, hose barb, adaptor galv (EPS-022-6) |
| 15052 | EPS-2017-444.189 | Solder Plumbers Kit, Builder Hardware, Wago 3Conductor (EPS-022-6) |
| 15052 | EPS-2017-444.190 | heating, elbow 90, couple black steel, comp connector, plub black, comp connector, hardware (EPS-0... |
| 15052 | EPS-2017-444.191 | Gasket maker (eps-022-6) |
| 15052 | EPS-2017-444.192 | Dyno Cell Fuel System: Use pipe and fittings EPS has provided for the system and install from out... |
| 15052 | EPS-2017-444.193 | 3/4" - 90 Degree Fittings EPS-022-6 |
| 15052 | EPS-2017-444.194 | connector cordgrp 1/2", connector combination 3/8, Cord power 16/3 sjtw 9' (EPS-022-7) |
| **15053 15053 - Hangar 11-16** | | |
| 15053 | EPS 2017-409 | Hangar 11-16, 625 W Hangar Road, New Richmond, WI  54017 |
| **15054 · 15054 - Bldg Improv 11-16** | | |
| 15054 | EPS 2015-259 | Improvements to Hangar 11-16, Manufacturing Shop |
| 15054 | EPS 2015-260 | Screen Doors added to Hangar 11-16, Manufacturing Shop |
| 15054 | EPS 2017-418 | Door Latches, Handles & Keys |
| 15054 | EPS 2017-448 | Security System |
| **15057 Leasehold Improvements Complete** | | |
| 15057 | EPS 2017-447 | Security System |
| **15061 Software (OH)** | | |
| 15061 | EPS 2014-158 | PO# 2014-00300 -- hyperMILL/hyper CAD Software |
| 15061 | EPS 2015-232 | CAM Software hyperMILL/hyper CAD® - 3D Expert |
| 15061 | EPS 2015-233 | hyperMILL® MAXX Roughing |
| 15061 | EPS 2016-331 | HMOM-0000UA-EXP  -  CAM Software, hyperMILL/hyper CAD® - 3D Expert, all 2D/3D/HSC CAM functions, internal simulation, |
| 15061 | EPS 2017-421 | Calypso Software |
| **15062 · Software (OH)** | | |
| 15062 | EPS 2016-308 | Bosch - Machine Named license for INCA Can-Trsmit add-on |
| 15062 | EPS 2016-353 | Net.AG - software tool for importing Bosch sets into EPS Integrity Implementation |
| **15063 · Software (G&A)** | | |
| **15064 · Software - CIP** | | |
| **15065 · Diagnostic Test Equipment** | | |
| 15065 | EPS 2016-314 | Advanced generic plugin for Serial Communication. It can receive serial date and extract text or numeric values from the byte stream. It allows also to send data to the serial device (e.g., on start of storing or every n seconds, etc.) (Note: part of monitoring and control racks) |
| 15065 | EPS 2016-350 | Qty 2 - Gas Measurement Equipment |
| 15065 | EPS 2016-388-1 | Job# 2009 - Fixed Asset - Data Acquisition Harness - In Progress |
| 15065 | EPS-2017-533 | Mass Flow Fuel Meter |
| 15065 | EPS-2017-534 | Closed Loop Cooling System |
| 15065 | EPS-2017-535 | AC Regen CAC Control |
| 15065 | EPS-2017-536 | Cooling Tower |

| 15065 | EPS 2011-001 | Dewtron Tools |
|-------|--------------|---------------|
| 15065 | EPS 2011-002 | Measurement Groups Tools |
| 15065 | EPS 2012-041 | Dewetron Test Equipment |
| 15065 | EPS 2013-073 | tools (Quality Control) |
| 15065 | EPS 2013-074 | Additional Parts to DWUS01 EPS000380 (Note: additional items in transport case with DWUS01) |
| 15065 | EPS 2013-075 | $50,365.70 DWUS03 Desktop Version DEWETRON$ 1,856.80 DWUSACC010 Thermo Amplifier$ 1,477.00 DWUSACC011 Voltage Amplifier$ 1,856.80 DWUSACC012 Thermo Amplifier |
| 15065 | EPS 2013-076 | DWUSACC012 GPS Receiver (Note: part of monitoring and control racks) |
| 15065 | EPS 2013-077 | DWUSACC013 GPS Receiver (Note: part of monitoring and control racks) |
| 15065 | EPS 2014-123 | DEWE-DCDC-24-300-ISO (External DC/DC converter with isolation, 9 to 36 VDC input range, LEMO EGJ.3B.302, including 2 m cable to banana jacks, 24 VDC output, 300 W, LEMO EGG.2B.302 connector) [Dewetron] DWUSACC015 (note: assume to be part of monitoring and control racks) |
| 15065 | EPS 2014-124 | EPAD2-TH8-T -- Dewetron: 8 channel high precision thermocouple amplifier, LEMO EGG.1B.304 RS-485 interface, 8 differential input channels, 8x 24-bit A/D converter, up to 12 samples/sec/channel, simultaneous sampling, 350 V isolation, thermocouple type T, accuracy ±0.4 °C, typ. ±0.2 °C [Dewetron] DWUSACC014 (note: part of monitoring and control racks) |
| 15065 | EPS 2014-125 | Dynamic Data Logger [Dewetron] DWUS04 |
| 15065 | EPS 2014-126 | 01-101532-AAA-AAA: 1.5" On Board Coolant Electromagnetic Flow Meter System [Flow Technology] |
| 15065 | EPS 2015-171 | Mobile Test Controller (note: controller hardware suite in dyno room) |
| 15065 | EPS 2015-172 | Calibration Tool - Qty 1 - ES592 ETK, CAN and LIN Interface Module (EPS-012) (note: part of engine control and monitoring rack) |
| **15071 Computer Equipment (COGS)** | | |
| 15071 | EPS 2017-451 | ThinkPad Computer |
| 15071 | EPS 2017-482 | Lenovo ThinkPad T560 w/ Dock |
| 15071 | EPS 2017-483 | Lenovo ThinkPad T540p |
| 15071 | EPS-2019-819 | Lenovo ThinkStation P330 (QTY 4) |
| 15071 | EPS-2019-829 | Lenovo ThinkPad P52 |
| **15072 Computer Equipment (OH)** | | |
| 15072 | EPS 2011-034 | NB Sony/VAIO/Software/ETC - ELTEUMJV |
| 15072 | EPS 2012-065 | EPSHPC01 - HPC Server |
| 15072 | EPS 2012-066 | EPSHPC02 - HPC |
| 15072 | EPS 2013-113 | Epson 3880 shop |
| 15072 | EPS 2013-114 | Newegg ECADUSCA01 |
| 15072 | EPS 2013-115 | Newegg ECADUSCA01 |
| 15072 | EPS 2013-116 | Lenovo ELTUSDR |
| 15072 | EPS 2014-163 | eltuswi01:  3443CTO: ThinkPad X1 Carbon |
| 15072 | EPS 2014-164 | Projector for Shop: Optoma HD131Xw HD 1920 x 1080, 2500 Lumens, 2 HDMI Inputs, 3D Ready Gaming Projector |
| 15072 | EPS 2014-165 | eltuswi02 - Lenovo Computer |
| 15072 | EPS 2014-166 | Backup desktop computer - ECADUSWI01 |
| 15072 | EPS 2014-167 | Laptop ELTUSWI03 |
| 15072 | EPS 2015-245 | ThinkPad W540 Laptop |
| 15072 | EPS 2015-247 | ecamuswi01 - Lenovo ThinkStation P300 Tower Workstation |
| 15072 | EPS 2015-248 | 2015-03-31 - Amazon - Lenovo ThinkPad W540-eltuswi05 |
| 15072 | EPS 2015-249 | ThinkCentre M93p - Computer for the Ford Van - etestuswi01 |

| 15072 | EPS 2015-250 | Lenovo W550S with accessories and 3 yr warranty |
|-------|--------------|-------------------------------------------------|
| 15072 | EPS 2016-302 | Lenovo P50 with accessories and 3 yr warranty |
| 15072 | EPS 2016-348 | BX80660E52640V4 - Xeon E5-2640 V4 |
| 15072 | EPS 2016-349 | D42132G4S - Samsung DDR4-2133 32GB |
| 15072 | EPS 2016-354 | Lenovo ThinkPad P50 |
| 15072 | EPS 2016-354a | Dock for Lenovo ThinkPad P50 |
| 15072 | EPS 2016-365 | Lenovo ThinkPad P50 (QC) |
| 15072 | EPS 2016-365a | Lenovo Backpack for ThinkPad (QC) |
| 15072 | EPS 2016-365b | Lenovo Dock for Think Pad (QC) |
| 15072 | EPS 2017-422 | ThinkPad P50 SN#PC0JGGVD |
| 15072 | EPS 2017-423 | ThinkPad Dock SN#M2D03B57 |
| 15072 | EPS 2017-468 | Adapter for ThinkPad Computer (ELTUSWI22 - Serial #PC0KK6L0) |
| 15072 | EPS 2017-469 | ThinkPad Computer (ELTUSWI22 - Serial #PC0KK6L0) |
| 15072 | EPS 2017-470 | Dock for Laptop Asset # EPS 2016-396-1 |
| 15072 | EPS 2017-502 | ThinkPad Workstation Dock |
| 15072 | EPS 2017-503 | ThinkPad Workstation Dock |
| 15072 | EPS 2017-527 | Lenovo P51 - Serial # PF0SF4LL |
| 15072 | EPS 2017-528 | Lenovo P51 - SN PF0SDQS6 |
| 15072 | EPS-2018-783 | Dell Poweredge R420 |
| 15072 | EPS-2018-786 | Hikvision DS-7716NI-I4/16P NVR |
| 15072 | EPS-2019-830 | Lenovo ThinkPad P51 Mobile Workstation 20HH000TUS - Intel QuadCore i7-7700HQ, 16GB DDR4 RAM, 512GB PCIe NVMe SSD, 15.6" FHD IPS; 1920x1080 Display, NVIDIA Quadro M1200 4GB, Windows 10 Pro |
| **15073 Computer Equipment (G&A)** | | |
| 15073 | EPS 2011-023 | MPB 15.4 Laptop - Serial #W81021ZNAGZ |
| 15073 | EPS 2011-028 | Jawbone BT Jambox Speaker (For telecommunications) |
| 15073 | EPS 2011-030 | Fijitsu Duplex Scanner |
| 15073 | EPS 2012-055 | LED Projector/Screen |
| 15073 | EPS 2012-057 | Computer Spare Parts |
| 15073 | EPS 2012-058 | Diskless Computer Storage - NAS-001 |
| 15073 | EPS 2012-061 | IT HardWare-Provantage - Tape Drive |
| 15073 | EPS 2012-063 | Label Printer |
| 15073 | EPS 2013-103 | Lenovo ThinkPad W350, EPS-011 CAM LAPTOP |
| 15073 | EPS 2013-104 | Lenovo ELTUSWI13 |
| 15073 | EPS 2013-105 | Newegg ELTUSAR (Monitor, Headset, Keyboard, Mouse) |
| 15073 | EPS 2013-106 | Epson 3880 office |
| 15073 | EPS 2014-159 | Conference Room Projector Screen - Samsung 65" Class 1080p 120H Smart 3D LED TV - UN65F6400AFXZA [NewEgg] |
| 15073 | EPS 2014-160 | emiscuswi02 - Conference Room Computer |
| 15073 | EPS 2014-161 | ecaduswi02: computer |
| 15073 | EPS 2014-162 | esvruswiqb - Dell Poweredge R710 Server - QuickBooks Server |
| 15073 | EPS 2015-234 | epshpc04 Computer |
| 15073 | EPS 2015-235 | Think Pad X1 Carbon |
| 15073 | EPS 2015-236 | EPS Server Rack 01 |
| 15073 | EPS 2015-237 | Lenovo ThinkPad T550 |
| 15073 | EPS 2015-238 | ThinkPad W550s Mobile Workstation and Dock - 90W -named: eltuswi08 |
| 15073 | EPS 2015-239 | Samsung 850 Pro 2TB SSD - for - eltuswi08 |
| 15073 | EPS 2016-328 | Lenovo P50 with accessories and 3 yr warranty - ELTUSWI12 |
| 15073 | EPS 2016-361 | HP ProLiant Server (1) |

| 15073 | EPS 2016-362 | HP ProLiant Server (2) |
|-------|--------------|------------------------|
| 15073 | EPS 2016-363 | HP ProLiant Server (3) |
| 15073 | EPS 2016-364 | Lenovo ThinkPad P50 |
| 15073 | EPS 2016-364a | Lenovo Dock for ThinkPad P50 |
| 15073 | EPS 2016-395 | Lenovo ThinkPad T560 |
| 15073 | EPS 2016-396 | Lenovo ThinkPad T560 |
| 15073 | EPS 2017-424 | Netgear 4300 Switch |
| 15073 | EPS 2017-425 | Netgear 4300 Switch |
| 15073 | EPS 2017-449 | HP 2920-48G |
| 15073 | EPS 2017-450 | 26U Wall Mount |
| 15073 | EPS 2017-529 | Jabra Speak 810 |
| 15073 | EPS 2017-530 | HP ProLiant DL360p Gen8 8 SFF Chassis - SQL Server Hardware |
| 15073 | EPS-2018-646 | Quantum LTO-8 Tape Drive External SAS Tabletop Kit |
| 15073 | EPS-2018-792 | ThinkPad T580 |
| 15073 | EPS-2018-793 | Lenovo ThinkPad T580 |
| 15073 | EPS-2019-820 | Lenovo T580 |
| 15073 | EPS-2019-831 | Lenovo 20LB0010US ThinkPad P52s Mobile Workstation Laptop: Intel Core i5-8350U (Quadcore, up to 3.6GHz, 6MB), 15.6" Full HD (1920x1080) IPS Display, 256 GB PCIe NVMe SSD, 8 GB RAM, Win 10 Pro, |

| **Miscellaneous** | |
|-------------------|-------------|
| **Location** | **Description** |
| 16 & 18 | Tool cabinets and machining fixtures |
| 16 | Tool setters, DMG/DMU UNO 14 20 (Qty 2) |
| 16 & 18 | Toolboxes and all tools including but not limited to hand tools, fabrication tools, electrical tools |
| 18 | Load Bank, blue, 300 amp |
| 16 & 18 | All propulsion system components, including but not limited to items in stock rooms 2 and 3, as well as all in-process, non-conforming, and accepted hardware |
| vendors | All tooling at all vendors, including but not limited to tools for forging, machining, and casting |
| 18 | Dewetron #1, DWUS01, and related equipment |
| 18 | Dewetron #2, DWUS02, and related equipment |
| 18 | Dewetron #5, DWUS05, and rack of equipment in which it is installed |
| vendors | crankshaft inventory and tools at Asca (Italy), including but not limited to steal forgings and forging tools |
| vendors | component and or assembly inventory at all vendors |
| 18 & 16 | passwords for servers and encryption keys for tapes |
| all | servers, free NAS, tapes, and tape drives in all US offices |

## Schedule 1.2(d) Work-In-Progress

None.

## Schedule 1.2(k) Hangars

The airplane hangar located upon the premises commonly referred to as Lot 18 Row 11 of the New Richmond Municipal Airport, New Richmond Wisconsin, and more specifically described as:

> LOT 18, ROW 11 OF THE AIRPORT LAYOUT PLAN DATED SEPTEMBER 1, 1989, BEING PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER (S 1/2 OF NE 1/4) AND THE NORTH HALF OF THE SOUTHEAST QUARTER (N 1/2 OF THE SE 1/4) AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER (SW 1/4 OF THE SW 1/4) OF SECTION TWENTY-FIVE (S25), TOWNSHIP THIRTY-ONE NORTH (T31N), RANGE EIGHTEEN WEST (R18W), IN THE CITY OF NEW RICHMOND, ST. CROIX COUNTY, WISCONSIN.

The airplane hangar located upon the premises commonly referred to as Lot 16 Row 11 of the New Richmond Municipal Airport, New Richmond Wisconsin, and more specifically described as:

> LOT 16, ROW 11 OF THE AIRPORT LAYOUT PLAN DATED SEPTEMBER 1, 1989, BEING PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER (S 1/2 OF NE 1/4) AND THE NORTH HALF OF THE SOUTHEAST QUARTER (N 1/2 OF THE SE 1/4) AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER (SW 1/4 OF THE SW 1/4) OF SECTION TWENTY-FIVE (S25), TOWNSHIP THIRTY-ONE NORTH (T31N), RANGE EIGHTEEN WEST (R18W), IN THE CITY OF NEW RICHMOND, ST. CROIX COUNTY, WISCONSIN.

## Schedule 1.3(a) Assumed Liabilities

None.

## Schedule 2.2 Purchase Price Allocation

| | | |
|---|---|---|
| Pre-paid deposit | | 161,300[3] |
| Personal property taxes - closing | | 26,797.00 |
| Directors & Officers Tail Policy-closing | | 34,000.00 |
| Post-petition A/P (excluding Bosch and EPS GmbH)-closing | | 35,098.00 |
| Carveout for Professionals- closing to be held in escrow by Steinhilber Swanson LLP in trust pending court orders authorizing professional compensation and any sum thereafter remaining shall be refunded by Steinhilber directly to Buyer.  These carved out funds are not property of the bankruptcy estate and are specifically reserved for the professionals alone.  The Carveout breakdown is included on the next page. | | 718,538.00 |
| U.S. Trustee Quarterly Fees-closing | | 58,266.00 |
| Miscellaneous Run-off expenses- closing | | 400.00 |
| Satisfaction of Obligations to Equipment Finance Lenders- closing | | 1,653,010.00[4] |
| U.S. Bank Equipment Finance | | |
| Wisconsin Department of Administration | | |
| First National Community Bank | | |
| Total Purchase Price | | 2,687,409.00 |
| Credit for Prepaid Deposit | | (161,300.00) |
| May, 2021 | 131,300.00 | |
| June, 2021 | 30,000.00 | |
| | | |
| Total cash from Buyer at Closing | | 2,526,109.00 |
| | | |
| | | |

[3] Includes estimate for utility invoices and week 24 nationwide business insurance premium – amounts subject to adjustment based on actual invoices received.

[4] Or the actual sums shown on the three equipment lender payoffs as of closing date.

| Invoice Date | Invoice # | Fees | Expenses | Finance Charge | Total Invoice | UST Objected Fees | Amount Paid | Outstanding Accrual/Estimates |
|---|---|---|---|---|---|---|---|---|
| **Steinhilber** | | | | | | | | |
| 8/31/2020 | 4184 | 135,746.50 | 5,039.30 | | 140,785.80 | 5,482.50 | 109,250.50 | 26,052.80 |
| 9/30/2020 | 4234 | 25,812.50 | 358.76 | | 26,171.26 | 300.00 | 20,768.76 | 5,102.50 |
| 10/31/2020 | 4379 | 56,251.50 | 4,705.79 | | 60,957.29 | 4,755.00 | 45,902.99 | 10,299.30 |
| 11/30/2020 | 4456 | 68,292.50 | 161.08 | | 68,453.58 | 112.50 | 54,705.08 | 13,636.00 |
| 12/31/2020 | 4621 | 30,482.00 | 1,336.71 | | 31,818.71 | | | 31,818.71 |
| 1/31/2021 | 4767 | 19,425.00 | | | 19,425.00 | | | 19,425.00 |
| 2/28/2021 | 4834 | 21,015.00 | 573.00 | | 21,588.00 | | | 21,588.00 |
| 3/31/2021 | 4930 | 37,583.00 | | | 37,583.00 | | | 37,583.00 |
| 4/30/2021 | | 30,655.00 | 944.73 | | 31,599.73 | | | 31,599.73 |
| Estimate May | | 45,000.00 | | | 45,000.00 | | | 45,000.00 |
| Estimate June | | 55,000.00 | | | 55,000.00 | | | 55,000.00 |
| Estimate Run Off | | - | | | - | | | |
| **Steinhilber Total** | | 525,263.00 | 13,119.37 | - | 538,382.37 | 10,650.00 | 230,627.33 | 297,105.04 |
| **Jarchow** | | | | | | | | |
| 7/31/2020 | 1752 - post | 1,860.00 | | | 1,860.00 | 1,860.00 | | - |
| 9/2/2020 | 1789 | 8,655.00 | | 173.97 | 8,828.97 | 4,335.00 | 3,595.18 | 898.79 |
| 10/6/2020 | 1819 | 2,640.00 | | 26.40 | 2,666.40 | | 2,133.12 | 533.28 |
| 11/2/2020 | 1844 | 8,280.00 | | | 8,280.00 | | 6,624.00 | 1,656.00 |
| 12/14/2020 | 1891 | 11,265.00 | | | 11,265.00 | | 9,012.00 | 2,253.00 |
| 1/12/2021 | 1919 | 3,540.00 | | | 3,540.00 | | | 3,540.00 |
| 2/4/2021 | 1931 | 2,475.00 | | | 2,475.00 | | | 2,475.00 |
| 3/2/2021 | 1969 | 1,410.00 | | | 1,410.00 | | | 1,410.00 |
| 4/5/2021 | 2026 | 4,995.00 | | | 4,995.00 | | | 4,995.00 |
| 5/6/2021 | 2073 | 1,290.00 | | | 1,290.00 | | | 1,290.00 |
| Estimate May | | 5,000.00 | | | 5,000.00 | | | 5,000.00 |
| Estimate June | | 2,500.00 | | | 2,500.00 | | | 2,500.00 |
| Estimate Run Off | | 5,000.00 | | | 5,000.00 | | | 5,000.00 |
| **Jarchow Total** | | 58,910.00 | - | 200.37 | 59,110.37 | 6,195.00 | 21,364.30 | 31,551.07 |
| **Peters, Revnew, Kappenman & Anderson, P.A** | | | | | | | | |
| 9/1/2020 | 69541 | 639.00 | | | 639.00 | | | 639.00 |
| 1/21/2021 | 70431 | 324.00 | | | 324.00 | | | 324.00 |
| 4/9/2021 | 70841 | 345.00 | | | 345.00 | | | 345.00 |
| **Peters, Revnew, Kappenman & Anderson, P.A To** | | 1,308.00 | - | - | 1,308.00 | - | - | 1,308.00 |
| **Baker Botts LLP** | | | | | | | | |
| to date | | 278,313.50 | | | 278,313.50 | | | 278,313.50 |
| to case closing est | | 20,000.00 | | | 20,000.00 | | | 20,000.00 |
| **Baker Botts LLP Total** | | 298,313.50 | - | - | 298,313.50 | - | - | 298,313.50 |
| **Patterson Thuente Pederson, P.A.** | | | | | | | | |
| Sept 2020 through March 16, 2021 | | 9,257.50 | 18,909.86 | | 28,167.36 | | | 28,167.36 |
| 5/5/2021 | | 5,629.57 | | | 5,629.57 | | | 5,629.57 |
| quote May and June | | 5,000.00 | | | 5,000.00 | | | 5,000.00 |
| quote patent actions | | 14,080.00 | | | 14,080.00 | | | 14,080.00 |
| **Patterson Thuente Pederson P.A. Total** | | 33,967.07 | 18,909.86 | - | 52,876.93 | - | - | 52,876.93 |
| **Guinn, Vinopal & Zahradka LLP** | | | | | | | | |
| 11/11/2020 | 23993 | 9,200.00 | | | 9,200.00 | | | 9,200.00 |
| 1/28/2021 | 7043 | 333.75 | | | 333.75 | | | 333.75 |
| Estimate Closing | | 450.00 | | | 450.00 | | | 450.00 |
| **Guinn Total** | | 9,983.75 | - | - | 9,983.75 | - | - | 9,983.75 |
| **Simma Flottemesch & Ohrenstein** | | | | | | | | |
| 12/31/2020 | 68951 | 2,399.25 | | | 2,399.25 | | | 2,399.25 |
| Estimated Post Closing | | | | | | | | |
| 2020 & 2021 tax returns | | 25,000.00 | | | 25,000.00 | | | 25,000.00 |
| **SFO Total** | | 27,399.25 | - | - | 27,399.25 | - | - | 27,399.25 |
| **Total Legal-Professional** | | | | | | | | 718,537.54 |

## Schedule 2.3(a) Seller's Executory Contracts

| Contract Counterparty | Contract Description |
|---|---|
| ADT Security LLC | Security system at office, Hanger 11-16, & Hanger 11-18 |
| AFCO | Business Insurance Premium Finance Company |
| AON: Nationwide/Global Aerospace | AON: Insurance brokerage<br>Nationwide and Global: Business Insurance (Property, Gen. Liability, Workers Comp, Transit, Aviation Products Liability) |
| American Family Insurance | Life Insurance for Michael Fuchs |
| Bosch Aviation Technology LLC | Contract for research and development for electronic control development |
| Bosch General Aviation Technology GmbH | Contract for research and development for electronic control development |
| Canon Financial Services, Inc. | Canon Printer -Model OCE Colorwave 500 |
| City of New Richmond | Lease of Lot 18, Row 11 of New Richmond Municipal Airport<br>Lease of Lot 16, Row 11 of New Richmond Municipal Airport |
| Delta Dental of WI | Group Dental Insurance Provider |
| DMG Mori USA | maintenance & annual software machines |
| EPIC Specialty Benefits | Group life insurance, short term disability insurance, long term disability insurance |
| GM Financial | 2019 Chevrolet Suburban |
| InspectionXpert Corporation | Software-Quality-Inspection |
| John Hancock Retirement Plan Services | 401(k) Plan |
| Manitou Properties, LLC | Lease Agreement-156 High Street, Ste 100C |
| Medica | Group Health Insurance Provider |
| Michael Fuchs - Employment Agreement | Executive Employment Agreement |
| Mike Driessen | Sublease: Hangar 13-3 at New Richmond Municipal airport |
| National Technical Systems (NTS Boxborough) | Environmental testing |
| NET.AG System Integration | software product life management system & requirement management system - annual |
| OPEN MIND Technologies USA Inc. | machine software & annual maintenance |
| PQ Systems | Software for tracking calibration |
| SoftwareOne | software license with annual maintenance |
| SSL.com | 2-year subscription renewal for eps.aero |
| Thru, Inc. | Software to send secure attachments. |
| T-Mobile | Corporate Cell Phone Plan |
| Zhengyi Development Aviation Industry Co., Ltd. | Technology License Contract dated July 5, 2019 |
| Wei Hang<br>Zhengyi Development International Investment Holding Limited Liability Company | Equity Joint Venture Contract dated July 5, 2019 |

12569612v.24

## <u>Schedule 2.3(b) Assumed Contract List</u>

1.  That certain lease dated January 13, 2017, between the City of New
    Richmond, Wisconsin and Engineered Propulsion Systems, Inc., for the
    real property known as Lot 16 Row 11 of the New Richmond Municipal
    Airport, New Richmond Wisconsin.

2.  That certain lease dated January 13, 2017, between the City of New
    Richmond, Wisconsin and Engineered Propulsion Systems, Inc., for the
    real property known as Lot 18 Row 11 of the New Richmond Municipal
    Airport, New Richmond Wisconsin.

3.  That certain "Small Business Contract" between ADT LLC dba ADT
    Security Services and Engineered Propulsion Systems, Inc., dated
    December 15, 2016.

### Schedule 3.10 -- Executory Contract or Unexpired Lease Assigned or Transferred to any Third Party.

None.

## Schedule 3.11(a) – Intellectual Property

| PTP Ref. | AppTitle | Country Name | Status | App Number | Filing Date | Pub Number | Pat Number | Iss Date | Renewal Date | Action Date | Action |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3957.01US02 | ENGINE WITH HYBRID CRANKCASE | United States of America | Granted | 11/879,011 | 13-Jul-07 | US2008002963 | US7509936 | 31-Mar-09 | | | |
| 3957.02US02 | AERO COMPRESSION COMBUSTION DRIVE ASSEMBLY CONTROL SYSTEM<br>aka Injection Control Strategy for Low Cetane Fuel | United States of America | Granted | 13/646,576 | 5-Oct-12 | US2013029155O | US961117SO | 4-Apr-17 | 4-Oct-24 | | |
| 3957.02WOAU | | Australia | Granted | 2012318370 | 5-Oct-12 | AU2012318370 | AU2012318370 | 9-Mar-17 | 5-Oct-21 | | |
| 3957.02WOBR | | Brazil | Published | 1120140083088 | 5-Oct-12 | BB112014008308 | | | 5-Oct-21 | 7-Jun-21 | Pay Final Fees ($1290) |
| 3957.02WOCA | | Canada | Granted | 2,853,748 | 5-Oct-12 | CA2853748 | CA2853748 | 7-Jul-20 | 5-Oct-21 | | |
| 3957.02WOCN | | China (People's Republic) | Granted | 201280060010.3 | 5-Oct-12 | CN100660952 | CN100660952 | 22-Dec-20 | 5-Oct-21 | 22-Jun-21 | Request for Grant Deadline ($1000) |
| 3957.02WOCNHK01 | | Hong Kong | Published | 15102898.2 | 5-Oct-12 | HK1202604 | | | 5-Oct-21 | | |
| 3957.02WOEP | | European Patent Convention | Published | 12838031.8 | 5-Oct-12 | EP2764723 | | | 5-Oct-21 | 24-Jun-21 | Divisional/Grant Formalities ($1000) |
| 3957.02WOIN | | India | Published | 741/MUMNP/2014 | 5-Oct-12 | IN741MUN2014 | | | | | |
| 3957.02WORU | | Russian Federation | Granted | 2014117700 | 5-Oct-12 | RU2014117700 | RU2616730 | 18-Apr-17 | 5-Oct-21 | | |
| 3957.02US03 | aka Combustion Tuning to Avoid Harmful Natural Resonance Frequencies | United States of America | Published | 15/422,613 | 2-Feb-17 | US2017014594S | US10598119 | 24-Mar-20 | 24-Sep-23 | | |
| 3957.02US04 | Filed with original parent claims | United States of America | Published | 16/827,142 | 23-Mar-20 | US2020039292O | | | | 16-Oct-21 | Response to OA due ($2500) |

12569612v.24

125696612v.24

| Ref | Description | Country | Status | Application No. | Date | Publication No. | Patent No. | Date | Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 3957.03US02 | aka Eight Cylinder Flat Vee Ignition Order | United States of America | Granted | 13/650,569 | 12-Oct-12 | US20130112158 | US9181868 | 10-Nov-15 | 10-May-23 | |
| 3957.03WOAU | | Australia | Granted | 2012322066 | 12-Oct-12 | AU2012322066 | AU2012322066 | 5-Jan-17 | 12-Oct-21 | |
| 3957.03WOBR | | Brazil | Pending | 112014009386 | 12-Oct-12 | BR112014009038 | | | 12-Oct-21 | 7-Jun-21 |
| 3957.03WOCA | | Canada | Granted | 2,854,230 | 12-Oct-12 | CA2854230 | CA2854230 | 8-Dec-20 | 12-Oct-21 | Pay Final Fees ($1290) |
| 3957.03WOCN | | China (People's Republic) | Granted | 2012800612933 | 12-Oct-12 | CN104145104 | CN104145104 | 23-Feb-18 | 12-Oct-21 | |
| 3957.03WOCNHK01 | | Hong Kong | Published | 15107509.9 | 12-Oct-12 | HK1202605 | | | | |
| 3957.03WOEP | | European Patent Convention | Granted | 12839362.6 | 12-Oct-12 | EP2766588 | EP2766588 | 21-Jun-17 | 21-Jun-17 | |
| 3957.03WOEPAT01 | | Austria | Granted | 12839362.6 | 12-Oct-12 | Validation | | 21-Jun-17 | 12-Oct-21 | |
| 3957.03WOEPCH01 | | Switzerland | Granted | 12839362.6 | 12-Oct-12 | Validation | | 21-Jun-17 | 12-Oct-21 | |
| 3957.03WOEPDE01 | | Germany | Granted | 12839362.6 | 12-Oct-12 | Validation | DE602012033807.5 | 21-Jun-17 | 12-Oct-21 | |
| 3957.03WOEPFR01 | | France | Granted | 12839362.6 | 12-Oct-12 | Validation | | 21-Jun-17 | 12-Oct-21 | |
| 3957.03WOEPGB01 | | United Kingdom | Granted | 12839362.6 | 12-Oct-12 | Validation | | 21-Jun-17 | 12-Oct-21 | |
| 3957.03WOEPIT01 | | Italy | Granted | 12839362.6 | 12-Oct-12 | Validation | | 21-Jun-17 | 12-Oct-21 | |
| 3957.03WOIN | | India | Published | 3208/DELNP/2014 | 12-Oct-12 | IN3208DEN2014 | | | | |
| 3957.03WORU | | Russian Federation | Published | 2014118576 | 12-Oct-12 | RU2014118576 | RU2628680 | 21-Aug-17 | 12-Oct-21 | |
| 3957.03US03 | aka Eight Cylinder Engine with Independently Operable Cylinder Banks | United States of America | Granted | 14/918,750 | 21-Oct-15 | US20160102605 | US9447729 | 20-Sep-16 | 20-Mar-24 | |

AN AERODIESEL ENGINE

ENHANCED AERO DIESEL ENGINE

12569912v.24

| Reference | Country | Status | Application No. | Date | Publication No. | Date | Date | Action |
|---|---|---|---|---|---|---|---|---|
| 3957.07W0US01 | United States of America | Published | 16/632,783 | 20-Jul-18 | US20200158015 | | 9-Oct-21 | Response to OA due ($2500) |
| 3957.07W0AU01 | Australia | Published | 2018304462 | 20-Jul-18 | AU2018304462 | 20-Jul-22 | | Request Exam Deadline ($1000) |
| 3957.07W0BR01 | Brazil | Published | 112020001304 8 | 20-Jul-18 | BR112020001304 8 | 20-Jul-21 | | |
| 3957.07W0CA01 | Canada | Published | 3070483 | 20-Jul-18 | CA3070483 | 20-Jul-21 | | Request Exam Deadline ($1000) |
| 3957.07W0CN01 | China (People's Republic) | Published | 201880060888.4 | 20-Jul-18 | CN111108275 | | | |
| 3957.07W0EP01 | European Patent Convention | Published | 18835228.0 | 20-Jul-18 | EP3655635 | 20-Jul-21 | | |
| 3957.07W0IN01 | India | Pending | 202017007206 | 20-Jul-18 | | | 20-Jul-21 | Request Exam Deadline ($1000) |
| 3957.07W0RU01 | Russian Federation | Pending | 2020107663 | 20-Jul-18 | | | 20-Jul-21 | Request Exam Deadline ($1000) |

## <u>Schedule 3.11(b) Licenses, Transfers and Assignments of Rights in Intellectual Property to Any Governmental Entity</u>

None.

## Schedule 3.11(c) Infringement

None.

## Schedule 3.14 Environmental Matters

None.

_____